**IN RE CIPROFLOXACIN HYDRO-CHLORIDE ANTITRUST LIT-IGATION.**

No. 1:00–MDL–1383.

United States District Court,
E.D. New York.

May 20, 2003.

See, also, 166 F. Supp.2d 740.

Bernard Persky, Goodkind, Labaton, Rudoff & Sucharow, LLP, New York City, Marc H. Edelson, Hoffman & Edelson, Doylestown, PA, Peter L. Masnik, Kalikman & Masnik, Haddonfield, NJ, Bruce E. Gerstein, Garwin, Bronzaft, Gertein & Fisher, LLP, New York City, John G. Odom, Odom & Des Roches, New Orleans, LA, Elwood S. Simon, Elwood S. Simon & Associates, P.C., Birmingham, MI, for Plaintiffs.

Phillip A. Proger, Jones Day Reavis & Pogue, Washington, DC, Fred H. Bartlit, Jr., Bartlit, Beck, Herman, Palenchar & Scott, Chicago, IL, David E. Everson, Stinson Mag Law Firm, Kansas City, MO, Joseph Serino, Jr., Kirkland & Ellis, New York City, for Defendants.

## MEMORANDUM & ORDER

TRAGER, District Judge.

This suit challenges the validity of agreements between the brand-name manufacturer of the widely used antibiotic ciprofloxacin hydrochloride ("Cipro") and potential generic manufacturers of Cipro. Direct Purchaser and Indirect Purchaser Class Plaintiffs and Individual Non–Class Plaintiffs (collectively, "plaintiffs") have brought suit against Bayer AG, a German company, and its American subsidiary, Bayer Corporation (collectively, "Bayer") and Barr Laboratories, Inc. ("Barr"); The Rugby Group, Inc. ("Rugby"); Hoechst Marion Roussel, Inc. ("HMR"); and Watson Pharmaceuticals, Inc. ("Watson") (collectively, "Generic Defendants")[1] alleging that Bayer and Generic Defendants (collectively, "defendants") entered into agree-

---

1. Barr and Rugby are in the business of, among other things, manufacturing and marketing generic drugs. Rugby was the U.S. generic drug subsidiary of HMR until February 1998, when Rugby was acquired by Watson, a company that produces and distributes generic and brand-name drugs. Watson is

ments that prevent competition in the market for Cipro in violation of federal and state antitrust laws. Plaintiffs now move this court pursuant to Federal Rule of Civil Procedure 56 for partial summary judgment finding that these agreements are *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, and various state antitrust and consumer protection laws. Defendants have filed a cross-motion seeking to dismiss plaintiffs' respective complaints pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to plead facts sufficient to sustain a Sherman Act violation.[2] These motions present difficult questions of antitrust law and its interaction with patent rights.

### Statutory and Regulatory Background

The manufacture and distribution of pharmaceutical drugs in the United States is regulated by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (the "Act"). Recognizing that the Act's "cumbersome drug approval process delayed entry of relatively inexpensive generic drugs into the marketplace," *Mylan Pharms., Inc. v. Shalala*, 81 F.Supp.2d 30, 32 (D.D.C.2000), Congress passed the "Hatch–Waxman Amendments" to the Act in 1984. *See* Drug Price Competition & Patent Term Restoration Act of 1984, Pub.L. No. 98–417 (codified as amended at 21 U.S.C. § 355). The impetus behind the Hatch–Waxman Amendments was "to make available more low cost generic drugs[.]" H.R.Rep. No. 98–857, pt. 1, at 14 (1984), *reprinted in* 1984 U.S.C.C.A.N 2647, 2647. In fact, the Hatch–Waxman Amendments embody Congress' attempt to "balance two conflicting policy objectives: to induce name-brand pharmaceutical firms to make the investments necessary to research and develop new drug products, while simultaneously enabling competitors to bring cheaper, generic copies of those drugs to market." *Mylan*, 81 F.Supp.2d at 32 (citations omitted).

To this end, the Hatch–Waxman Amendments established new guidelines that simplify the approval process for generic drugs. Previously, any company wanting to market a new drug had to secure approval from the U.S. Food & Drug Administration ("FDA") by filing a New Drug Application ("NDA"), a process often "time consuming and costly" because a NDA requires companies to submit specific data concerning the drug's safety and effectiveness. *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 801 (D.C.Cir. 2001) (citations omitted), *cert. denied* 535 U.S. 931, 122 S.Ct. 1305, 152 L.Ed.2d 216 (2002). Under the new guidelines, a generic drug manufacturer can file an Abbreviated New Drug Application ("ANDA") that incorporates by reference the safety and efficacy data developed and previously submitted by the company that manufactured the original, "pioneer" brand-name drug. To obtain FDA approval, the

---

not a signatory to any of the allegedly unlawful agreements.

**2.** Four complaints were filed in this case, each of which raises virtually identical arguments:

*Direct Purchaser Complaints:*

(1) Second Amended and Consolidated Class Action Complaint filed by Louisiana Wholesale Drug Company, Inc. and Arthur's Drug Store, Inc. on behalf of a class of direct purchasers ("D.P.Compl.");

(2) Second Amended Complaint filed by CVS Meridan, Inc. and Rite Aid Corporation ("CVS Compl.");

*Indirect Purchaser Complaints:*

(3) Indirect Purchaser Class Plaintiffs' Amended and Consolidated Class Action Complaint filed by Marie LoCurto and other plaintiffs ("I.P.Compl."); and

(4) Second Amended Class Action Complaint filed by Mark Aston and other plaintiffs ("Aston Compl.").

ANDA filer must demonstrate that its product is "bioequivalent" to the pioneer drug. 21 U.S.C. § 355(j)(2)(A)(iv).

To protect the patent rights of the pioneer drug manufacturer, the ANDA filer must make one of four certifications in its ANDA concerning patents listed with the FDA for the pioneer drug,[3] namely that (1) no patent for the pioneer drug is listed in the Orange Book; (2) the patent listed in the Orange Book has expired; (3) the listed patent will expire on a particular date, and the ANDA filer does not seek FDA approval before that date (a "Paragraph III Certification"); and (4) the listed patent "is invalid or . . . will not be infringed by the manufacture, use, or sale of the [generic] drug" (a "Paragraph IV Certification"). *Id.* § 355(j)(2)(A)(vii); *see also* 21 C.F.R. § 314.94(a)(12)(A)(4).

An ANDA containing a Paragraph IV Certification (an "ANDA IV") has "important legal ramifications. It automatically creates a cause of action for patent infringement." *Mylan,* 81 F.Supp.2d at 32. Indeed, an ANDA applicant making such a certification must notify the owner of the listed patent of the filing of its ANDA and certification. *See* 21 U.S.C. § 355(j)(2)(B). Thereafter, the patent holder has 45 days to initiate a patent infringement suit against the ANDA applicant. *See id.* § 355(j)(5)(B)(iii). If the patent holder does not commence an action within 45 days, the FDA may approve the ANDA at any time. *See id.* If a timely infringement suit is initiated, the FDA cannot approve the ANDA for 30 months. *See id.* Moreover, the court hearing the patent case may, in its discretion, extend the 30–month stay if either party fails to "reasonably cooperate in expediting the action." *Id.* § 355(j)(5)(B)(iii).[4] However, if the court presiding over the infringement action determines before the 30–month period expires that the patent at issue is "invalid or not infringed," approval is effective "on the date of the court decision[.]" *Id.* § 355(j)(5)(B)(iii)(I).

The Hatch–Waxman Amendments provide an incentive to encourage generic drug manufacturers to challenge listed patents for brand-name drugs. As an incentive to incur "potentially substantial litigation costs," *Mylan,* 81 F.Supp.2d at 33, the first company to submit an ANDA IV is awarded a 180–day period of exclusive rights to market a generic formula of the pioneer drug. *See* 21 U.S.C. § 355(j)(5)(B)(iv). Prior to the expiration of the exclusivity period, the FDA cannot finally approve any other ANDA for the same generic drug. *See id.* The exclusivity period is triggered by either the commercial marketing of the generic drug by the first ANDA filer or the decision of a court finding the pioneer drug's patent to be either invalid, unenforceable, or not in-

---

3. The Hatch–Waxman Amendments require a NDA to list any patents "which claim[ ] the drug . . . or which claim[ ] a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1). The FDA maintains and publishes this information in the *Approved Drug Products with Therapeutic Equivalence Evaluations* (commonly referred to as the "Orange Book"). *See id.* § 355(j)(7)(A).

4. As this court previously noted,

It seems relatively clear . . . that if there is no resolution of the patent litigation and a stay is not granted, and the patent holder has not obtained preliminary injunctive relief, the ANDA filer may begin to market its product. In such an instance, the ANDA filer assumes the risk it might be found liable for infringing the pioneer manufacturer's patent.

*In re Ciprofloxacin Hydrochloride Antitrust Litig.,* 166 F.Supp.2d 740, 744 (E.D.N.Y.2001) ("*Ciprofloxacin I* ").

fringed. *See id.; see also* 21 C.F.R. § 314.107.

## Factual Background[5]

### (1)

Bayer manufactures and distributes Cipro, a broad spectrum antibiotic that is prescribed for various infections and is dispensed in tablet, liquid and intravenous forms. Bayer AG claims the active ingredient in Cipro—ciprofloxacin hydrochloride—in Patent No. 4,670,444 (the "444 Patent"), which was issued by the Patent and Trademark Office ("PTO") on June 2, 1987. *See* App. to Bayer's Mem. in Opp'n to Pls.' Mot. for Partial Summ. J. ("Bayer App."), Ex. 1. The 444 Patent expires on December 9, 2003. In October 1987, Miles, Inc. (the predecessor to Bayer Corporation and the licensee of the 444 Patent) obtained FDA approval to market Cipro in the United States. Cipro has been the best selling antibiotic in the United States for many consecutive years and is described as "the most prescribed antibiotic in the world." D.P. Compl. ¶ 1. Since 1987, Bayer has been the only producer of Cipro in the United States, and, since 1997, Bayer has derived over $1 billion in U.S. net sales of all Cipro products. *See* Bayer App., Ex. 12 ¶ 3.

By letter dated October 22, 1991, Barr filed ANDA 74–124 for a generic, bioequi-valent version of Cipro.[6] *See* App. to Decl. of Edwin John U in Supp. of Generic Defs.' Mem. in Opp'n to Pls.' Mot. for "Partial Summ. J." ("G.Defs.' Summ. J. Mem.") ("G.Defs.' App."), Tab 1. Barr's ANDA included a Paragraph IV Certification seeking the FDA's permission to market its generic drug before the 444 Patent expires on the grounds that the patent is invalid and unenforceable. *See* J.A. in Supp. of all Pls.' Mot. for Summ. J. ("Pls.' J.A."), Ex. T. As set forth in the Hatch–Waxman Amendments, on December 6, 1991, Barr notified Bayer of its ANDA IV filing and its assertions contained therein regarding Bayer's 444 Patent. *See id.* On January 16, 1992, Bayer commenced a timely patent infringement suit against Barr in the Southern District of New York, thereby triggering the 30–month statutory waiting period for FDA approval. *See generally id.,* Ex. G; *see also* Bayer App., Ex. 3. This litigation was styled *Bayer AG and Miles, Inc. v. Barr Labs., Inc.,* 798 F.Supp. 196 (S.D.N.Y.1992) (Knapp, J.). In its pleadings, Barr denied any violation of the patent laws and asserted counterclaims seeking a declaratory judgment that the 444 Patent is invalid and unenforceable.[7] *See generally* Pls.' J.A., Exs. H, I.

Subsequently, in November 1992, Bayer and Barr executed a stipulation whereby

---

**5.** The facts pertinent to the current motions are drawn from each of plaintiffs' complaints and the parties' respective statements pursuant to Local Civil Rule 56.1. Unless otherwise indicated, the facts are not in dispute.

**6.** Specifically, Barr's ANDA sought permission to manufacture ciprofloxacin hydrochloride tablets, U.S.P. 250 mg, 500 mg and 750 mg.

**7.** Bayer notes that Barr did not, in fact, allege that its proposed generic product would not infringe the 444 Patent, if such patent was held to be valid and enforceable. *See* Bayer's Resp. to Pls.' Joint Statement of Material Facts Pursuant to Local Civ. R. 56.1 ("Bayer's 56.1 Stat.") ¶ 7 (citing Bayer App., Ex. 27). Instead, Barr maintained that the 444 Patent is invalid and unenforceable. *See* Pls.' J.A., Exs. H ¶¶ 15–19, I ¶¶ 16–23. By way of explanation, Barr's Chairman and CEO stated that, in this case, "where the patent in question covers the active ingredient of the listed drug, the generic applicants' [i.e., Barr's] bioequivalent product necessarily infringes the patent. Hence, the only route for challenging the patent would be to claim that the patent is invalid." Decl. of Bruce L. Downey, G.Defs.' Summ. J. Mem., Ex. A ("Downey Decl.") ¶ 9; *see also id.* ¶¶ 17, 18.

the parties agreed to extend the 30–month waiting period until final judgment was entered in the patent infringement action. *See id.*, Ex. J. This stipulation was "so ordered" by Judge Knapp on December 8, 1992. *See id.* Absent this agreement, the stay would otherwise have expired on April 22, 1995.[8] *See id.* In a letter dated January 4, 1995, while the patent litigation was pending, the FDA granted tentative approval of Barr's ANDA for generic Cipro. *See id.*, Ex. U. Plaintiffs contend that this approval was tentative, rather than final, due to the parties' stipulation to extend the 30–month stay. *See* D.P. Summ. J. Mem. at 15. In fact, in its letter to Barr, the FDA stated that "[i]n certain cases approval can be granted after the expiration of the 30–month period.... In this case, the 30–month option is not relevant. The [FDA] was advised that on December 8, 1992, the court ordered that the 30–month period be extended[.]" Pls.' J.A., Ex. U. A year later, in January 1996, Bayer and Barr filed cross-motions for partial summary judgment. *See* Bayer App., Ex. 16. Judge Knapp denied the parties' respective motions in an order and opinion dated June 5, 1996. *See* Pls.' J.A., Ex. K. Upon a motion by Bayer to reconsider that ruling, the court re-affirmed its decision in a separate order and opinion

dated September 5, 1996. *See id.*, Ex. L. After some postponements, trial of the patent litigation was finally scheduled to begin on January 27, 1997.

Meanwhile, HMR and Rugby entered the fray. On March 29, 1996, Barr and Rugby entered into an agreement pursuant to which Barr agreed to share equally with Rugby (then a subsidiary of HMR) any rights and profits from the eventual marketing and/or distribution of Cipro, and, in return, Rugby agreed to finance a portion of the costs and expenses of the patent litigation (the "Litigation Funding Agreement"). *See generally id.*, Ex. P. By subsequent amendment, HMR succeeded to Rugby's rights under this agreement. See *id.*, Ex. Q § 1.1. Rugby was later acquired by Watson and is now a wholly owned subsidiary of Watson.

### (2)

As the trial date approached, Bayer and Barr reached a settlement that concluded the patent litigation in the Southern District. In connection with the settlement, on January 8, 1997, Bayer entered into three separate but interrelated settlement agreements with Barr, HMR and Rugby, and Bernard Sherman ("Sherman") and Apotex, Inc. ("Apotex")[9] (collectively, the "Settlement Agreements") and a supply agreement with Barr and HMR (the "Sup-

---

8. Plaintiffs assert in their complaints that, absent the stipulation, the 30–month statutory period would expire on January 4, 1994, *see* D.P. Compl. ¶ 37; I.P. Compl. ¶ 64, or January 6, 1994, *see* Aston Compl. ¶ 66; CVS Compl. ¶ 28. Although the automatic stay is ordinarily 30 months, "in the case of new drug products, like Cipro, that contain active ingredients that have never before received FDA approval, 21 U.S.C. § 355(j)(5)(D)(ii) automatically extends the stay, in the event of an ANDA (IV) lawsuit, until 7.5 years after the date of the drug's initial approval by FDA, thus yielding an expiration date of April 22, 1995 in this case." Mem. of Law in Supp. of Def. Bayer's Mot. to Dismiss all MDL 001383 Compls. ("Bayer's Mot. Dismiss Mem.") at

15 n. 19. Plaintiffs conceded this fact at oral argument. *See* Tr. at 32:6–32:19.

9. HMR, Rugby, Sherman, and Apotex were not parties to the patent litigation. At the time of the Settlement Agreements, Barr, HMR and Rugby were parties to the Litigation Funding Agreement, *see* Pls.' J.A., Ex. P, and Sherman was the majority shareholder of both Barr and Apotex. *See id.*, Ex. D ¶¶ 1, 2. Therefore, Bayer contends that it was proper to enter into agreements with these parties because they participated either directly or indirectly in the patent challenge. *See* Bayer's 56.1 Stat. ¶ 17. This contention is discussed *infra*.

ply Agreement"). The terms of these agreements form the bases of plaintiffs' allegations of a Sherman Act violation. Under the Settlement Agreements, Barr, HMR, Rugby, Sherman, and Apotex acknowledged the validity of the 444 Patent and additional U.S. Patents held by Bayer.[10] *See id.*, Ex. B § 4; *id.*, Ex. C § 3; *id.*, Ex. D § 1. In the Barr Settlement Agreement, Barr also agreed to amend its ANDA to change its Paragraph IV Certification to a Paragraph III Certification, thereby permitting Barr to obtain FDA approval to market generic Cipro only upon expiration of the 444 Patent. *See id.*, Ex. B § 5(a); *see also* 21 U.S.C. § 355(j)(2)(A)(vii)(III). The agreement also provides for an immediate $49.1 million payment from Bayer to the "Barr Escrow Account."[11] *See* Pls.' J.A., Ex. B § 1.

In the Supply Agreement, Barr and HMR agreed not to manufacture (or to have manufactured) Cipro in the United States. *See id.*, Ex. E § 3.01. In addition, the agreement provides that Bayer either will (1) supply Bayer-manufactured Cipro to Barr, HMR and Rugby for distribution in the United States, subject to certain price controls, *see id.* § 3.06(a)(i); or (2) make quarterly payments—varying from $15 million to approximately $17 million— to the Barr Escrow Account from January 1998 through December 2003 (when the 444 Patent expires). *See id.* §§ 3.06(a)(i), 4.01(a), 4.02 & Sch. 4.01. If Bayer does not license Cipro immediately, it has agreed to do so at a set price if another generic company successfully challenges the validity of the 444 Patent. *See id.* §§ 1.01, 3.06(d). In addition, defendants claim that Bayer agreed to supply Cipro to Barr for marketing under a generic label beginning six months prior to the expiration of the 444 Patent.[12] *See id.* § 3.06(a)(ii). To date, Bayer has chosen to make payments to the Barr Escrow Account, which through December 2003 will total approximately $398 million. *See id.*, Sch. 4.01.

### (3)

Pursuant to the terms of the Barr Settlement Agreement, Bayer and Barr submitted to Judge Knapp a two-page consent judgment (the "Consent Judgment") that the parties had negotiated and that extinguished all claims raised in the patent litigation. *See id.*, Ex. N. On January 16, 1997, Judge Knapp signed the Consent Judgment in the form submitted by the parties. *See id.* The Consent Judgment entered judgment for Bayer, providing that the 444 Patent is valid and enforceable as to, and was infringed by, Barr. *See id.* ¶¶ 2–4. There was no mention in the Consent Judgment of the payments Bayer agreed to make to the Barr Escrow Account or the agreement by Barr, HMR and Rugby not to manufacture and market a generic form of Cipro. The Settlement Agreements and the Supply Agreement were not filed with or otherwise provided to the patent court, but the court was

---

**10.** These patents claim, among other things, starting materials and intermediaries for use in preparing Cipro, some of the processes for preparing Cipro, and the specific tablet, oral suspension, and intravenous formulations that Bayer uses in its proprietary Cipro products. *See generally* Decl. of Dr. Wolfgang Petrovicki, Bayer App., Ex. 23 ("Petrovicki Decl.").

**11.** The "Barr Escrow Account" is a bank account established by Barr and HMR to receive payments made by Bayer. On January 9, 1997, Barr and HMR executed an escrow agreement that established this account and provided that Barr and HMR each would receive one-half of all funds paid by Bayer into the account. *See* Pls.' J.A., Ex. F.

**12.** Plaintiffs dispute this fact. *See* All Pls.' Joint Reply of Material Facts Pursuant to Local Civ. R. 56.1 ("Pls.' Reply 56.1") ¶ 37.

apprised of the material terms of the settlement on January 30, 1997 when Bayer's counsel forwarded Bayer's news release to the court. *See* G.Defs.' App., Tab 10.

On January 17, 1997, Bayer and Barr each issued a news release announcing the settlement and discussing the payment scheme set forth in the Supply Agreement.[13] *See* Pls.' J.A., Ex. B § 8 (permitting press releases); G.Defs.' App., Tabs 10, 11. In fact, the press releases note that the settlement is comprised of two components: (1) an initial cash payment and (2) a Supply Agreement, which sets forth Bayer's option to make payments to the Barr Escrow Account or to provide Barr with Cipro that Barr would market pursuant to a license from Bayer. *See generally* G.Defs.' App., Tabs 10, 11. Also, on January 22, 1997, pursuant to the Barr Settlement Agreement, Barr filed an amendment to its ANDA 74–124, *see* Pls.' J.A., Ex. V, and in a letter to the FDA dated January 23, 1997, Barr amended its Paragraph IV Certification to a Paragraph III Certification. *See id.,* Ex. W.

In July 1997, Bayer voluntarily submitted its 444 Patent to the PTO for reexamination, and, upon reexamination, the PTO reaffirmed the patent's validity. *See* Bayer App., Exs. 17, 18. Since the execution of the Settlement Agreements, four generic companies have filed ANDA IVs for Cipro and have mounted challenges to the 444 Patent similar to the challenge raised by Barr; one challenge was dismissed, *see Bayer AG v. Ranbaxy Pharms., Inc.,* No. 3:98 Civ. 4464 (D.N.J. Oct. 29, 1999) (dismissing case per stipulation), Bayer App., Ex. 21, and three challenges were unsuccessful, *see Bayer AG v. Schein Pharm., Inc.,* 301 F.3d 1306 (Fed.Cir.2002) [hereinafter *"Schein & Mylan"*], unpublished version enclosed with Letter from Counsel for Bayer to Judge Trager of 8/19/02; *Bayer AG v. Carlsbad Tech., Inc.,* No. 01 Civ. 867–B (S.D.Cal. Oct. 24, 2001) (denying Carlsbad's motion for summary judgment), Bayer App., Ex. 31. At present, Bayer sells the only ciprofloxacin hydrochloride drug available in the United States.

## Discussion

### Motion to Dismiss—Federal Claims

Defendants have before this court numerous motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).[14]

---

13. The parties disagree as to whether the Supply Agreement and Settlement Agreements were intended to be confidential. Under these agreements, the parties were permitted to make, and did indeed make, press releases regarding the settlement and the major terms of the Supply Agreement. *See* Pls.' J.A., Ex. B § 8; *id.,* Ex. C § 6; *id.,* Ex. E § 13.02; *see also* G.Defs.' App., Tabs 10, 11. In addition, Barr submitted a redacted copy of the Supply Agreement in a public Securities and Exchange Commission filing. *See* Pls.' J.A., Ex. Z. Nonetheless, "with the intention to keep the terms of the Settlement Agreements and the Supply Agreement" confidential, each agreement obligates the parties to use "reasonable best efforts" not to disclose the terms of the agreements, except as provided by law, regulation or government authority. *Id.,* Ex. B § 7; *id.,* Ex. C § 6; *id.,* Ex. D § 4.

14. Defendants' arguments in support of their motions to dismiss are contained in five memoranda:

(1) Memorandum of Law in Support of Defendants Bayer AG's and Bayer Corporation's Motion to Dismiss All MDL–001383 Complaints ("Bayer Mot. Dismiss Mem.");

(2) Memorandum of Law in Support of the Generic Defendants' Motion to Dismiss the Direct Purchasers' Second Amended and Consolidated Class Action Complaint ("G.Defs.' Mot. Dismiss Mem.");

(3) Memorandum of Law in Support of the Generic Defendants' Motion to Dismiss the Indirect Purchaser Plaintiffs' Amended Consolidated Complaint ("G.Defs' I.P. Pls. Mem.");

(4) Memorandum of Law in Support of the Generic Defendants' Motion to Dismiss

Bayer and Generic Defendants move to dismiss each of plaintiffs' respective complaints for failure to state a claim upon which relief can be granted.[15] Watson moves to dismiss the claims in the Aston Complaint and Indirect Purchaser Plaintiffs' Complaint as failing to state a cognizable claim as to Watson.[16] In addition, Generic Defendants seek to dismiss the claims of the "Organizational Plaintiffs" contained in the Aston Complaint as time-barred. Lastly, Generic Defendants seek to dismiss Indirect Purchaser Plaintiffs' claims on various additional grounds related to those plaintiffs' allegations under state antitrust and consumer protection laws.[17]

When considering defendants' motions to dismiss under Rule 12(b)(6), the court must deny the motions unless "it appears beyond reasonable doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Moreover, the court is obligated to accept the complaints' allegations as true and to read them in the light most favorable to plaintiffs. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002); *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 (2d Cir.2000). When determining the suffi-

ciency of a plaintiff's claim, "consideration is limited to the factual allegations in [the] complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bring suit." *Brass v. Am. Film Techs.*, 987 F.2d 142, 150 (2d Cir.1993) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991)).

Two sections of the Clayton Act authorize private parties to bring suit under the federal antitrust laws. Section 4 of the Clayton Act provides treble damages to "'[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws....'"[18] *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 485, 97 S.Ct. 690, 696, 50 L.Ed.2d 701 (1977) (quoting 15 U.S.C. § 15(a)). Moreover, Section 16 of the Clayton Act provides injunctive relief to persons "threatened [with] loss or damage by a violation of the antitrust laws."[19] 15 U.S.C. § 26. The Clayton Act includes the Sherman Act, 15 U.S.C. § 1 *et seq.*, as one of the "antitrust laws." *Id.* § 12. To plead a claim under Section 1 of the Sherman Act, plaintiffs must allege that defen-

---

the Organizational Plaintiffs' Second Amended Complaint [i.e., Aston Complaint] ("G.Defs.' Org. Pls. Mem."); and (5) Memorandum of Law in Support of Watson Pharmaceuticals, Inc.'s Motion to Dismiss ("Watson Mot. Dismiss Mem.").

15. To date, Bayer AG has been served with complaints only in the consolidated indirect purchaser case and the CVS Meridian, Inc. case. Accordingly, Bayer AG moves to dismiss only those complaints with which it has been properly served.

16. Neither Direct Purchaser Plaintiffs' Complaint nor the CVS Complaint name Watson as a defendant.

17. This argument will be addressed *infra* after the discussion of plaintiffs' motion for summary judgment.

18. All of the Direct Purchaser Plaintiffs seek treble damages for defendants' alleged violations of the Sherman Act. Indirect Purchaser Plaintiffs seek treble damages only for defendants' alleged violations of the antitrust laws of Indirect Purchaser Plaintiffs' states.

19. All plaintiffs seek injunctive relief to enjoin defendants from continuing their allegedly unlawful conduct.

dants' conduct imposed an actual restraint on competition. As an initial matter, plaintiffs have sufficiently alleged that defendants' conduct constitutes a restraint on competition in violation of Section 1. The facts supporting plaintiffs' argument, and a discussion concerning the merits of their argument, will be set forth in some detail in the discussion below regarding summary judgment. Suffice it to say that the complaints adequately allege that the Supply Agreement and Settlement Agreements operate to pay Bayer's generic competitors, Barr, HMR and Rugby, hundreds of millions of dollars to suppress generic competition in the domestic market for Cipro and that those competitors did abandon their efforts to come to market with less expensive, generic forms of Cipro.

However, the Supreme Court has cautioned that although a defendant's conduct can constitute a violation of Section 1, such liability does not indicate whether a private plaintiff has suffered the appropriate injury to seek relief under the Clayton Act. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342, 110 S.Ct. 1884, 1893, 109 L.Ed.2d 333 (1990). Therefore, to recover damages under Section 4 (or to qualify for injunctive relief under Section 16) of the Clayton Act, plaintiffs must also allege that the challenged restraint, even if it violates Section 1, is causally linked to their alleged injury (i.e., injury-in-fact), *see Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535, 103 S.Ct. 897, 907, 74 L.Ed.2d 723 (1983); *Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir.1986), and that such injury is an "antitrust injury." *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697. Antitrust injury is "injury of the type that the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *Id.; see also Atl. Richfield*, 495 U.S. at 344–45, 110 S.Ct. at 1894–95; *Balaklaw v. Lovell,*

14 F.3d 793, 797 (2d Cir.1994) (quoting *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697); *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 66 (2d Cir.1988) (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) (quoting *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697)). Bayer and Generic Defendants' claims regarding the common deficiencies of the four consolidated complaints will be addressed first. Then Watson's motion and Generic Defendants' additional claims will be discussed *seriatim.*

### (1)

### Injury–in–Fact

Plaintiffs maintain that the challenged agreements suppressed entry of a generic version of Cipro into the U.S. market. As a result, plaintiffs claim that they are paying more than they would have paid for Cipro absent defendants' alleged restraint. *See* Aston Compl. ¶ 97; CVS Compl. ¶ 65; D.P. Compl. ¶ 73; I.P. Compl. ¶ 135. Defendants assert that plaintiffs have no claim under the antitrust laws because all of their theories of liability depend on generic entry into the domestic market for Cipro, which defendants claim is completely blocked by the 444 Patent. Therefore, defendants maintain that plaintiffs' alleged injuries flow from the existence of the 444 Patent and not from any claimed restraint on trade. In response to this position, plaintiffs offer three theories in support of their claim.

### a. Successful Litigation

■ Plaintiffs allege that but for the challenged agreements, Barr would have prevailed in the patent litigation and then Barr, HMR and Rugby (and possibly other generic firms) would have come to market with generic versions of Cipro. *See* CVS

Compl. ¶ 49; D.P. Compl. ¶ 61.[20] Plaintiffs support this theory of causation with assertions that Barr submitted to the FDA a Paragraph IV Certification, stating that the 444 Patent is invalid or unenforceable, *see* CVS Compl. ¶ 22; D.P. Compl. ¶ 32, and that "for six years—until it was paid hundreds of millions to concede otherwise—Barr vigorously asserted that the '444 patent is invalid and unenforceable." Direct Purchaser Pls.' Mem. in Opp'n to all Defs.' Mot. to Dismiss the Compls. ("D.P. Mot. Dismiss Mem.") at 7. Moreover, Barr repeated its assertion that the patent is invalid during the patent litigation, withstanding Bayer's motions for summary judgment and reconsideration, both of which were denied. *See* CVS Compl. ¶¶ 25, 29–31; D.P. Compl. ¶¶ 35, 38–39. Lastly, plaintiffs emphasize that Bayer paid enormous sums of money to avoid a judicial determination of the patent infringement case. *See* CVS Compl. ¶¶ 34–35; D.P. Compl. ¶¶ 41–42.

The Supreme Court has held—albeit in a different factual context—that a legal theory dependent on predicting the outcome of a specific lawsuit is unduly speculative. *See Whitmore v. Arkansas,* 495 U.S. 149, 159–60, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). In *Whitmore,* a death row inmate wanted to challenge the validity of a death sentence imposed on another capital defendant who waived his right to appeal to the Arkansas Supreme Court. *See id.* at 151, 110 S.Ct. at 1719. The plaintiff's alleged injury was that if the

court did not review the capital defendant's sentence, that defendant's crimes would not be included in a database of crimes of convicted capital defendants, which was compiled by the state for comparative purposes to ensure fair application of the death penalty. *See id.* at 156, 110 S.Ct. at 1723. To support his claim, the plaintiff asserted that he may eventually seek federal habeas corpus relief that would entitle him to a new trial and that, if he received this new trial and was again sentenced to death, his crime would then be compared to the crimes in the state database. The Supreme Court remarked that to prevail with his claim, the plaintiff would have to prove not only that he may eventually secure federal habeas corpus relief but that, if he did, he would be retried, convicted and again sentenced to death. *See id.* at 157, 110 S.Ct. at 1724. The Court found the plaintiff's alleged injury "too speculative" to constitute an injury in fact and denied him standing to bring his claim. *Id.; see also id.* at 159–60, 110 S.Ct. at 1725 ("It is just not possible for a litigant to prove in advance that the judicial system will lead to any particular result in his case.").

Although no other decision of the Court addresses this question in an antitrust or other economic context, the Second Circuit has foreclosed speculation about the outcome of litigation in the corporate context. *See Boehm v. Comm'r,* 146 F.2d 553 (2d Cir.), *aff'd,* 326 U.S. 287, 66 S.Ct. 120, 90

---

**20.** Unlike the CVS Complaint, the Direct Purchaser Plaintiffs' Complaint does not expressly espouse this theory. Rather, the complaint alleges that "but for the agreements, Barr would have received final FDA approval of its generic version of Cipro, and would have come to market with that version." D.P. Compl. ¶ 61. Nonetheless, in their memorandum, Direct Purchaser Plaintiffs cite paragraph 61 of the their complaint in support of the theory that but for the challenged agree-

ments, Barr would have prevailed in the patent litigation. *See* D.P. Mot. Dismiss Mem. at 7. Construing the allegations of the complaint in favor of plaintiffs, and drawing all reasonable inferences in their favor, Direct Purchaser Plaintiffs' Complaint alleges such a theory since the passage quoted above can be read to assert that Barr would have entered the market either pending the outcome of the patent litigation or upon a favorable outcome of such litigation.

L.Ed. 78 (1945). In *Boehm*, a stockholder postponed reporting losses on worthless stock for tax purposes until resolution of a pending stockholder derivative action, which ultimately settled. *See id.* at 553–55. The plaintiff argued that she postponed her losses because she believed that her stock could in fact have had some value if the litigation were successful, thereby restoring money to the corporate treasury. *See id.* at 555. The Second Circuit rejected this argument. In doing so, it found that the tax court properly inferred that the derivative suit had unproven value and, therefore, that the probability of a particular result in that litigation was "too speculative." *Id.; see also United States v. Carboni*, 204 F.3d 39, 46–47 (2d Cir.2000) (holding that the district court properly refused to consider the outcome of a potential lawsuit in determining for sentencing purposes the amount of loss caused by the criminal defendant's fraudulent acts because "the cost of litigation and the uncertainty of success made any recovery ... speculative").

In this case, without a showing of patent invalidity, all that the complaints contain is conjecture as to (1) whether Barr would prevail in the trial court; (2) whether the Federal Circuit would reverse any ruling for Barr; (3) whether the Supreme Court would have heard this case; and (4) when this case ultimately would be resolved. Plaintiffs' allegations, far from proving causation, merely allege that prior to its settlement with Bayer, Barr initiated and then litigated this case in good faith and to the best of its abilities. Therefore, this allegation, like those in *Whitmore* and *Boehm*, is too speculative and is insufficient to state a claim under the antitrust laws.[21]

The speculative nature of plaintiffs' allegations is highlighted by the post-settlement affirmations of the 444 Patent's validity. For instance, in 1997, Bayer voluntarily submitted the 444 Patent to the PTO for reexamination pursuant to 35 U.S.C. § 305, and the PTO upheld the patent's validity. More significantly, other generic manufacturers have brought challenges to the 444 Patent—all unsuccessfully.[22] Indeed, the Court of Appeals for the Federal Circuit has upheld summary judgment for Bayer on the issue of the 444 Patent's validity. *See Schein & Mylan*, 301 F.3d 1306. These judicially noticed facts provide more compelling evidence than the proffers made by plaintiffs, who really can do little more than speculate about what might or might not have happened if the patent litigation had continued.[23] These facts do not,

---

21. Plaintiffs cite the Supreme Court's decision in *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), as supporting their theory that a claim can depend on establishing the but—for outcome of litigation. However, that citation is unpersuasive. The Court in *Olano* held that, for purposes of Federal Rule of Criminal Procedure 52(a), the doctrine of prejudicial error requires that an error may have or probably influenced the underlying verdict of a case that has been tried. *See* 507 U.S. at 734–35, 113 S.Ct. at 1777–78. Therefore, a party asserting "forfeited-but-reversible-error" in a criminal appeal must establish that the error may have affected the outcome of the proceedings. *Id.* at 732–35, 113 S.Ct. at 1776–

78. However, proof that specific error may have or probably influenced a verdict is not as speculative as proving that the entire Cipro patent litigation would have been decided in Barr's favor if it had been tried.

22. *See Schein & Mylan*, 301 F.3d 1306; *Carlsbad*, No. 01 Civ. 867–B (S.D.Cal. Oct. 24, 2001), Bayer App., Ex. 31.

23. This court can take judicial notice of these cases since they are "capable of accurate and ready determination" through reliable sources. Fed.R.Evid. 201(b); *see also Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir.1991) (finding that "a district court may take judicial notice of the contents of relevant

however, shield the 444 Patent from all future challenges. Rather, the significance of the reexamination and the litigation that Bayer has won is that plaintiffs' allegations that Barr "would have won" the patent challenge are little more than dubious expectations or desires. Therefore, plaintiffs can not avoid dismissal based on a claim of injury-in-fact that relies on the hope that Barr would have prevailed in its suit against Bayer.

### b. Final FDA Approval

■ Some of the plaintiffs also allege that but for the challenged agreements, Barr would have received final marketing approval from the FDA (i.e., it would not have changed its Paragraph IV Certification to a Paragraph III Certification) and it would have marketed generic Cipro before resolution of the patent litigation. *See* CVS Compl. ¶ 49; I.P. Compl. ¶¶ 63, 65, 136. If Barr had entered the market, other generic companies, like HMR and Rugby, could have entered the market with their own generic versions of Cipro after Barr's 180–day exclusivity period. Plaintiffs emphasize that the availability of this theory clearly establishes that, despite defendants' contentions, it is not necessary to plead patent invalidity to state a cognizable claim of an antitrust violation.

It is not contested that before a company may market a new drug, it must receive FDA approval. *See* 21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application . . . is effective with respect to such drug."). As described above, the Hatch–Waxman Amendments simplified the ap-

proval process for companies wanting to market generic drugs by permitting such companies to file an ANDA. The amendments also addressed the interests of patent holders by requiring an ANDA filer to include one of four certifications regarding the patents held by the pioneer drug manufacturer. The certification relevant to this case—the Paragraph IV Certification—seeks FDA permission to market a generic drug before the expiration of the pioneer manufacturer's patent by asserting either that the patent is invalid and unenforceable or that the generic drug product does not infringe the patent. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(IV); *see also* 21 C.F.R. § 314.94(a)(12)(A)(4). By contrast, the Paragraph III Certification seeks FDA permission to market a generic drug upon the expiration of the pioneer drug manufacturer's patent. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(III). The pioneer drug manufacturer can bring a patent infringement case against an ANDA IV filer, which will delay FDA approval of the ANDA for 30 months or until successful resolution of the litigation, whichever occurs first. *See id.* § 355(j)(5)(B)(iii). A court is permitted to lengthen or shorten this 30–month stay if it determines that ether party to the litigation has failed to "reasonably cooperate in expediting the action." *Id.*

Courts and commentators have recognized that after the expiration of the 30–month stay, the FDA may grant a generic company final marketing approval despite a pending patent infringement suit. *See Bayer AG v. Elan Pharm. Research Corp.,* 212 F.3d 1241, 1247 n. 5 (Fed.Cir.2000) (stating that the parties agreed that the generic company was "free to market its

public disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' ") (quoting Fed.R.Evid. 201(b));

*Bankers Trust Co. v. Freeman,* 245 F.2d 200, 200 (2d Cir.1957) (per curiam) (dismissing appeal as moot based on actions taken in a later case, of which the court took judicial notice).

product" since the thirty-month delay on FDA approval had expired); *Ciprofloxacin I*, 166 F.Supp.2d at 744; *Zeneca Ltd. v. Pharmachemie B.V.*, 16 F.Supp.2d 112, 155–16 (D.Mass.1998) (reviewing legislative history and recognizing that the notion "that the statutory bar might expire prior to a ruling on the validity of the patent was anticipated and accepted by legislators as part of the compromise measure"); *see also* Sheila F. Anthony, *Riddles and Lessons from the Prescription Drug Wars: Antitrust Implications of Certain Types of Agreements involving Intellectual Property* at 2 (June 1, 2000) ("Under the [Hatch–Waxman] Act, the FDA is empowered to approve a generic for market even *before* the branded company's patents expire.").

Therefore, if the patent holder wants to prevent generic competition after the 30-month stay expires but before resolution of the patent infringement case, it must obtain a preliminary injunction restraining generic sales that allegedly infringe upon its patent. *See Ciprofloxacin I*, 166 F.Supp.2d at 740; *Zeneca*, 16 F.Supp.2d at 116 (citing 21 U.S.C. § 355(j)(5)(B)(iii)(III)). Occasionally, courts have denied preliminary injunctions in patent cases on the ground that, until there is a judicial finding of validity and infringement, the alleged infringer has a "right to compete." *Ill. Tool Works, Inc. v. Grip–Pak, Inc.*, 906 F.2d 679, 684 (Fed. Cir.1990) (noting that the district court properly balanced the public interest in the protection of patent rights against the alleged infringer's continuing right to compete during motion stage of litigation); *see also Easter Unlimited v. Rubie's Costume Co.*, No. 00 Civ. 6241, 2000 WL 1341400, at *10 (S.D.N.Y. Sept. 15, 2000) ("While there is a public interest in the protection of patent rights, this interest is counterbalanced by [alleged infringer's] continuing right to compete before a trial on the merits can be concluded."); *accord Cargo Protectors, Inc. v. Am. Lock Co.*, 92 F.Supp.2d 926, 935 (D.Minn.2000).

The complaints in this case contain numerous facts in support of plaintiffs' allegation that but for the challenged agreements, Barr would have received final FDA approval to market its generic product and would thereby have had the capacity to enter the Cipro market before resolution of the patent suit. In October 1991, Barr filed an ANDA IV seeking the FDA's permission to market a generic version of Cipro before the expiration of the 444 Patent. *See, e.g.,* CVS Compl. ¶ 22. Shortly thereafter, Barr notified Bayer of its ANDA and certification. *See, e.g., id.* ¶ 23. On January 16, 1992, Bayer commenced a timely patent infringement case against Barr, thereby triggering the statutory waiting period for FDA approval of Barr's ANDA. *See, e.g., id.* ¶ 24. The parties subsequently stipulated to extend the statutory waiting period until final resolution of the patent infringement case.[24] *See, e.g., id.* ¶ 26. In January 1995, while the case was still pending, the FDA granted tentative approval of Barr's ANDA for generic Cipro. *See* Aston Compl. ¶ 66. In the FDA's letter to Barr granting this approval, it stated that the FDA had "completed the review of [Barr's] abbreviated application and has concluded that, based upon the information [Barr has] presented to date, the drugs are safe and efficient for uses as recommended in the submitted labeling—therefore, the application is tentatively approved." *Id.* According to plaintiffs, once Barr received tentative approval, final approval was imminent

---

**24.** For purposes of the stipulation, "final judgment" would not occur until the exhaustion of all appeals to the Court of Appeals for the Federal Circuit or the expiration of the time permitted for such appeals. *See* CVS Compl. ¶ 26.

upon expiration of the 30–month stay. However, under the Barr Settlement Agreement, Barr agreed to (and did in fact) amend its ANDA to contain a Paragraph III Certification instead of a Paragraph IV Certification, thereby relinquishing its efforts to come to market before the 444 Patent expires. *See id.* ¶¶ 74, 84. These allegations adequately show that but for the stipulation and Barr Settlement Agreement, the statutory stay would have expired in April 1995, at which time Barr would have likely received final FDA approval to market its generic Cipro.[25] Accordingly, plaintiffs maintain that once Barr received FDA approval, it would have had a "right to compete" with Bayer and that it should have been permitted to decide on its own, without colluding with Bayer, whether it would enter the market or withhold its product pending resolution of the patent litigation.

Bayer, however, has labeled this theory as "plaintiffs' theory of infringing entry," which it likens to a market in stolen, infringing goods. Bayer Mot. Dismiss Mem. at 25; *see also id.* at 31, 33. Bayer maintains that the 444 Patent, not the challenged agreements, blocked generic entry. This analogy is unpersuasive. Bayer in effect is substituting its self-fulfilling prophecy for plaintiffs' allegations, since unlicensed market entry is "infringing" only if the patent holder ultimately prevails. Therefore, Bayer's argument assumes that the district court would have found the 444 Patent valid and that Barr's generic product would infringe the patent. But the district court made no such finding. Indeed, the crux of plaintiffs' claim of a *per se* violation is that the challenged agreements allowed Barr to accept cash in exchange for an agreement to halt the process by which a court *would* make such a determination—a process encouraged by the Hatch–Waxman Amendments and beneficial to consumers. Therefore, defendants' claim that generic entry upon FDA approval is precluded is rejected.

Nonetheless, courts have recognized that if a generic company that received FDA approval markets its drug before the resolution of the patent infringement suit, the generic company assumes the risk that it may subsequently be found liable for infringement. *See Ciprofloxacin I,* 166 F.Supp.2d at 744; *Zeneca,* 16 F.Supp.2d at 115–16 ("Of course, in the event that the FDA approves a generic because of the expiration of [the statutory stay] without a court decision, and it is later determined that the patent is valid, the patent owner may still recover damages from the generic.") (citing H.R.Rep. No. 98–857, pt. 2 at 9 (1984) *reprinted at* 1984 U.S.C.C.A.N. 2647, 2694) (citation and footnote omitted). Therefore, a prudent company may well determine that its interests require waiting until a court has decided the patent infringement case before marketing its ge-

---

**25.** As an initial matter, this argument may be foreclosed by the stipulation among the parties to extend the statutory waiting period. Although the Aston Complaint alleges (and other complaints imply) that the stipulation between Bayer and Barr extending the waiting period was invalid, this argument is without merit. Plaintiffs assert that Bayer and Barr did not advise the district court of the statutory requirement that the period could be extended only if one of the parties fails to reasonably cooperate in expediting the lawsuit. *See* CVS Compl. ¶ 27; *see also* 21 U.S.C. § 355(j)(5)(B)(iii). Moreover, plaintiffs allege that in fact neither Barr nor Bayer failed to cooperate in the prosecution of the patent litigation. *See* CVS Compl. ¶ 27. However, a review of the stipulation reveals that Judge Knapp was apprised of the requirement set forth in 21 U.S.C. § 355(j) for extending the statutory stay, and in fact, the stipulation contains an example of the parties' failure to cooperate in commencing trial before the waiting period was scheduled to expire in April 1995.

neric drug. For instance, in *Elan*, the generic manufacturer, Elan, chose to delay marketing its product until the resolution of its lawsuit with Bayer, even though the parties agreed that, since the statutory stay had expired, Elan could come to market. *See* 212 F.3d at 1248 n. 5. In this case, the complaints do not allege that Barr had the desire or intent to enter the market before resolution of the patent litigation. Moreover, it seems highly unlikely that Barr would risk market entry without a judicial decision of patent invalidity considering that the Bayer/Barr patent suit involved a patent validity challenge on a compound patent, which the generic drug necessarily infringes. In fact, the complaints seem to undermine plaintiffs' assertion. For example, according to Indirect Purchaser Plaintiffs' Complaint, on January 11, 1995, the *Newark Star–Ledger* reported that a spokesman for Barr said that the company will launch its product immediately "*if Barr prevails in court.*" I.P. Compl. ¶ 64 (emphasis added); *accord* Aston Compl. ¶ 67. Consequently, without allegations that Barr intended to enter the market upon FDA approval, before a court decision on the validity of the 444 Patent, plaintiffs' claim of injury-in-fact based on this theory cannot withstand a motion to dismiss.[26]

█ In a separate argument, HMR and Rugby maintain that plaintiffs' attempt to stretch this theory to encompass them is flawed. HMR and Rugby argue that plaintiffs have failed to allege an actionable antitrust injury flowing from HMR and Rugby's conduct because neither HMR nor Rugby exercised control over Barr's entry into the Cipro market prior to a resolution in the patent litigation and neither HMR nor Rugby had the legal capacity to produce Cipro.

Although neither HMR nor Rugby were parties to the patent litigation, the complaints clearly establish their participation in the challenged agreements. Indeed, HMR and Rugby are both signatories to one of the Settlement Agreements, and HMR is a signatory to the Supply Agreement. *See* I.P. Compl. ¶¶ 22, 23. In addition, in March 1996, Barr and Rugby (then a subsidiary of HMR) entered into the Litigation Funding Agreement pursuant to which Rugby agreed to help Barr fund its patent litigation against Bayer. *See* CVS Compl. ¶ 31; I.P. Compl. ¶ 71. In return, Barr agreed that if it acquired the right to manufacture and/or distribute a generic Cipro tablet—either by Barr prevailing in the patent litigation or by settlement of such litigation—Barr would share the right to market that product exclusively with Rugby. *See* CVS Compl. ¶¶ 9, 31; I.P. Compl. ¶ 71. The agreement also provided that Barr could not settle the Bayer/Barr patent litigation without Rugby's· express written approval, that any settlement of that case must provide equal benefits to Barr and Rugby and that Rugby would obtain FDA approval to manufacture Cipro. *See* I.P. Compl. ¶ 71. Moreover, Barr and Rugby were to share equally in the profits derived from those sales. In December 1996, the Litigation Funding

26. This court recognizes that in *Andrx,* the D.C. Circuit rejected the argument that "any rational actor ... would not market its generic drug until the patent infringement suit against it was resolved," finding that a jury could infer from an agreement under which the patent holder paid the generic manufacturer to prevent market entry that but for the payments, the generic manufacturer would have entered the market. 256 F.3d at 809. For the reasons discussed *infra* in the context of plaintiffs' summary judgment motion, this court finds the underlying facts of the *Andrx* case (the same facts in the *Cardizem* case) distinguishable from the facts of this case and accordingly declines to follow the D.C. Circuit in this regard.

Agreement was amended to transfer certain of Rugby's rights and obligations to HMR. However, the amendment provided that Rugby still retained the exclusive right to distribute any Cipro that HMR obtained the right to market or jointly market with Barr. *See* I.P. Compl.' ¶ 72. The parties also agreed that all monies received from Bayer in connection with the settlement of the patent litigation would be split equally between Barr and HMR. *See* CVS Compl. ¶ 32; I.P. Compl. ¶ 75.

However, a fair reading of plaintiffs' complaints fails to establish any facts from which a jury could infer that either HMR or Rugby could have influenced or controlled Barr's decision to enter the domestic Cipro market prior to a resolution of the patent litigation. Moreover, the Litigation Funding Agreement—which requires Barr to share with Rugby and HMR its rights to market and/or distribute Cipro *upon successful litigation or settlement*—does not contemplate such entry.

In addition, to the extent plaintiffs allege that HMR and Rugby could have entered the market with their own generic Cipro product following Barr's statutory exclusivity period, this claim also fails. Although a jury could infer from the facts surrounding the Litigation Funding Agreement that Rugby and HMR intended to enter the Cipro market, the fact remains that neither HMR nor Rugby had the legal capacity to market Cipro. The complaints do not allege otherwise. Although · plaintiffs assert that Rugby agreed in the Litigation Funding Agreement to seek FDA approval to manufacture Cipro, none of the complaints allege that either HMR or Rugby filed an ANDA seeking to manufacture Cipro or received FDA approval to do so. Without an ANDA and FDA approval, neither HMR nor Rugby had a right to manufacture generic Cipro. Moreover,

any inference that HMR or Rugby would seek FDA approval in this situation is mere conjecture and unsupported by any facts in the complaints.

As an alternative theory, plaintiffs direct this court to cases from various circuits imposing under the antitrust laws joint and several liability on members of a conspiracy. These cases are unpersuasive because none of them involves a situation where the alleged conspirators were prohibited by government regulation from entering the market and, therefore, could not have caused the plaintiff's antitrust injury. For instance, plaintiffs rely on *Paper Systems, Inc. v. Nippon Paper Industries Co.*, where the Seventh Circuit addressed the effect of joint and several liability on the application of the *Illinois Brick* doctrine. 281 F.3d 629 (7th Cir.2002). In that case, the defendant, Nippon, was one of five manufacturers accused of conspiring to reduce output and raise prices in the thermal facsimile paper business. *See id.* at 631. Each manufacturer in the alleged conspiracy sold paper through different distribution systems; consequently, the *Paper Systems* plaintiffs were indirect purchasers of Nippon but direct purchasers of the other alleged conspirators. *See id.* at 632. The court found that although the direct customers of Nippon held the exclusive right to recover damages in an antitrust suit based on the overcharges caused by Nippon (and accordingly carved their recovery out of the case), Nippon was still liable to the plaintiffs for the entire overcharge caused by the conspiracy. In other words, although Nippon did not sell directly to the plaintiffs, that fact did not preclude Nippon's liability for the aggregate overcharge.

Accordingly, plaintiffs allege that, like the defendants in *Paper Systems*, HMR and Rugby are liable for the entire injury caused by defendants' collective actions,

even if Barr, rather than HMR and Rugby, would have been the party that sold or distributed generic Cipro but for the challenged agreements. Plaintiffs' argument is misguided. By relying on *Paper Systems,* which focuses on the issue of damages and does. not even address causation, plaintiffs are getting ahead of themselves. It is reasonable to infer that the *Paper Systems* plaintiffs' theory of injury was that but for the cartel, Nippon (and the other conspirators) would have sold paper pursuant to the elastics of supply and demand. Therefore, those plaintiffs' alleged injury—overcharge—was directly linked to Nippon selling pursuant to the illegal cartel. In this case, plaintiffs claim that but for the allegedly illegal agreements, they would have the opportunity to purchaser lower-priced, generic drugs. However, unlike the *Paper Systems* plaintiffs' injury, our plaintiffs' alleged injury—overcharge—cannot be linked to HMR and Rugby because even absent the allegedly illicit agreements, HMR and Rugby still could not introduce generic drugs into the U.S. market pending outcome of the patent litigation. The other cases cited by plaintiffs are similarly irrelevant.

In addition, as to HMR and Rugby, the *Andrx* case is instructive. In that case Biovail (the second ANDA IV filer) maintained that it could not reach the generic drug market as quickly as it could in the absence of an agreement between HMR (the brand-name drug manufacturer) and Andrx (the first ANDA IV filer). *See* 256 F.3d at 806. To support its claim, Biovail alleged that it filed an ANDA IV seeking permission to market Cardizem CD, but did not specifically allege that it was prepared to market a generic version of that drug or that it anticipated FDA approval. *See id.* at 807. The district court denied Biovail standing and dismissed the case with prejudice. The district court reasoned that Biovail failed to plead an injury

because its exclusion from the generic drug market was caused by lack of FDA approval, not the agreement. *See id.* (citing district court opinion, 83 F.Supp.2d 179, 186 (D.D.C.2000)). The D.C. Circuit, although it agreed that Biovail failed to plead an injury, disagreed as to whether Biovail could ever do so. *See id.* at 808. In fact, the circuit court found that Biovail could allege its intent and preparedness to enter the market by claiming that FDA approval was probable. *See id.* In this case, the Aston Complaint does not allege that HMR or Rugby filed an ANDA or that FDA approval was probable. Consequently, any injury based on market entry by HMR or Rugby pending outcome of the Bayer/Barr patent infringement case fails because that injury is precluded by operation of the regulatory scheme and not by any conduct on the part of HMR and/or Rugby.

### c. License under 444 Patent

■ As this court has previously observed with regard to the state law claims in Indirect Purchaser Plaintiffs' Complaint, "plaintiffs have asserted at least one theory by which they may establish state antitrust violations without resorting to a determination of patent law." *Ciprofloxacin I,* 166 F.Supp.2d at 748. The theory to which this court referred was that "if in fact Bayer would have licensed or authorized Barr to distribute ciprofloxacin rather than risk the loss of its patents, plaintiffs would have benefitted from the resulting competition, and there would never have been a judicial determination of the validity of Bayer's patents." *Id.* at 749. Accordingly, plaintiffs also assert that but for the challenged agreements, Bayer would have settled the Bayer/Barr patent litigation by granting Barr, HMR and/or Rugby a license to bring a generic version of Cipro on the market. *See* CVS

Compl. ¶ 49; *see also* D.P. Compl. ¶ 58; I.P. Compl. ¶ 113. Like the previously discussed theory, this theory does not require plaintiffs to allege that the 444 Patent is invalid.

In support of this theory, Direct Purchaser Plaintiffs contend that Bayer at different times had entered serious discussions with both Schein Pharmaceuticals, Inc. ("Schein") and Barr concerning the issuance of a license to market generic Cipro. *See* D.P. Compl. ¶ 58. For instance, they assert that in or about August 1996, Bayer met with Barr and/or HMR to discuss, *inter alia*, the possibility of Bayer issuing an exclusive license to Barr to market a generic form of all present and future forms of Cipro. *See id.* Moreover, the complaints allege that at the time of the challenged agreements, there was a serious dispute as to the validity of the 444 Patent. In fact, Judge Knapp denied both Barr and Bayer's respective motions for summary judgment.

Moreover, defendants recognize the leverage that Barr had in this case, particularly under the new Hatch–Waxman scheme, which allows a generic manufacturer to seek entry into a market without incurring damages for infringement. *See, e.g.,* Bayer's Mem. in Opp'n to Pls.' Mot. for Partial Summ. J. ("Bayer's Summ. J. Mem.") at 31 ("The patent owner has much more at stake, because it may lose its patent altogether. Its losses represent a larger share of the market, with much higher lost profits (due to higher prices) on each sale. Thus, the generic challenger's potential upside can be a fraction of the patent owner's potential downside.").

Indeed, defendants concede that patent litigation is inherently uncertain and that, consequently, many patent infringement cases settle. *See, e.g., id.* ("[N]o matter how valid a patent is—no matter how often it has been upheld in other litigation . . .

or successfully reexamined . . .—it is still a gamble to place a technology case in the hands of a lay judge or jury. . . . Even the confident patent owner knows that the chances of prevailing in [patent] litigation rarely exceed seventy percent. . . . Thus, there are risks involved even in that rare case with great prospects.") (internal quotation marks and citations omitted); *id.* at 32 ("The range of potential settlements is now substantial. Because the generic challenger's valuation of victory is smaller than the patent owner's valuation of loss, settlement is highly likely.") (citation omitted); G.Defs.' Summ. J. Mem. at 16–17 ("The inherent uncertainty of a trial and appeal meant that Bayer faced some risk of losing even a valid patent, along with the attendant profits which the patent laws are designed to provide to patent holders."); *id.* at 16 ("It is beyond dispute that some 95% of all litigation settles.") (citation omitted).

In addition, plaintiffs argue that their contention is supported by the provisions of the Supply Agreement. In fact, the Supply Agreement contains a licensing provision pursuant to which Bayer would supply Barr and HMR with generic Cipro to bring onto the market beginning as early as January 1, 1998. The agreement also contains provisions giving Bayer the unilateral right not to issue a license and instead to pay Barr and HMR hundreds of millions of dollars in exchange for their agreement not to manufacture competing, generic versions of Cipro. Accordingly, plaintiffs maintain that in the absence of the challenged agreements (i.e., without the payment option) Bayer would in fact have entered into a license arrangement. Plaintiffs also argue that the evidentiary value of the licensing provisions is bolstered by the agreement's severability clause, which provides for the provisions to be enforced "if any term or provision of

this Agreement shall for any reason be held invalid, illegal or unenforceable in any respect." CVS Compl. ¶ 51; D.P. Compl. ¶ 60.

Defendants argue that Bayer has a right, acting unilaterally, not to license its patent and that plaintiffs' claim "turn[s] this principle on its head" by stripping Bayer of this right and by creating a legal duty to license: "Even though plaintiffs purport to concede that a patentee cannot be held liable under the antitrust laws for failing to grant a license, plaintiffs argue that the same failure to grant Barr a license … gives rise to cognizable injury under the antitrust laws." Bayer Mot. Dismiss Mem. at 36–37. Bayer then cites numerous cases to support its proposition that Bayer cannot be liable under the antitrust laws for refusing to license its 444 Patent. *See id.* Bayer is correct in its recitation of the law. *See, e.g., SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1204 (2d Cir.1981) (finding refusal to license immune from antitrust scrutiny). Moreover, plaintiffs recognize that Bayer has a unilateral right not to license under the challenged agreements and at law. In addition, they concede that the challenged agreements contain a license. However, defendants seriously misconstrue plaintiffs' allegations, which are not in conflict with this principle of patent law.

Plaintiffs do not contend that Bayer violated the antitrust laws because it unilaterally refused to issue Barr and/or HMR and Rugby a license. Rather, plaintiffs allege that if Bayer had not entered into the challenged agreements, under which it paid Barr, HMR and Rugby in lieu of supplying Cipro, those Generic Defendants would in fact have entered the market with generic Cipro. According to plaintiffs, but for the agreements, Barr would have used the leverage of the pending patent litigation to obtain a license under the 444 Patent for itself and/or HMR and Rugby. Thus, plaintiffs allege that Bayer, notwithstanding its legal right not to issue a license, would *in fact* have granted Barr and/or HMR and Rugby a license. Accordingly, this case is distinguishable from cases like *SCM* cited by defendants, all of which address whether a defendant's refusal to grant a license violates the Sherman Act. This case addresses a different issue, namely whether plaintiffs who have already alleged a violation of the Sherman Act can demonstrate causation by showing that Bayer would in fact have granted a license but for its allegedly illicit conduct.

Thus, plaintiffs' complaints have provided sufficient allegations that Bayer would have issued to Barr, HMR and/or Rugby a license for distribution of generic Cipro if it had not instead agreed to pay Barr and HMR hundreds of millions of dollars—an arrangement that plaintiffs claim is illegal—indeed, *per se* illegal. Moreover, it is fair to assume from the allegations in the complaint that if Barr intended to enter the market upon successful resolution of the patent litigation, it also would enter the market upon receiving a license, which would likewise shield Barr from any liability for patent infringement. Therefore, unlike plaintiffs' successful litigation theory discussed above, this theory is not so speculative to justify denying plaintiffs the opportunity to show that the challenged agreements foreclosed the leverage provided by the patent litigation that would have led Bayer to grant a license.

As to HMR and Rugby, under this theory, plaintiffs have alleged injury-in-fact linked to those defendants. Plaintiffs assert that Bayer would have issued Barr (and perhaps HMR and/or Rugby) a license in the absence of the allegedly illegal agreements. In this regard, the presence of HMR and Rugby made it more likely than not that Bayer would have issued a

license for generic Cipro. The fact that Rugby (and later HMR) was providing financial assistance to Barr during the patent litigation added to Barr's leverage in that case, as it demonstrates that Barr had the resources to continue with the litigation, including a trial. In addition, the fact that a license would ward off not only Barr, but also HMR and Rugby, as two other potential patent challengers, makes it more likely than not that Bayer would have licensed Cipro if it had not entered into the challenged agreements.

Moreover, if Bayer granted Barr a license to manufacture generic Cipro, presumably in connection with a settlement of the Bayer/Barr patent litigation, that license would trigger the provisions of the Litigation Funding Agreement. Under that scenario, there is another plausible argument for linking lack of generic entry to HMR and Rugby. ˊ If Barr received from Bayer a license to manufacture Cipro, Rugby would begin distributing Barr-manufactured Cipro as contemplated by the Litigation Funding Agreement, as amended. Accordingly, but for HMR and Rugby agreeing not to enter the market with Cipro, Bayer would have granted a license to Barr to manufacture Cipro, and Rugby would have distributed generic Cipro.

### (2)

### Antitrust Injury

■ Since plaintiffs have alleged one theory of injury-in-fact causally linked to defendants' alleged illegal conduct, it is necessary to determine whether that injury is "antitrust injury," i.e., injury of the type contemplated by the antitrust laws. See Brunswick, 429 U.S. at 489, 97 S.Ct. at 697. Antitrust injury "should reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations ... would be likely to cause." Id., 97 S.Ct. at 697–98 (internal quotation marks and citation omitted). It is well established that the antitrust laws "[were] enacted to assure customers the benefits of price competition." Assoc. Gen. Contractors, 459 U.S. at 538, 103 S.Ct. at 908. As purchasers of Cipro, plaintiffs, therefore, present classic allegations of antitrust injury.

In fact, plaintiffs' complaints demonstrate how the introduction of generic competition into the Cipro market would have greatly benefitted plaintiffs. According to plaintiffs, generic drugs are invariably priced below the brand-name drugs to which they are bioequivalent. See, e.g., I.P. Compl. ¶ 47. A 1998 study conducted by the Congressional Budget Office ("CBO") concluded that the purchase of generic drugs saved consumers and third party payors between $8–10 billion in a single year. See, e.g., id. Similarly, a report prepared by the Government Accounting Office in August 2000 observed that "[b]ecause generic drugs are not patented and can be copied by different manufacturers, they often face intense competition, which usually results in much lower prices than brand-name drugs." Id. Indeed, according to plaintiffs' complaints, Barr has recognized the importance of generic drugs, as it spelled out on its web page:

> Generic pharmaceuticals can cost 30–80% less than the equivalent, branded product. Yet, the consumer is getting the same product, manufactured to the same high standards, as the brand name product.

> * * * * * *

> [I]ntroduction of generic products—which offer consumers a choice—results in competition that can also help lower prices. The generic manufacturer

makes a real contribution to lowering health care costs, by offering the very same quality pharmaceutical products at significantly lower prices.

*Id.; accord* CVS Compl. ¶ 16; D.P. Compl. ¶¶ 26, 27. According to plaintiffs, Barr stated that it planned to enter the market for Cipro by initially pricing its generic product 30% less than Bayer's Cipro. *See* I.P. Compl. ¶ 47. This price, plaintiffs maintain, would inevitably have been lowered, as additional generic companies entered the market and competed for market share. *See id.;* D.P. ¶ 26.

Moreover, the complaints recognize the detrimental consequences to Bayer of generic competition in the Cipro market. According to plaintiffs, a brand-name company loses a significant portion of its market share to generic competitors less than a year after the introduction of generic competition, even if the brand-name manufacturer lowers prices to meet such competition. *See* I.P. Compl. ¶ 48. The 1998 CBO Study estimates that generic drugs capture at least 44% of the brand-name drug's market share in just the first year of sale. *See id.* Moreover, in testimony before Congress, a representative from the Pharmaceutical Research and Manufacturers of America (a brand-name pharmaceutical manufacturer's trade association), confirmed that "in most cases, sale of pioneer medicines drop as much as 75% within weeks after a generic copy enters the market." *Id.* In addition, the complaints establish that Bayer well understood the dramatic, adverse consequence that generic competition would have on Bayer's sales of brand-name Cipro; indeed, it noted that

"being hit by generics is traumatic for an organization." D.P. Compl. ¶ 26; *accord* CVS Compl. ¶ 15. These facts demonstrate that, but for the challenged agreements, Bayer stood to lose billions of dollars in the face of generic competition. To prevent this result, plaintiffs maintain that Bayer suppressed generic entry in the Cipro market, at the expense of Cipro purchasers, including plaintiffs.

In *In re Warfarin Sodium Antitrust Litigation,* the Third Circuit sanctioned a claim of antitrust injury similar to the claim raised by plaintiffs in this case. *See* 214 F.3d 395 (3d Cir.2000). The plaintiffs in *Warfarin,* indirect purchasers of the drug Coumadin, sought injunctive relief for the anticompetitive conduct of the drug's manufacturer, DuPont Pharmaceuticals Company ("DuPont"). *See id.* at 396–97. They alleged that DuPont's conduct prevented competition in the Coumadin market, which caused Coumadin users to pay supra-competitive prices for the drug. *See id.* at 396, 400. The court granted the plaintiffs standing for injunctive relief, remarking that "the excess amount paid by Coumadin users not only is 'inextricably intertwined' with the injury DuPont aimed to inflict, the overcharge was the aim of DuPont's preclusive conduct. *It is difficult to imagine a more formidable demonstration of antitrust injury." Id.* at 401 (emphasis added).[27]

In this case, plaintiffs' allegations of antitrust injury are equally formidable. Like the plaintiffs in *Warfarin,* plaintiffs in this case allege that defendants' conduct suppressed generic entry in the Cipro market,

---

**27.** Subsequently, the parties in *Warfarin* settled their dispute pursuant to a Stipulation of Settlement and Compromise that was approved by the court. *See generally* No. 98 MDL 1232, 212 F.R.D. 231 (D.Del.2002) The settlement provides for the defendant to pay $44.5 million to settle the claims of a class that was certified by the court for settlement purposes only. *See id.,* at *27. Upon final approval of the settlement, all pending actions against the defendant were dismissed with prejudice. *See id.,* at *105.

causing plaintiffs to pay inflated prices for Cipro. *See* CVS Compl. ¶¶ 1, 52; D.P. Compl. ¶¶ 1, 63. According to plaintiffs, the agreements suppressed competition because, in their absence, Bayer would have granted a license to Barr and/or HMR and Rugby to market generic Cipro. As plaintiffs' complaints establish, at the time of the agreements, there was uncertainty regarding the validity of the 444 Patent. Plaintiffs maintain that consumers would have benefitted from that uncertainty and if the risk of a court invalidating Bayer's 444 Patent prompted it to grant a license under the patent. Moreover, plaintiffs argue that absent the payments, Barr's interests were in line with its customers—it could make profits by selling less expensive, generic versions of Cipro to consumers, and it could make those sales by using the threat of invalidation to obtain a license from Bayer.

Instead, plaintiffs claim that, since entering into the agreements, Bayer has instituted price increases for Cipro that are among the highest percentage increases for any prescription drug in the United States. *See* Aston Compl. ¶ 95; I.P. Compl. ¶ 120. As a result, plaintiffs maintain that they have been denied the opportunity to obtain low-cost generic Cipro and are forced to pay supra-competitive prices. *See* Aston Compl. ¶ 99; I.P. Compl. 135. Just as in *Warfarin*, in this case, Bayer's "efforts to keep the generic drug off the market emanate from the fact that the introduction of the generic product would force down the price paid [for Cipro]. The higher prices paid were the *raison d'etre* of [Bayer's alleged] antitrust conduct." 214 F.3d at 402. Accordingly, plaintiffs have advanced prototypical allegations of antitrust injury directly linked to defendants' allegedly illegal conduct. Moreover, the injury occurred not only by reason of defendants' allegedly illegal conduct—entering into the agreements—but also "from that which makes defendants' acts unlawful"—illegally restraining competition in the market for Cipro. *Brunswick,* 429 U.S. at 488, 97 S.Ct. at 697. Consequently, as plaintiffs have adequately alleged an antitrust injury casually linked to defendants' conduct, defendants' motions to dismiss plaintiffs' complaints for failure to state a claim are denied.

### (3)

### Defendants' Argument for Immunity under *Noerr–Pennington*

■ Finally, defendants suggest that they can escape antitrust liability by hiding behind the protections provided by the *Noerr–Pennington* doctrine. Under this doctrine, legitimate government petitioning, including the filing of a non-sham lawsuit, is immune from attack under the Sherman Act. *See E. R.R. Presidents Conf. v. Noerr Motor Freight,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). The essence of the doctrine is that "no violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws." *Noerr,* 365 U.S. at 135, 81 S.Ct. at 528. This principal is rooted in, and may be required by, the First Amendment to protect the right to petition the government for redress of grievances. *See id.* at 137, 81 S.Ct. at 529. Defendants incorrectly assert that their conduct is immune from liability because it was undertaken pursuant to the terms of the Settlement Agreements, which provided for the Consent Judgment to be entered by Judge Knapp.

Defendants' argument is easily refuted. The challenged agreements in this case are private agreements between the defendants, in which Judge Knapp played no role other than signing the Consent Judgment. The Consent Judgment did not in-

clude the terms of the agreements, nor was the judge even apprised of the terms before he "so ordered" the Consent Judgment. Even if signing the Consent Judgment could be construed as approving the Settlement Agreements, government action that "amounts to little more than approval of a private proposal" is not protected. *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 602, 96 S.Ct. 3110, 3123, 49 L.Ed.2d 1141 (1976). The fact that the patent court was subsequently informed of the material terms of the settlement does not change this conclusion. The Supreme Court has emphasized that "actual state involvement, not deference to private price fixing arrangements under the general auspices of state law, is the precondition for immunity from federal law." *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 633, 112 S.Ct. 2169, 2176, 119 L.Ed.2d 410 (1992). Consequently, defendants' conduct pursuant to the agreements in this case is not afforded immunity from the antitrust laws under the *Noerr–Pennington* doctrine.

### (4)
### Defendant Watson's Individual Arguments

■ Watson moves to dismiss the Aston Complaint and Indirect Purchaser Plaintiffs' Complaint for failure to state a claim upon which relief can be granted. To sustain a motion to dismiss, plaintiffs must allege that Watson's conduct unlawfully restrained competition, *see Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 543 (2d Cir.1993), and that plaintiffs suffered an antitrust injury causally connected to Watson's conduct. *See Brunswick*, 429 U.S. at 485, 97

S.Ct. at 696. Watson maintains that it had no involvement whatsoever with any of the conduct that plaintiffs allege was illegal and that plaintiffs have failed to allege the requisite antitrust injury against Watson.

Watson was not a signatory to any of the challenged agreements. Watson entered the picture in February 1998, a little more than one year after the agreements were executed. At that time, Watson purchased Rugby from HMR, pursuant to a Stock Purchase Agreement ("Purchase Agreement") between Watson and HMR dated August 25, 1997 (and amended on November 26, 1997 and February 27, 1998).[28] *See* Aston Compl. ¶ 85; I.P. Compl. ¶ 100. According to plaintiffs, in Section 3.35 of that agreement, the parties acknowledge Rugby's obligations pursuant to the HMR/Rugby Settlement Agreement, including the obligation not to compete with Bayer's Cipro or, according to plaintiffs, file any ANDA for a generic form of Cipro. *See* Aston Compl. ¶ 89; I.P. Compl. ¶ 106.

HMR's agreement with Watson and Rugby concerning Cipro is described in two other documents, a Side Letter Agreement ("Side Letter") between HMR and Watson dated February 27, 1998 and a Term Sheet for a distribution agreement ("Term Sheet") to govern Rugby's distribution of Cipro. *See* Aston Compl. ¶ 85; I.P. Compl ¶ 101. Plaintiffs allege that these two documents and the Purchase Agreement collectively embody an arrangement whereby HMR will share with Rugby and Watson any financial benefit from the marketing or distribution of Cipro or a generic form of Cipro.[29] *See*

**28.** Although the complaints allege that the Purchase Agreement was dated February 25, 1997, it was in fact dated August 25, 1997. *See* Watson Mot. Dismiss Mem., Ex. A. ¶ 1.

**29.** This court can properly consider the entirety of the Purchase Agreement and the other two documents alleged by plaintiffs to establish Watson's anticompetitive conduct. The Second Circuit has stated that when deciding a motion to dismiss pursuant to Rule

Aston Compl. ¶ 86; I.P. Compl. ¶ 102. Section 1 of the Side Letter provides the following:

> [HMR] hereby agrees to pay Watson one-half of all amounts received by [HMR] or its Affiliates pursuant to the [Supply Agreement], the [Litigation Funding Agreement] or any agreement entered into by [HMR] or its Affiliates in replacement, amendment or substitution of either of the foregoing agreements ..., other than payments made or related to events prior to the launch of the Product (the "Launch Date") by [HMR], Barr Laboratories, Inc. ....

Watson Mot. Dismiss Mem., Ex. A § 1; *accord* CVS Compl. ¶ 86; I.P. Compl. ¶ 102.

In addition, the Term Sheet designates Rugby as HMR's "exclusive distributor of the product in the United States and Puerto Rico." Watson Mot. Dismiss Mem., Ex. A of Ex. A ¶ 3. According to plaintiffs, it further provides that once Rugby commences distributing Cipro or a generic equivalent thereof, HMR will share the profits equally with Watson and Rugby.[30] Plaintiffs also allege that the Term Sheet obligates Rugby to abide by certain resale price limitations that guarantee a "target profit percentage."[31] CVS Compl. ¶ 87; I.P. Compl. ¶ 103. Furthermore, the Term Sheet states that "neither Rugby nor any of its affiliates will sell any product AB rated[32] with the Product during the term." Watson Mot. Dismiss Mem., Ex. A of Ex. A ¶ 3 (footnote added). Ac-

12(b)(6), the court may consider documents attached to the complaint as exhibits or incorporated in it by reference without converting the motion to one for summary judgment. *See Brass*, 987 F.2d at 150 (citing *Cortec*, 949 F.2d at 47–48). Watson has attached the Side Letter and Term Sheet to its memorandum. *See* Watson Mot. Dismiss Mem., Ex. A. Although plaintiffs did not attach any documents to their complaints, they do expressly refer to the Side Letter, Term Sheet and Purchase Agreement in their complaints. Therefore, these agreements may be considered on this motion. *See Johns v. Town of East Hampton*, 942 F.Supp. 99, 104 (E.D.N.Y. 1996) ("It is well established that when a plaintiff fails to introduce a pertinent document as part of his pleading, a defendant may introduce that exhibit as part of his motion attacking the pleading.") (internal quotation marks and citations omitted); *Barnum v. Millbrook Care, Ltd.*, 850 F.Supp. 1227, 1230 n. 2 (S.D.N.Y.1994) ("The Agreement was partially incorporated in [plaintiff]'s Amended Complaint. However, the entire Agreement has been submitted by Defendants, and may be duly considered by the Court upon a motion to dismiss.") (citations omitted).

30. In fact, the Term Sheet only provides that HMR will share the payments with Rugby: "Rugby will receive one-half of any amounts received by Parent [HMR] under the [Supply Agreement] or the [Litigation Funding Agreement], other than payments made or related to events prior to the launch of the Product by Parent and Barr." Watson's Mot. Dismiss Mem., Ex. A of Ex. A ¶ 7. Nonetheless, as noted above, the Side Letter provides for HMR and Watson to share one-half of any such amounts. *See* Watson's Mot. Dismiss Mem., Ex. A § 1.

31. The relevant provision reads as follows:

> Transfer by Parent to Rugby will be at a price that achieves a target profit percentage to Rugby in relation to the then prevailing market price for the Product. No Product will be priced by Rugby as a loss leader, tie-in or in any other manner intended to increase the sale of other products then being sold by Rugby or any affiliate. Barr is also subject to such limitation on Product pricing.

Watson Mot. Dismiss Mem., Ex. A. of Ex. A ¶ 6.

32. Where a generic drug is bioequivalent to a pioneer or brand-name drug, the FDA assigns the generic drug an "AB" rating. According to the FDA, a bioequivalent drug rated "AB" may be used and substituted interchangeably with the referenced brand-name drug. The complaints assert that Barr recognized these facts on its website. *See, e.g.*, I.P. Compl. ¶ 43.

cording to plaintiffs, this provision prevents Rugby, Watson and Watson's other subsidiaries from selling any AB-rated formulation of Cipro.[33] Lastly, the Term Sheet contains restrictions on the sale of Cipro after a generic product reaches market:

> After launch of the Product ..., neither Rugby nor any affiliate can sell any Product (whether purchased from a third-party or manufactured by it to any affiliate) for one-year after the termination (other than expiration as indicated in the first sentence under this heading) of the agreement, unless such termination is by Rugby due to a material breach by Parent (i.e., HMR) or is a wrongful termination by Parent.

Aston Compl. ¶ 88; I.P. Compl. ¶ 105.

Plaintiffs maintain that the provisions in the HMR/Rugby Settlement Agreement and in the Purchase Agreement, Side Letter and Term Sheet—which plaintiffs allege prevent Watson or Rugby or any of their affiliates from competing or attempting to compete in the U.S. Cipro market—are onerous to competition because another Watson subsidiary, Schein,[34] has filed an ANDA IV for Cipro. Accordingly, plaintiffs claim that unless enforcement of the challenged agreements is enjoined, "Schein will be prohibited from marketing a generic formulation of Cipro because it is an affiliate of Rugby and Watson...." I.P. Compl. ¶ 109; *accord* Aston Compl. ¶ 91. As further support for this assertion, plaintiffs emphasize that Section 8 of the HMR/Rugby Settlement Agreement provides that, in the event of a breach by any party (including Rugby and its affiliates), Bayer would be entitled not only to damages, but also to "specific performance of its rights hereunder." I.P. Compl. ¶ 91 (internal quotation marks omitted); *accord* Aston Compl. ¶ 109.

Plaintiffs' argument fails because they have misinterpreted the provisions of the HMR/Rugby Settlement Agreement. The complaints set forth the definition of the term "affiliate" from Section 9(e) of the HMR/Rugby Settlement Agreement as including "any entity 'which controls, or is controlled by or under common control with' HMR or Rugby." I.P. Compl. ¶ 81. Plaintiffs claim that this definition includes not only HMR and Rugby, but also Watson and its respective subsidiaries (i.e., Schein). *See id.* However, in its brief, Watson correctly demonstrates that Schein is not in fact constrained by the terms of the HMR/Rugby Settlement Agreement. Indeed, although that agreement provides that HMR, Rugby and their affiliates acknowledge the validity of Bayer's 444 Patent and agree to refrain from marketing a generic form of Cipro, *see* Aston Compl. ¶ 76; I.P. Compl. ¶ 81, Schein is not an affiliate of Rugby. The definition of affiliate in the HMR/Rugby Settlement Agreement states that "after a change of control transaction involving Rugby so that Rugby is no longer an affiliate of HMR, 'affiliate' with respect to Rugby shall mean Rugby, its successor, if any, by operation of law (other than Barr), and Rugby's subsidiaries."· Watson Mot. Dismiss Mem., Ex. B

---

**33.** This argument seems illogical. Plaintiffs are interpreting the phrase "any product AB-rated" to include generic Cipro. Thus, plaintiffs are asserting that the Term Sheet prohibits Rugby from selling generic Cipro with Cipro during the terms of the distribution agreement. However, the Term Sheet contemplates Rugby distributing Cipro when it is supplied to HMR pursuant to the Litigation Funding Agreement and the Supply Agreement. These agreements both appear to contemplate Bayer supplying Cipro to be marketed under a generic label.

**34.** Watson completed a successful tender offer for Schein in July 2000. *See* Aston Compl. ¶ 90; I.P. Compl. ¶ 108.

¶ 9(e). The sale of Rugby to Watson triggered this provision. According to Watson, Schein was then (and is still) a subsidiary of Watson, not Rugby. *See id.* at 7 n. 4 (citing Schein Pharmaceutical, Inc. Form 10–Q, June 24, 2000, at 7); *see also id.,* Ex. C.[35] Thus, Schein was not, and is not, bound by the terms of the HMR/Rugby Settlement Agreement and neither are any of Watson's other subsidiaries. This conclusion is supported by the fact that Schein filed and defended an ANDA IV, actions that it would not be permitted to take if Watson and its subsidiaries were constrained by the terms of the HMR/Rugby Settlement Agreement.

Even if Schein could be considered bound by the terms of the HMR/Rugby Settlement Agreement, plaintiffs' argument that Watson's acknowledgment of Rugby's obligations under such agreement prevents Schein from marketing Cipro has been foreclosed by the Federal Circuit.[36] In fact, as noted above, that court has upheld the validity of the 444 Patent as to Schein. *See Schein & Mylan,* 301 F.3d 1306. Consequently, plaintiffs have failed to allege conduct by Watson that violates Section 1 because any restraint in trade from Schein not entering the generic market with a form of Cipro is a result of Bayer's 444 Patent, not Watson's purchase of Rugby and the attendant acknowledgment of Rugby's pre-existing contractual arrangements with Bayer.

In addition, plaintiffs' allegations of Watson's anticompetitive conduct based upon the Side Letter and/or Term Sheet are equally unconvincing. Plaintiffs allege that Watson is receiving financial benefit from the alleged conspiracy, i.e., that Watson is receiving a portion of the allegedly illegal payments made pursuant to the Supply Agreement, which, plaintiffs claim, operates to suppress generic competition in the Cipro market. For support, plaintiffs highlight paragraph one of the Side Letter, which states that HMR and Watson agree to share any financial benefit from the marketing and distribution of Cipro. *See* I.P. Compl. ¶ 102. However, the complaints recognize that this provision goes on to exclude from these benefits any "payments made or related to events prior to the launch of Product [Cipro]" by HMR or Barr. Watson Mot. Dismiss Mem., Ex. A § 1; *accord* CVS Compl. ¶ 86; I.P. Compl. ¶ 102. Indeed, the Side Letter expressly states that Watson is not receiving any portion of the payments currently being made by Bayer to the Barr Escrow Account. In fact, according to the Side Letter, Watson does not receive any financial benefit until Rugby begins distributing generic Cipro. Moreover, despite plaintiffs' assertions, Watson is not receiving these payments in exchange for Rugby acting as exclusive distributor of Cipro. In fact, Rugby's role as exclusive distributor of a generic form of Cipro was

**35.** This court can adopt Watson's argument, because "if the allegations of a complaint are contradicted by documents made a part therefore, the document controls and the court need not accept as true the allegations in the complaint." *Sazerac Co., Inc. v. Falk,* 861 F.Supp. 253, 258 (S.D.N.Y.1994); *see also Kramer,* 937 F.2d at 774 ("Were courts to refrain from considering [documents integral to a plaintiff's allegations], complaints that quoted only selected and misleading portions of such documents could not be dismissed

under Rule 12(b)(6) even though they would be doomed to failure.").

**36.** Moreover, although not properly before this court on a motion to dismiss, Schein no longer even owns an ANDA for generic Cipro. In fact, in January 2001, Schein transferred all rights to its ANDA for Cipro to Dr. Reddy's Laboratories Ltd., who, according to Watson, is an independent third party. *See* Watson Mot. Dismiss Mem. at 7–8; *see also* Reply Mem. in Supp. of Def. Watson's Mot. to Dismiss, Ex. 1.

contemplated by the Litigation Funding Agreement, which was executed by Barr and HMR long before Watson entered the picture.

Moreover, plaintiffs' allegations of anti-competitive conduct based on the fact that the Term Sheet "obligate[s]" the parties to, and "prevents" the parties from, taking certain actions are rejected because the Term Sheet is not an agreement. When Watson purchased Rugby from HMR, the parties agreed that Rugby would remain the exclusive distributor of Cipro should Bayer chose to supply the drug to Barr and HMR per the Supply Agreement. *See* Watson Mot. Dismiss Mem. at 4. To this end, the parties agreed to negotiate in good faith to reach a distribution agreement. *See id.* at 5. Accordingly, the parties drafted the Term Sheet, which set forth general terms of a distribution agreement for Cipro, but they never executed such an agreement. *See id.* at 4. Even now, there is no agreement because, until the 444 Patent expires or until Bayer licenses Cipro, there is no product for Rugby to distribute. *See id.* at 5. Indeed, all that the Term Sheet embodies is HMR and Watson's attempt to negotiate in good faith, as required by the Side Letter. The complaints do not allege that the Term Sheet is binding in any way on the parties or that the parties have made any additional attempts to execute the distribution agreement. Therefore, any claim of anti-competitive conduct flowing from the Term Sheet is too speculative to support a cause of action under the Sherman Act.

As a last resort, plaintiffs argue that Watson, as the current parent of Rugby, is liable for actions undertaken by Rugby pursuant to the HMR/Rugby Settlement Agreement before Watson's acquisition of the company. As support, plaintiffs emphasize that Watson acknowledged Rugby's obligations under that agreement in the Purchase Agreement attendant to Watson's acquisition of Rugby from HMR. However, the authorities on which plaintiffs rely do not support this proposition. Plaintiffs direct this court to *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), as support for their proposition that Watson is liable for the acts of Rugby allegedly taken in furtherance of the alleged conspiracy. In fact, *Copperweld* merely established the proposition that a parent and its wholly owned subsidiary are not legally capable of conspiring with one another in violation of Section 1 of the Sherman Act. The case does not hold, and plaintiffs have cited no other authority for, the proposition that a parent corporation is separately liable for the acts of a subsidiary undertaken before the parent was even involved.

Finally, plaintiffs' reliance on judicial estoppel to bar Watson from arguing that it is not liable for Rugby's acts is equally misplaced. Under the doctrine of judicial estoppel, when a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, particularly if it prejudices the party who has acquiesced in the position formerly taken. *See New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S.Ct. 1808, 1814, 149 L.Ed.2d 968 (2001) (citing *Davis v. Wakelee*, 156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895)). Plaintiffs rely on an argument made by Watson in *Watson Laboratories, Inc. v. Rhone–Poulenc Rorer, Inc.*, 178 F.Supp.2d 1099 (C.D.Cal.2000). In that case, Watson sued the supplier of a hypertension drug, its parent corporation and its affiliates, alleging that the supplier breached a contract to supply the drug and that all defendants breached a non-compete agreement. Watson argued that not only were the signatories of the relevant

agreements liable for breach, but that their parent company also was liable. The Third Circuit found that, absent any evidence to the contrary submitted by the defendants, the parent company was liable for acts undertaken by its subsidiaries. Accordingly, it granted summary judgment to Watson. In this case, however, Watson is not arguing that liability can never be imposed on a parent corporation for the acts of its subsidiary. It only argues that it cannot be held liable for the acts of Rugby, a previously independent company that it acquired after the challenged conduct occurred and from which it has received no separate benefits. Thus, plaintiffs' efforts to apply judicial estoppel to preclude Watson's motion to dismiss miss the mark.

Therefore, plaintiffs fail to allege that Watson's conduct has restrained, or threatens to restrain, trade in the U.S. market for Cipro or that, even if such conduct could constitute a restraint of trade, Watson has caused plaintiffs an antitrust injury. Consequently, the Aston Complaint and the Indirect Purchaser Plaintiffs' Complaint are dismissed as to Watson for failure to state a claim upon which relief can be granted.

### (5)

### Generic Defendant's Statute of Limitations Argument

Barr, HMR and Rugby assert a separate ground for dismissal directed at the "Organizational Plaintiffs" bringing this suit (i.e., all plaintiffs that submitted the Aston Complaint with the exception of the original and sole consumer plaintiff, Mark Aston). These defendants assert that the Organizational Plaintiffs' claims should be dismissed as time-barred. A complaint alleging relief that is barred by an affirmative defense, like the statute of limitations, can be dismissed for failure to state a claim upon which relief can be granted. *See Sapienza v. Osleeb*, 550 F.Supp. 1304, 1307 (E.D.N.Y.1982) ("Although Fed. R.Civ.P. 12 does not expressly provide that a statute of limitations defense may be raised in a pre-answer motion, the vast weight of authority supports the proposition that such a motion is permissible so long as the statutory bar can be gleaned from the face of the complaint.") (citations omitted). Under the Sherman Act, a cause of action must be commenced within four years of accrual. *See* Clayton Act § 4B, 15 U.S.C. § 15b.[37] An antitrust cause of action accrues, and the limitations period begins to run, when a defendant commits an act that causes injury to the plaintiff. *See Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77; *Johnson v. Nyack Hosp.*, 86 F.3d 8, 11 (2d Cir.1996).

In this case, on or about October 24, 2001, several advocacy groups (the Organizational Plaintiffs) joined in a lawsuit previously filed by Mark Aston, seeking damages under state antitrust and consumer protection laws. In that amended complaint, and in Organizational Plaintiffs' November 21, 2001 complaint (i.e., the current Aston Complaint), these plaintiffs also allege violations of the Sherman Act, seeking declaratory and injunctive relief. Specifically, they allege that in January 1997, Bayer and Barr, HMR and Rugby entered into a series of allegedly unlawful agreements to settle the Bayer/Barr patent litigation. *See* Aston Compl. ¶¶ 3–5. They also claim that, through these agreements, "Defendants have limited the U.S. production capabilities of Cipro, and Plaintiffs

---

**37.** The statute reads as follows: "Any action to enforce any cause of action under sections 15, 15a or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b.

and are [sic] members of the Class have been forced to pay supra-competitive prices for Cipro resulting in injury...." *Id.* ¶ 6. The complaint establishes that some of the Organizational Plaintiffs purchased Cipro as third-party payors for their members.

The conduct challenged by Organizational Plaintiffs—entering into the allegedly anticompetitive agreements in January 1997—occurred more than four years before Organizational Plaintiffs filed their claims. In fact, Organizational Plaintiffs' complaint was filed more than nine months after the limitations period had passed in January 2001. Accordingly, defendants argue that Organizational Plaintiffs' claims should be dismissed as untimely. Plaintiffs, however, allege that Organizational Plaintiffs' claims are not untimely because they fall into several exceptions to the four-year statute of limitations rule. Organizational Plaintiffs assert three arguments in support of this claim: (1) that the statute of limitations was tolled on or about August 1, 2000, when the first indirect purchaser class action complaint was filed in this case; (2) that the statute of limitations was tolled by fraudulent concealment; and (3) that indirect purchaser class plaintiffs have alleged current and continuing violations of the antitrust laws by defendants extending the limitations period.

### a. Class Action Tolling

■ Plaintiffs maintain that the statute of limitations in this case was tolled around August 1, 2000 when the first indirect purchaser class action complaint was filed. It is well settled that "[t]he filing of a class action tolls the statute of limitations 'as to all asserted members of the class.'" *Crown, Cork & Seal Co., Inc. v. Parker,* 462 U.S. 345, 353–54, 103 S.Ct. 2392, 2397, 76 L.Ed.2d 628 (1983) (citing *Am. Pipe &*

*Constr. Co. v. Utah,* 414 U.S. 538, 554, 94 S.Ct. 756, 766, 38 L.Ed.2d 713 (1974)). In *Crown, Cork,* the Supreme Court held that "[o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits or intervene as plaintiffs in the pending action." *Id.* at 354, 103 S.Ct. at 2397–98. The Supreme Court has also recognized that tolling the statute of limitations in this respect does not create the potential for unfair surprise or otherwise prejudice a defendant when the later filed actions raise claims concerning "the same evidence, memories, and witnesses as the subject matter of the original class suit." *Am. Pipe,* 414 U.S. at 562, 94 S.Ct. at 770 (Blackmun, J., concurring).

Defendants, however, argue that the filing of the first indirect purchaser class action in this case did not toll the statute of limitations with respect to Organizational Plaintiffs because those plaintiffs are not members of the indirect purchaser class, as that class is defined in the first complaint. In the class action context, the statute of limitations can be tolled only for those who are "asserted members of the class" when another action was timely filed. *See Crown, Cork,* 462 U.S. at 353–54, 103 S.Ct. at 2397 (citing *Am. Pipe,* 414 U.S. at 554, 94 S.Ct. at 766). In *Crown, Cork,* the petitioner, an African–American male, filed charges with the Equal Employment Opportunity Commission ("EEOC") against the respondent, his former employer, alleging that he had been harassed and discharged from his job because of his race. *See id.* at 347, 103 S.Ct. at 2394. While his claim was pending before the EEOC, two other African–American males formerly employed by the respondent filed a class action lawsuit. *See id.* In their complaint, these former employees "purported to represent a class

of 'black persons who have been, continue to be and who in the future will be denied equal employment opportunities by defendant on the grounds of race or color.' " *Id.* (citing App. to Brief for Petitioner 2a). Based on this suit, petitioner sought to toll the statute of limitations. At the outset of the Supreme Court's analysis of petitioner's claim, it noted that "it is undisputed" that the petitioner is a member of the asserted class.

Accordingly, the complaint here is the starting point to determining whether Organizational Plaintiffs were included among Indirect Purchaser Plaintiffs' class. *See Shimazaki Communications, Inc. v. AT & T,* 647 F.Supp. 10, 14 (S.D.N.Y. 1986). In this case, the first indirect purchaser class action complaint was asserted by those plaintiffs on behalf of "all consumers who purchased Cipro during the Class Period in the United States and its territories." G.Defs.' Org. Pls. Mem. at 3 (quoting LoCurto [Indirect Purchaser Plaintiff] Class Action Compl. ¶ 4). Defendants maintain that Organizational Plaintiffs have "never purchased Cipro, directly or indirectly. They do not allege otherwise." *Id.* Consequently, defendants claim that Organizational Plaintiffs, as third party payors, do not meet the definition of the class asserted in the underlying indirect purchaser complaint. However, the Aston Complaint does establish that four of the seventeen Organizational Plaintiffs "as third party payor[s] for [their] members, purchased Cipro other than for resale and [were] injured by the illegal conduct alleged herein." Aston Compl. ¶ 9; *accord id.* ¶¶ 14, 16, 20.

Nonetheless, defendants cite *Shimazaki* as support for their claim that class action tolling does not apply where a plaintiff "was never intended to be a member" of the initial class. 647 F.Supp. at 14. In that case, the plaintiff sought to toll the statute of limitations based on a complaint filed that asserted the following class:

> all persons who engaged in the business of distributing, selling, renting and/or leasing, PBX Systems, both automatic and otherwise, and key telephone systems, of various manufacturers, to subscribers of telephone service in interstate commerce provided by the defendants, New Jersey Bell Telephone Company and New York Telephone Company, and who sustained damages as a result of the acts herein alleged.

*Id.* The plaintiff claimed that it was one of the class members because it sold PBX and key telephone systems. *See id.* However, the plaintiff was a wholesale dealer who sold to retail interconnect companies, not to end users. Accordingly, the court emphasized that the "complaint requires that class members sell to subscribers of telephone service . . . provided by the defendants," and that plaintiff was therefore "never intended to be a member" of the class. *Id.* (internal quotation marks omitted). In this case, Organizational Plaintiffs, as third party payors and not consumers, were not intended to be members of the class asserted in the first indirect purchaser class action complaint.

Even if Organizational Plaintiffs are asserted members of Indirect Purchaser Plaintiffs' class, defendants argue that their claims are still untimely because *Crown, Cork* does not contemplate tolling the statute of limitations in this situation.[38]

---

**38.** Defendants summarily claim that Organizational Plaintiffs would not be proper members of any indirect purchaser class action suit in any event because they would not satisfy the constitutional requirements for standing with regard to representative organizations. This argument is more fully briefed in Generic Defendants' motion to dismiss Indirect Purchaser Plaintiffs' state law claims. However, for the reasons set forth in this

The Supreme Court crafted its holding in *Crown, Cork* to permit individual plaintiffs to file their own, individual action, as opposed to intervening in the pending action, in the event that certification of an initial class was denied. Indeed, Justice Blackmun, writing for the Court, explained that "[t]he question that confronts us in this case is whether the filing of a class action tolls the applicable statute of limitations, and thus permits all members of the putative class to file individual actions *in the event that class certification is denied ....*" 462 U.S. at 346–47, 103 S.Ct. at 2394 (emphasis added). The rationale behind that decision—avoidance of multiple lawsuits, court congestion, wasted paperwork and expense—militates against applying the tolling doctrine to Organizational Plaintiffs in this case who are attempting to bring another lawsuit before class certification in the initial action has even been addressed. *See id.* at 351, 103 S.Ct. 2392 (emphasizing that filing of a separate action by a putative class member prior to a decision on class certification would result in "a needless multiplicity of actions—precisely the situation that Federal Rule of Civil Procedure 23 and the tolling rule of *American Pipe* were designed to avoid").

Lastly, even if class certification in Indirect Purchaser Plaintiffs' case was ultimately denied, defendants maintain that the Supreme Court's absent class member tolling doctrine does not extend to the filing of subsequent related class actions. The Second Circuit has noted that although the class action tolling principal permits individuals to file actions following denial of class certification, that principle "does not apply to permit a plaintiff to file a subsequent class action." *Korwek v. Hunt,* 827 F.2d 874, 876 (2d Cir.1987); *see*

discussion dismissing Organizational Plaintiffs' claims as time-barred, this argument is

*also id.* at 879. *Korwek* has been cited with approval by other courts for the same proposition. *See Robbin v. Fluor Corp.,* 835 F.2d 213, 214 (9th Cir.1987) ("We agree with the Second Circuit that to extend tolling to class actions 'tests the outer limits of the *American Pipe* doctrine and ... falls beyond the carefully crafted parameters into the range of abusive options.' ") (quoting *Korwek,* 827 F.2d at 879); *Fleming v. Bank of Boston Corp.,* 127 F.R.D. 30, 36 (D.Mass.1989) (noting that "[t]he Court of Appeals for the Second Circuit has stated that all courts that have addressed this question 'have found that the *American Pipe* tolling rule does not apply to permit putative class members to file a subsequent class action.' ") (quoting *Korwek,* 827 F.2d at 878), *aff'd sub nom. Fleming v. Lind–Waldock & Co.,* 922 F.2d 20 (1st Cir.1990). In this case, Organizational Plaintiffs are filing a class action claim before the court has made a determination on class certification in the initial action—undermining the policy behind the class action tolling doctrine. Moreover, it is not clear that Organizational Plaintiffs are even members of the putative class in this case, and, in any event, the class action tolling exception does not permit filing of additional class action claims as opposed to subsequent individual lawsuits. For these reasons, Organizational Plaintiffs' argument that the filing of the first indirect purchaser class action complaint tolled the statute of limitations for their Sherman Act claims is unpersuasive.

**b. Fraudulent Concealment**

■ Organizational Plaintiffs also allege that the statute of limitations has been tolled by defendants' fraudulent concealment. *See* Aston Compl. ¶ 100. The

rendered moot.

Second Circuit has long recognized that "fraudulent concealment of the existence of a cause of action" under the antitrust laws tolls the running of the four-year statute of limitations under the Clayton Act. *Atl. City Elec. Co. v. Gen. Elec. Co.,* 312 F.2d 236, 238 (2d Cir.1962). As that court has noted, "the purpose of the fraudulent-concealment doctrine is to prevent a defendant from 'concealing a fraud, or ... committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it.' " *New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1083 (2d Cir.1988) (quoting *Bailey v. Glover,* 88 U.S. (21 Wall) 342, 349, 22 L.Ed. 636 (1874)). To establish fraudulent concealment, Organizational Plaintiffs must plead three elements: (1) defendants' wrongful concealment of their actions; (2) Organizational Plaintiffs' failure to discover the operative facts that are the basis of their cause of action within the limitations period; and (3) their due diligence in pursuing the discovery of their claim. *See In re Merrill Lynch Ltd. P'ship Litig.,* 154 F.3d 56, 60 (2d Cir.1998) (RICO context); *see also Hendrickson,* 840 F.2d at 1083 (citation omitted). Pursuant to Federal Rule of Civil Procedure 9(b), Organizational Plaintiffs must plead circumstances constituting fraudulent concealment with particularity.[39] *See* Fed.R.Civ.P. 9(b); *see also Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389, 394 (6th Cir.1975); *Donahue v. Pendleton Woolen Mills, Inc.,* 633 F.Supp. 1423, 1443 (S.D.N.Y.1986) (citing, *inter alia, Dayco,* 523 F.2d at 394).

Organizational Plaintiffs claim that defendants "secretly had agreed to extend the 30–month waiting period" for FDA approval of Barr's ANDA for a generic version of Cipro. Aston Compl. ¶ 101. They also allege that defendants' agreements and conspiracy were covert and not disclosed to them or other putative class members. *See id.* To support this allegation, the Organizational Plaintiffs claim that defendants met secretly and discussed and agreed with each other to stifle competition by Cipro generic equivalents.[40] *See id.* These plaintiffs rely in their complaint "on information and belief" to allege that they were "unaware of, and could not through due diligence have discovered, the existence of these meetings and the unlawful agreement which resulted in the Stipulation."[41] *Id.*

Moreover, Organizational Plaintiffs claim that defendants took affirmative steps to prevent the discovery of their claim or injury. To support their contention, Organizational Plaintiffs allege that defendants agreed to keep the terms of

---

**39.** Federal Rule of Civil Procedure 9(b) provides in relevant part: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b).

**40.** These plaintiffs also assert that defendants falsely represented to the public that Barr was vigorously challenging Bayer's patent rights. As an example, Organizational Plaintiffs quote Barr's website, on which it stated that "Barr Laboratories actively challenges the patents protecting certain branded pharmaceutical products where it believes such patents are either invalid, unenforceable or not infringed by the Company's products." Aston Compl.

¶ 101. In their memoranda, however, plaintiffs appear to abandon this allegation.

**41.** At first blush, it appears that Organizational Plaintiffs' allegations are based solely on the stipulation to extend the 30–month waiting period for FDA approval. However, construing the allegations in the light most favorable to plaintiffs, one can infer from the second sentence of Paragraph 101 of the Aston Complaint that Organizational Plaintiffs claim that defendants fraudulently concealed the Settlement Agreements and the Supply Agreement, which they allege operate to "stifle competition by Cipro generic equivalents." Aston Compl. ¶ 101.

the allegedly illegal agreements confidential. *See* Aston Compl. ¶¶ 75, 77. In fact, the Settlement Agreements obligate the parties to use "reasonable best efforts" not to disclose the terms of the agreements, except as provided by law, regulation or government authority. *See id.* In addition, Organizational Plaintiffs assert that Bayer required Barr to assist Bayer in any legal or protective orders against a third party trying to discover the existence of the terms of the agreements. Although not alleged in the Aston Complaint, the Settlement Agreements, in fact, prohibit Barr from assisting third parties in challenging Bayer's patents and require Barr to collect and destroy documents pertaining to the Bayer/Barr patent litigation.

However, Organizational Plaintiffs' allegations regarding defendants' concealment of their actions are directly contradicted by other allegations in the Aston Complaint. There is no dispute that the fact of the settlement and its principal terms were contained in press reports regarding the settlement of the Bayer/Barr patent litigation. *See* Aston Compl. ¶ 81. Indeed, the Aston Complaint acknowledges that Bayer explained the settlement in a press release dated January 17, 1997, the day after the challenged agreements were executed.[42] *See id.* Specifically, Bayer's press release announces that the Barr Settlement Agreement ended the parties' patent litigation and that, under the agreement, Barr acknowledged the validity of Bayer's patents. *See id.* The press release also describes the payment scheme established in the Supply Agreement, and it even discusses Bayer's option either to supply Cipro to Barr and its financial partner (stated in the press release as Rugby, but, in fact, HMR) or to make payments to Barr and its partner. *See id.*

In addition, the complaint recognizes that Judge Knapp entered the Consent Judgment ending the patent litigation. *See id.* ¶ 82 (noting that Barr agreed to acknowledge the validity of the 444 Patent in the Consent Judgment). A review of the Consent Judgment shows that the parties did not agree to keep the judgment confidential and that it would, therefore, have been part of the court record. Moreover, the Consent Judgment was referenced in Bayer's press release. Lastly, Barr filed a Form 10–K405 with the SEC on September 22, 1998, which further elaborates on the payment scheme established in the Supply Agreement. Barr's public filing explains that the payments from Bayer to the Barr Escrow Account were expected to be from $24 million to $32 million per year until 2003, specifying that "[i]f the innovator [i.e., Bayer] chooses not to provide the product to Barr, Barr would receive quarterly income and cash flow of $6 million to $8 million throughout the life of the Agreement." I.P. Compl. ¶ 29. Thus, not only were the material terms of the settlement not concealed, defendants affirmatively disclosed these terms to the public.

Consequently, Organizational Plaintiffs' argument that defendants' conduct was "self-concealing" is also rejected. It is well established that a plaintiff may allege fraudulent concealment by "showing either that the defendant took affirmative steps to prevent the plaintiffs' discovery of his claim of injury or that the wrong itself was of such a nature as to be self-concealing." *Hendrickson,* 840 F.2d at 1083 (discussing *Bailey,* 88 U.S. 342, 21 Wall. 342, 22 L.Ed. 636). Thus, courts often toll the limita-

---

**42.** In addition, although not acknowledged in the Aston Complaint, Barr made a similar press release on the same day, which sets forth virtually identical information as the Bayer press release. *See* I.P. Compl. ¶ 87.

tions period in cases involving secret conspiracies. For instance, in *Hendrickson,* the Second Circuit tolled the statute of limitations based on claims of price-fixing and bid-rigging conspiracies where it found that such conspiracies are self-concealing. *See id.* *Hendrickson* was decided in the context of the defendants' request for judgment notwithstanding the verdict or a new trial on the grounds that the plaintiffs' claims were time-barred. In denying the defendants' request, the *Hendrickson* court noted that a conclusive bid purports to be something that it is not, i.e., a product of genuine competition, and is, therefore, "an inherently self-concealing fraud." *Id.* (citation omitted). The court also acknowledged that a bid-rigging scheme has to remain concealed from the victim of the fraudulent bids to remain successful. *See id.* at 1084 (citation omitted). Accordingly, the court found that the defendants' scheme "necessarily included the concealment of the existence of their conspiracy" and that, therefore, "proof of the conspiracy itself sufficed to prove concealment by the co-conspirators." [43] *Id.*

Relying on *Hendrickson,* the Southern District in *In re Nine West Shoes Antitrust Litigation* summarily found that "by alleging a price fixing scheme, the plaintiff has sufficiently alleged the first prong of fraudulent concealment and ... there is no need to require the pleading of affirmative actions taken by the defendants to prevent the plaintiff's discovery of his claims." 80 F.Supp.2d. 181, 193 (S.D.N.Y.2000) (citations omitted). Plaintiffs cite *Nine West Shoes* in support of their assertion that since the Aston Complaint alleges a price-fixing claim, Organizational Plaintiffs have

adequately established the first element of fraudulent concealment.

However, this case does not fit the rubric of the self-concealing doctrine. As the *Hendrickson* court explained, a bid-rigging conspiracy necessarily has many participants and a hidden agreement as to a number of contracts. *See* 840 F.2d at 1084. A price-fixing agreement has a similar set-up with a secret agreement as to price. Thus, if one gets word of the collusion as to price or bids (i.e., the illegal conspiracy), the entire scheme is compromised and collapses. In this case, however, the alleged collusion between Bayer and the other defendants was not secret, nor did the challenged agreements require secrecy to take effect. In fact, the agreements here were immediately disclosed to the public. Moreover, the "scheme" established by defendants would not, and in fact did not, dissolve once the agreements were made public. Such a situation cannot be characterized as a self-concealing fraud. *See Pinney Dock & Transp. Co. v. Penn Cent. Corp.,* 838 F.2d 1445, 1471–72 (6th Cir.1988) ("Self-concealment of a conspiracy sufficient to toll the statute of limitations refers to activities in furtherance of a conspiracy *which by their nature defy detection* ....") (emphasis added) (internal quotation marks and citation omitted).

In addition, even if defendants could in some way be considered to have concealed their actions, disclosed facts in the public domain would have been more than adequate to raise Organizational Plaintiffs' suspicions as to their claim of injury. "[T]he statute of limitations is not tolled by fraudulent concealment once the plaintiff knows of the operative facts that form the basis of his claim such that he could dis-

---

**43.** In addition, the *Hendrickson* court found affirmative acts of concealment, such as burning and shredding incriminating documents, agreeing not to talk to any third parties regarding the conspiracy and agreeing that one member of the conspiracy would testify falsely if called before a grand jury. *See* 840 F.2d at 1084.

cover his cause of action through the exercise of diligence." *U.S. v. Inc. Vill. of Island Park,* 791 F.Supp. 354, 370 (E.D.N.Y.1992) (citing *Dayco,* 523 F.2d at 394); *see also Cerbone v. Int'l Ladies' Garment Worker's Union,* 768 F.2d 45, 48–49 (2d Cir.1985). Moreover, courts have found that "[a]ny fact that should excite [a plaintiff's] suspicion is the same as actual knowledge of his entire claim." *Dayco,* 523 F.2d at 394; *accord Donahue,* 633 F.Supp. at 1443 (citing *Dayco,* 523 F.2d at 394); *Island Park,* 791 F.Supp. at 370 (same); *Wolf v. Wagner Spray Tech. Corp.,* 715 F.Supp. 504, 509 (S.D.N.Y.1989) (same); *see also Wood v. Carpenter,* 101 U.S. (11 Otto) 135, 143, 25 L.Ed. 807 (1879) ("[T]he means of knowledge are the same thing in effect as knowledge itself."); *Hendrickson,* 840 F.2d at 1085–86 (finding it proper for district court to instruct jury that plaintiff would not meet its burden of proving fraudulent concealment if plaintiff "had a suspicion of collusive bidding on a single contract or any other information that should have alerted it to its claim of an overall conspiracy"). Therefore, the critical determinant is when "a significant fact emerges," not when plaintiffs realize the specific details of their alleged claims. *Wolf,* 715 F.Supp. at 509; *see also Donahue,* 633 F.Supp. at 1443 ("Because the fraudulent concealment standard equates suspicion with knowledge, plaintiffs need not have learned the intimate details of the resale price maintenance agreement for

the statute of limitations to begin running.").

In this case, Organizational Plaintiffs allege "on information and belief" that they were unaware of the operative facts behind their claims within the limitations period.[44] Aston Compl. ¶ 101. However, as noted above, operative facts such as Barr's acknowledgment in the Barr Settlement Agreement of the validity of the 444 Patent and Bayer's other patents, Bayer's option in the Supply Agreement either to supply Cipro or to make payments to the Barr Escrow Account and the mechanics of the payment scheme established in the Supply Agreement were publicly disclosed. In addition, defendants claim that dozens of nearly identical complaints were filed against some of the defendants in several state courts within four years of the challenged settlement, in some cases by the exact same lawyers who represent Organizational Plaintiffs in this case. *See* G.Defs.' Org. Pls. Mem. at 9. Given the publicity of the Barr Settlement Agreement and the Supply Agreement, Organizational Plaintiffs cannot credibly claim ignorance of the operative facts of their claims once the January 1997 agreements were disclosed in that same month.[45] *Cf. Dayco,* 523 F.2d at 394 (finding that congressional proceeding that explored some of plaintiff's allegations "should have aroused [plaintiff's] suspicions"); *Wolf,* 715

---

44. Specifically, Organizational Plaintiffs allege that "[o]n information and belief, plaintiff and members of the Class were unaware of, and could not through due diligence have discovered, the existence of these meetings and the unlawful agreements which resulted in the Stipulation." Aston Compl. ¶ 101.

45. In fact, in their memorandum, plaintiffs acknowledge that the terms of the allegedly illicit agreements would put them on notice of an antitrust violation. Indeed, plaintiffs argue that the fact of the settlement (and the

Consent Judgment) in and of itself does not lead to the conclusion that the parties violated the antitrust laws and that "[i]t is only the terms of the secret Cipro Agreements that gave Plaintiffs' notice of their claims arising out of the Cipro Agreements." Indirect Purchaser Class Pls.' Mem. in Opp'n to all Defs.' Mot. to Dismiss the I.P. Compl. at 85. Plaintiffs neglect to mention the fact that the terms of the agreements were disclosed in press releases that were issued the very next day after the agreements were executed.

F.Supp. at 509 (finding that since plaintiffs knew existence of operative facts, they can not argue fraudulent concealment because they failed to realize the significance of those facts to their claim); *Island Park*, 791 F.Supp. at 371 (rejecting government's claim of fraudulent concealment, finding it "difficult to comprehend" how a HUD audit report, which detailed defendant's wrongdoings, did not defeat government's claim that it was ignorant of the basis for its cause of action beyond the report's date).

Lastly, Organizational Plaintiffs' allegation that due diligence would have been fruitless in discovering their claims is equally implausible and, in any event, is defective on its face. The Supreme Court established the standards for alleging fraudulent concealment over a century ago in *Wood. See* 101 U.S. 135, 11 Otto 135, 25 L.Ed. 807. In that case, the Court emphasized that an injured plaintiff must show reasonable diligence in discovering his cause of action within the limitations period. *See id.* at 143, 11 Otto 135. Moreover, the Court found that "the circumstances of the discovery must be fully stated and proved, and the delay which has occurred must be shown consistent with the requisite diligence." *Id.* Since *Wood,* numerous courts have required plaintiffs to plead circumstances constituting fraudulent concealment, including the exercise of due diligence, with particularity. *See, e.g., Nine West,* 80 F.Supp.2d at 193 (citing *Merrill Lynch,* 154 F.3d at 60); *Donahue,* 633 F.Supp. at 1443 (citing *Rutledge v. Boston Woven Hose & Rubber Co.,* 576 F.2d 248, 250 (9th Cir.1978); *Dayco,* 523 F.2d at 394).

In this case, Organizational Plaintiffs merely allege that "[o]n information and belief," they could not through due diligence have discovered the operative facts for their cause of action. Aston Compl.

¶ 101. Such an allegation is insufficient. As stated above, due diligence is a requisite element of a fraudulent concealment defense to the statute of limitations bar, and Organizational Plaintiffs' failure to include such allegations is fatal to their claims. *See Hendrickson,* 840 F.2d at 1083 (plaintiffs must allege that their "continuing ignorance was not attributable to lack of diligence on [their] part"); *see also Tran v. Alphonse Hotel Corp.,* 281 F.3d 23, 36–37 (2d Cir.2002) (same in RICO context). Indeed, by merely relying on "information and belief" to substantiate their assertions, Organizational Plaintiffs have violated the express requirement that fraudulent concealment be pleaded with particularity. *See Merrill Lynch,* 154 F.3d at 60 (finding that plaintiffs failed to allege that they exercised due diligence because they made "no allegation of any specific inquiries of Merrill Lynch, let alone detail when such inquiries were made, to whom, regarding what, and with what response"); *Dayco,* 523 F.2d at 394 (noting that plaintiff's "mere allegation of due diligence without asserting what steps were taken" did not meet the *Wood* standard); *Mahoney v. Beacon City Sch. Dist.,* 988 F.Supp. 395, 400 (S.D.N.Y.1997) ("The evidence submitted by plaintiff to support a fraudulent concealment claim must not be conclusory . . . .") (citing *Pinaud v. County of Suffolk,* 52 F.3d 1139 (2d Cir.1995)); *cf. Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1003 (2d Cir.1988) (finding that allegations of securities fraud generally cannot be based "on information and belief"); *DiVittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987) (same).

Organizational Plaintiffs inappropriately rely on *Nine West* to support their allegation that their ignorance was not the result of a lack of due diligence, but rather the concerted actions of defendants to shield the alleged anticompetitive aspects of the

agreements. However, *Nine West* is distinguishable from this case. Indeed, in *Nine West*, the plaintiffs not only alleged that they "could not have discovered the conspiracy at an earlier date by the exercise of due diligence" because of the defendants' affirmative acts of concealment, they also alleged two specific examples of such concealment. *See* 80 F.Supp.2d at 193. In this case, all that Organizational Plaintiffs allege is that defendants conducted "secret meetings" that led to an allegedly unlawful stipulation and, we can infer, the challenged agreements. Such allegations do not meet the pleading specificity required by Rule 9(b). Moreover, in *Nine West* the court found that the plaintiffs exercised due diligence because they "promptly filed suit" "within days" of media reports of facts relating to the defendants' alleged conspiracy. *Id.* Quite to the contrary, in this case, Organizational Plaintiffs did not file suit until nearly five years after facts surrounding the Barr Settlement Agreement and the Supply Agreement were made public.

Accordingly, documents in the public record and referred to in Organizational Plaintiffs' own complaint establish that defendants did not engage in any type of concealment and that, even if they did, Organizational Plaintiffs knew, or at the very least should have known, the operative facts that are the basis of their cause of action. Consequently, they can not be permitted to rely on bald allegations of fraudulent concealment to shield their claims from dismissal as untimely.

### c. Continuing Violation

▇▇ Lastly, Organizational Plaintiffs assert that the statute of limitations has been extended in this case because they have alleged continuing violations of the antitrust laws beginning with the 1997 challenged agreements.[46] The Supreme Court has recognized that in the context of a continuing conspiracy to violate the antitrust laws, "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act, and that, as to those damages, the statute of limitations runs from the date of commission of the act." *Zenith,* 401 U.S. at 338–39, 91 S.Ct. at 806; *accord Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 295 (2d Cir.1979) (quoting *Zenith,* 401 U.S. at 338–39, 91 S.Ct. at 806); *Donahue,* 633 F.Supp. at 1441 (same). Organizational Plaintiffs here maintain that although the challenged agreements were executed in 1997, various acts in furtherance of defendants' alleged conspiracy were taken subsequent to 1997 and continue to the present. More specifically, they contend that the agreements contemplate continued performance (i.e., installment payments) for at least six years, with the last installment being made in 2003. *See* Aston Compl. ¶¶ 79, 81. Accordingly, they assert that each payment constitutes an act in continuation of the alleged conspiracy and consequently extends the limitations period.

However, although the law in the criminal context is clear that the statute of limitations only starts to run from the last act in furtherance of the conspiracy, the law regarding the continuing violation exception in the civil context is not as clear as plaintiffs' argument suggests. Policy considerations justify different treatment. In *Vitale v. Marlborough Gallery,* the

---

**46.** As Hovenkamp explains, "the continuing violation issue only arises when the initial act violating the antitrust laws ... has not been improperly concealed." II Hovenkamp, *Antitrust Law* ¶ 320c. In other words, if Organizational Plaintiffs had adequately alleged that defendant's conduct was not known to them, the fraudulent concealment rule would have tolled the statute in any event. *See id.*

Southern District noted that to toll the statute of limitations based on a continuing conspiracy, a plaintiff must allege injury by " 'continued, separate antitrust violations *within the limitations period.*'" No. 93 Civ. 6276, 1994 WL 654494, at *5 (S.D.N.Y. July 5, 1994) (emphasis added) (quoting *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1301 (9th Cir. 1986); citing *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1039–40 (2d Cir.1992)); *accord Kaw Valley Elec. Co-op., Inc. v. Kan. Elec. Power Co-op., Inc.*, 872 F.2d 931, 933 (10th Cir.1989) (quoting *Hennegan*, 787 F.2d at 1301). In addition, the *Vitale* court stated that "to restart the statute of limitations plaintiff must allege an overt act which (1) is a 'new and independent act that is not merely a reaffirmation of a previous act'; and (2) 'inflict[s] new and accumulating injury on the plaintiff.'" 1994 WL 654494, at *5 (alteration in original) (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir.1987)). The plaintiff in *Vitale* alleged antitrust violations based on her repeated unsuccessful attempts to sell a painting that was designated a fraud by the defendant. *See id.* The court construed the plaintiff's allegations as claiming merely a refusal to deal. Accordingly, it found that the statute of limitations began to run at the initial refusal to deal and "does not restart when the plaintiff makes subsequent unsuccessful efforts to deal with the defendant." *Id.; see also Kaw*, 872 F.2d at 933 (finding a ratified decision not to provide power to a rival was final, and subsequent acts of refusal were mere reaffirmations of the initial act and did not therefore extend the limitations period).

Likewise, in *Wolf*, the Southern District interpreted the Supreme Court's decision in *Zenith* as requiring that the defendant commit an overt anticompetitive act *within the limitations period. See* 715 F.Supp. at 508. Accordingly, the court found that the defendant's continued use of an allegedly unenforceable patent obtained eight years earlier, and the defendant's ongoing refusal to surrender the patent, or to notify officials of issues associated with the patent, did not constitute ongoing anticompetitive acts within the four-year statute of limitations sufficient to restart the limitations period. *See id.* at 508–09.

Other courts have similarly distinguished independent predicate acts committed during the limitations period, which extend the period, from mere reaffirmations of an initial act, which will not extend the limitations period. *Compare, e.g., DXS v. Siemens Med. Sys.*, 100 F.3d 462, 467 (6th Cir.1996) (dicta in part) (finding new overt act sufficient to restart limitations period when defendant enforced a policy, of which it notified customers before limitations period, but which it did not enforce for some time; court noted, however, that if notification of policy was final statement of such policy by defendant, subsequent enforcement would probably be mere reaffirmation) *with, e.g., United Farmers Agents v. Farmers Ins. Exch.*, 892 F.Supp. 890, 912 (W.D.Tex.1995) (finding mere reaffirmation when defendant conditioned sale of product on purchase of another product, where defendant announced policy of such conditioning before limitations period and continually enforced such policy), *aff'd*, 89 F.3d 233 (5th Cir. 1996).

Moreover, the *Vitale* court recognized that courts within the Second Circuit "consistently have looked unfavorably on continuing violation arguments" and that "compelling circumstances" must exist before the limitations period will be extended. 1994 WL 654494, at *5 (internal quotation marks and citations omitted). In that case, the court found that the defendants' repeated requests for authentication of the plaintiff's painting and repeated fail-

ure to notify the plaintiff that she may sell her painting did not constitute compelling circumstances. *See id.*

In this case, the only acts alleged by Organizational Plaintiffs subsequent to January 1997 are payments from Bayer to the Barr Escrow Account. These payments are contemplated by, and needed to implement, the fixed terms of the challenged agreements. Accordingly, such acts are not sufficient to extend or restart the limitations period because the performance of an allegedly anticompetitive, pre-existing contract is not a new predicate act. *See Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir.1999) ("[E]ven if the payment agreement constituted a continuing violation ... the individual payments to [defendant] were only a manifestation of the previous agreement. The individual payments therefore do not constitute a new and independent act, as required to restart the statute of limitations.") (internal quotation marks and citation omitted); *County of Stanislaus v. Pac. Gas & Elec. Co.*, No. 93 Civ. F–5866, 1995 WL 819150, at *24 (E.D.Cal. Dec. 18, 1995) ("[P]erformance of the alleged anticompetitive contracts during the limitations period is not sufficient to restart the period.") (citation omitted), *aff'd*, 114 F.3d 858 (9th Cir.1997). In other words, the payments from Bayer to the Barr Escrow Account are "merely the abatable but unabatable inertial consequences of some pre-limitations action," which do not satisfy the requirements for a continuing violation. *Al George v. Envirotech Corp.*, 939 F.2d 1271, 1275 (5th Cir.1991) (citing *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir.1975)); *see also Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 586 (8th Cir.1987) (same); *DXS*, 100 F.3d at 467 ("For statute of limitations purposes, the focus is on the timing of the causes of action, i.e., the defendant's overt acts, as opposed to the effects of the overt acts."). Moreover, as in *Vitale*, in this case, Organizational Plaintiffs' allegations are not so compelling as to justify an exception to the statute of limitations.

Lastly, the cases cited by plaintiffs do not compel a different conclusion. Plaintiffs cite *Santana Products, Inc. v. Sylvester & Associates, Ltd.*, 121 F.Supp.2d 729, 734 (E.D.N.Y.1999), to support their contention that a plaintiff can bring a claim, even if some of the initial anticompetitive events occurred more than four years ago. In *Santana*, however, the plaintiff alleged that within the limitations period defendants had distributed bulletins and fact sheets while conducting lunch box presentations in which false and misleading statements were made regarding plaintiff's products. *See id.* at 735. Here, Organizational Plaintiffs do not and cannot allege new, affirmative and independent acts within the limitations period. Consequently, *Santana* does not support Organizational Plaintiffs' claims. *See id.* at 734 (noting that although "[a] cause of action is not barred ... because anti-competitive conduct began outside the statutory period," plaintiff must prove "some overt act injuring plaintiff [that] is committed within the limitations period").

In addition, plaintiffs' reliance on *Vermont Home Owners' Association, Inc. v. Lapierre*, 87 F.Supp.2d 348 (D.Vt.1999), is misplaced. Plaintiffs cite *Lapierre* in support of their proposition that each payment pursuant to the challenged agreements constitutes a continuation of defendants' conspiracy. In *Lapierre*, the plaintiffs alleged that the defendants were involved in a conspiracy in which the owners of a mobile home park were paid by cooperating mobile home dealers for each home sold in their park as a condition for a loan, and the owners, in return, would pay their creditors against the principal

of the loan for each mobile home sold. *See id.* at 349. The court found that the plaintiffs alleged a continuing violation since a fact-finder could infer that the creditor continued to benefit from the original agreement with the owners of the mobile park "in the form of payments of principal and interest on its loan, derived in part from tied-in mobile home sales." *Id.* at 351. However, in *Lapierre*, there was also evidence that the defendants re-negotiated portions of the original agreement, and reached additional agreements to extend new lines of credit, during the limitations period. *See id.* at 350. In this case, there is no evidence that defendants made any separate or distinct acts during the limitations period other than payments pursuant to the 1997 agreements.

Thus, the payments made pursuant to the challenged agreements in this case do not restart the limitations period where defendants' alleged wrongful conduct—settling the Bayer/Barr patent litigation and the attendant agreements—occurred long beforehand. Consequently, as Organizational Plaintiffs have failed to plead an exception to the four-year statute of limitations, those plaintiffs' claims are dismissed as untimely.

In sum, Bayer and Generic Defendants' motions to dismiss plaintiffs' complaints for failure to state a claim are denied because plaintiffs have alleged one viable theory of injury casually linked to Bayer, Barr, HMR, and Rugby's conduct, namely that but for the challenged agreements, Bayer would have issued a license for generic Cipro to Barr and/or HMR and Rugby at a price that would have resulted in a substantial lower cost to Cipro purchasers. However, plaintiffs have failed to allege a claim against defendant Watson, and, consequently, Watson's motion to dismiss the

Indirect Purchaser Plaintiffs' Complaint and the Aston Complaint is granted. Lastly, Organizational Plaintiffs' claims are dismissed as untimely.

## Summary Judgment

### (1)

### Availability of Partial Summary Judgment

■ Plaintiffs contend that Bayer's agreement to pay cash in exchange for the commitment of Barr, HMR and Rugby not to enter the Cipro market is a *per se* illegal market allocation agreement that violates Section 1 of the Sherman Act. As an initial matter, Bayer asserts that plaintiffs' motion is procedurally improper because it seeks "partial summary judgment on an element of a claim and not on the entire claim." Bayer's Summ. J. Mem. at 48. To recover under the Sherman Act, plaintiffs must establish three elements: (1) anticompetitive conduct; (2) injury-in-fact; and (3) antitrust injury, i.e., " 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' act unlawful.' " *Balaklaw*, 14 F.3d at 797 (quoting *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697). If the Settlement Agreements and the Supply Agreement were found to constitute "anticompetitive conduct," Bayer argues that such a conclusion would impermissibly establish only one of at least three elements of a private antitrust claim. *See* Bayer's Summ. J. Mem. at 48. This assertion is incorrect, and the cases cited by Bayer do not support its argument as they fail to address the current issue, namely whether it is proper for a court to issue an order declaring that defendants' express agreements constitute a *per se* violation of the Sherman Act and similar state antitrust laws.[47]

---

47. Indeed, the cases cited by Bayer acknowl- edge such a practice. In those cases, the

In fact, Federal Rule of Civil Procedure 56 authorizes partial summary judgment that falls short of a final determination to limit the issues to be determined at trial. *See* Fed.R.Civ.P. 56(d); *see also* Fed. R.Civ.P. 56, Advisory Committee's Note ("The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case. This adjudication ... serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact."). Moreover, the Second Circuit has recognized the value of summary judgment in antitrust cases, noting that summary judgment is a "vital procedural tool to avoid wasteful trials and may be particularly important in antitrust litigation to prevent lengthy and drawn-out litigation that has a chilling effect on competitive market forces." *Capital Imaging*, 996 F.2d at 541. Lastly, courts have awarded plaintiffs partial summary judgment on the issue of *per se* liability, reserving for trial the issues of causation and damages. *See, e.g., Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49, 111 S.Ct. 401, 402, 112 L.Ed.2d 349 (1990); *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 344, 102 S.Ct. 2466, 2473, 73 L.Ed.2d 48 (1982); *In re Terazosin Hydrochloride Antitrust Litig.*, 164 F.Supp.2d 1340, 1348–50 (S.D.Fla.2000); *In re Cardizem CD Antitrust Litig.*, 105 F.Supp.2d 682, 692 (E.D.Mich.2000). Therefore, Bayer's argument that partial

summary judgement is improper in this case is rejected.

### (2)

### The *Per Se* Rule and the Rule of Reason

Section 1 of the Sherman Act makes unlawful "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States...." 15 U.S.C. § 1. Although this provision literally bans every agreement involving interstate commerce, the Supreme Court has interpreted it to prohibit only those contracts that "unreasonably" restrain competition. *E.g., United States v. Topco Assocs., Inc.*, 405 U.S. 596, 606–08, 92 S.Ct. 1126, 1133–34, 31 L.Ed.2d 515 (1972); *Standard Oil Co. v. United States*, 221 U.S. 1, 55–60, 31 S.Ct. 502, 513–16, 55 L.Ed. 619 (1911).

To establish a Section 1 violation, plaintiffs must therefore show " 'a combination or some form of concerted action between at least two legally distinct economic entities' " that " 'constituted an unreasonable restraint of trade either *per se* or under the rule of reason.' " *Primetime 24 Joint Venture v. Nat'l Broad. Co.*, 219 F.3d 92, 103 (2d Cir.2000) (quoting *Capital Imaging*, 996 F.2d at 542). A court decides which antitrust analysis to apply by first determining whether the challenged agreement falls into a category of conduct that the Supreme Court has found likely to have predominately anticompetitive effects

---

courts noted that a plaintiff cannot obtain final judgment for a dollar amount that represents a partial payment of the total amount sought under one claim. *See Kirsch v. Lot Polish Airlines (In re Air Crash Disaster near Warsaw, Pol.)*, 979 F.Supp. 164, 167 (E.D.N.Y.1997) ("[T]he Federal Rules do not permit entry of a partial judgment."), *aff'd sub nom. Filus v. Lot Polish Airlines*, 133 F.3d 169 (2d. Cir.1997); *Primavera Familienstifung v. Askin*, 130 F.Supp.2d 450, 539 (S.D.N.Y.2001) ("[D]espite the language of

Rule 56(a) permitting a party to seek summary judgment on 'all or any part' of a claim, entry of a partial judgment as to a single claim is not permitted under the Federal Rules.") (quoting Fed. R. Civ. P 56(a)). In doing so, however, the courts recognized that a court *can* enter partial summary judgment that eliminated, before trial, that portion of the claim as to which there is no genuine issue of material fact. *See Kirsch*, 979 F.Supp. at 166–67; *Primavera Familienstifung*, 130 F.Supp.2d at 539.

and therefore to be illegal *per se.* *See Maricopa,* 457 U.S. at 344–45, 351, 102 S.Ct. at 2473–74, 2476; *Bogan v. Hodgkins,* 166 F.3d 509, 515 (2d Cir.1999) (citing *Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,* 472 U.S. 284, 298, 105 S.Ct. 2613, 2621, 86 L.Ed.2d 202 (1985)). The Supreme Court has long recognized that a limited class of restraints are so manifestly anticompetitive that they are *per se* violations of the antitrust laws. The judicial rationale for this *per se* rule is best summarized by Justice Black in the seminal case, *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958):

> [T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principal of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.

356 U.S. at 5, 78 S.Ct. at 518.

Examples of *per se* illegal conduct include horizontal price fixing, *see United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 218, 60 S.Ct. 811, 814, 84 L.Ed. 1129 (1940); division of markets, *see Palmer,* 498 U.S. at 49–50, 111 S.Ct. at 403; *Topco,* 405 U.S. at 609, 92 S.Ct. at 1134; tying arrangements, *see Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 9, 104 S.Ct. 1551, 1556, 80 L.Ed.2d 2 (1984); and group boycotts, *see Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207, 211–12, 79 S.Ct. 705, 708–09, 3 L.Ed.2d 741 (1959). These categories reflect judicial experience with a particular type of conduct under the rule of reason. *See Maricopa,* 457 U.S. at 344, 102 S.Ct. at 2473 ("Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable.").

Because the Settlement Agreements and Supply Agreement may be viewed as dividing the market for Cipro, by allocating it to Bayer, there may be some facial appeal to applying the *per se* rule in this case. However, the issue is not so simple. The Second Circuit has noted, "a majority of cases fall outside these narrow, carefully demarcated categories held to be illegal *per se* " and are, therefore, analyzed under the rule of reason. *Capital Imaging,* 996 F.2d at 543 ("In the general run of cases a plaintiff must prove an antitrust injury under the rule of reason."); *see also Bogan,* 166 F.3d at 514 ("The majority of allegedly anticompetitive conduct continues to be examined under the rule of reason.... Absent a showing that a presumption of anticompetitive effect is appropriate, we apply the rule of reason.") (citations omitted).

Conduct that is not *per se* illegal may nevertheless be found to violate the antitrust laws pursuant to the rule of reason. Under the rule of reason, the factfinder must decide whether a challenged practice is an unreasonable restraint of trade, "taking into account a variety of factors, including specific information about the relevant business, its condition before and

after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 279, 139 L.Ed.2d 199 (1997) (citing *Maricopa,* 457 U.S. at 343 n. 13, 102 S.Ct. at 2475 n. 13); *see also Chi. Bd. of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).[48]

Regardless of the type of analysis employed by the court, the critical focus is on the challenged restraint's impact on competition. Indeed, the Supreme Court has noted that " 'whether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry is the same—whether or not the challenged restraint enhances competition.' " *Cal. Dental Assocs. v. FTC,* 526 U.S. 756, 779–80, 119 S.Ct. 1604, 1617, 143 L.Ed.2d 935 (1999) (quoting *NCAA v. Bd. of Regents,* 468 U.S. 85, 104, 104 S.Ct. 2948, 2961, 82 L.Ed.2d 70 (1984)); *see also Capital Imaging,* 996 F.2d at 543 ("[T]he factfinder must decide the overarching question of whether the challenged action purports to promote or to destroy competition.").

### (3)

### Application of the *Per Se* Rule to the Settlement Agreements and Supply Agreement

As noted above, *per se* analysis is reserved for a small number of cases involving agreements in restraint of trade that experience teaches have no redeeming value and a pernicious anticompetitive effect. This case involves the rights of a patent

holder whose patent has been scrutinized on reexamination by the PTO and repeatedly challenged in court, but has never been found invalid. This case also involves the Hatch–Waxman Amendments—a new statutory scheme creating a novel, low-cost method for challenging the validity of drug patents. Lastly, this case involves settlement agreements, the type of agreements, generally speaking, encouraged by the legal system and entered into with great frequency. These circumstances pose significant obstacles to *per se* treatment of the challenged agreements.

Plaintiffs argue that the Settlement Agreements and the Supply Agreement should nonetheless be held *per se* unlawful because they illegally allocate the domestic market for Cipro. Indeed, plaintiffs argue that although Barr, HMR and Rugby sought to compete head to head with Bayer in sales of Cipro, under the Settlement Agreements and Supply Agreement, defendants combined and conspired to allocate the entire domestic market for Cipro and its bioequivalent generics to Bayer. These actions, plaintiffs maintain, unlawfully perpetuate Bayer's monopoly and prevent price competition among horizontal competitors. The Supply Agreement and Settlement Agreements speak for themselves, and their provisions are set forth in some detail below.

In the Supply Agreement, Barr and HMR agreed to "purchase and accept all of [their] requirements for Product from Bayer" and not to "manufacture or have manufactured in the United States or

---

**48.** The Second Circuit in *Capital Imaging* articulated a burden-shifting approach to the rule of reason. "[P]laintiff bears the initial burden of showing that the challenged conduct has had an *actual* adverse effect on competition as a whole in the relevant market...." 996 F.2d at 543. If the plaintiff meets this burden, "the burden shifts to the defendant to offer evidence of the pro-com-

petitive redeeming virtues of their combination." *Id.* (internal quotation marks and citations omitted). Should the defendant offer such proof, the plaintiff must show that such procompetitive objectives could be achieved through alternative means that are "less prejudicial to competition as a whole." *Id.* (citations omitted).

Puerto Rico (other than by Bayer) the Product or market the Product in the United States or Puerto Rico....".[49] Pls.' J.A., Ex. E § 3.01. "Product" is defined to mean "all oral dosage forms of ciprofloxacin presently or subsequently marketed by Bayer or any of its subsidiaries in the United States...." *Id.*, Art. II. Bayer, however, is not required under the Supply Agreement to supply Cipro to Barr and HMR; instead, Bayer has an option to do so. The agreement expressly provides that Bayer "shall pay at the end of each Calendar Quarter to the Barr Escrow Account the amount set forth in Schedule 4.01 for such Calendar Quarter." *Id.* § 4.01. Alternatively, under the "Bayer Option," Bayer may, in its "sole discretion," "cease making the payments to the Barr Escrow Account" and begin supplying Cipro to Barr and/or HMR.[50] *Id.* § 4.02. To date, Bayer has exercised its option to make the payments. These payments, through December 2003, total $398 million. *See id.*, Sch. 4.01. According to plaintiffs, the unambiguous terms of this agreement establish that, "in exchange for cash, Barr and HMR ceded to Bayer, their horizontal competitor, the determination whether they would market generic Cipro in the United States." D.P. Summ. J. Mem. at 17. Such an arrangement, they contend, is a "classic market allocation agreement." *Id.*

Plaintiffs claim that their conclusions are corroborated by examining the terms of the Supply Agreement together with those of the Settlement Agreements. The Barr Settlement Agreement ended the patent challenge between Bayer and Barr. *See* Pls.' J.A., Ex. B ¶ 3. Although not parties to that litigation, HMR, Rugby, Sherman, and Apotex also executed "settlement agreements" with Bayer. Under the Barr and HMR/Rugby Settlement Agreements, Bayer agreed to pay $49.1 million to the Barr Escrow Account, and Bayer, Barr and HMR agreed concurrently to enter into the Supply Agreement (which provides for further payments). *See id.* §§ 1, 2; *id.*, Ex. C §§ 1, 2. In return, Barr and the other signatories acknowledged the validity in the United States of (and agreed not to challenge) the 444 Patent—the only patent at issue in the patent litigation—as well as additional patents "relating to the synthesis, manufacture, compound or precursors to ciprofloxacin and any pharmaceutical formulation containing ciprofloxacin existing throughout the world." *Id.*, Ex. B §§ 4, 5(c); *id.*, Ex. C §§ 3, 4(c); *id.*, Ex. D §§ 1, 2; *see also generally* Petrovicki Decl. Among these additional patents are three patents related to the synthesis and manufacture of Cipro administered intravenously, all of which will expire after the 444 Patent. *See* Pls.' Joint Statement of Material Facts Pursuant to Local Civ. R. 56.1 ¶ 24; Bayer's 56.1 Stat. ¶ 24. According to plaintiffs, prior to entering into the Settlement Agreements, Barr and Rugby agreed in the Litigation Funding Agreement to retain patent counsel to examine the validity of Bayer's patents claiming intravenous Cipro and, if appropriate, jointly challenge the validity of such patents. *See* Pls.' J.A., Ex. P § 5.1(a)-(e). Plaintiffs claim that the Settlement Agree-

---

**49.** The Supply Agreement contains some exceptions to this limitation: Barr and HMR may manufacture Cipro to maintain qualifications of suppliers, qualify new suppliers, make qualifying batches, make validation batches, conduct product development work, or file a new ANDA for Cipro. *See* Pls.' J.A., Ex. E § 3.01.

**50.** In addition, if a court were to find the 444 Patent invalid or unenforceable as to a particular person (triggering a "Generic Date") or as to all persons (triggering an "Invalidity Date"), *see* Pls.' J.A., Ex. E § 1.01, Bayer agreed to supply Cipro to Barr and HMR. *See id.* (defining "Supply Period"); *id.* § 3.06 (setting forth royalty payment).

ments prevent Barr and HMR from bringing any such challenge.

Under the Barr Settlement Agreement, Barr also agreed to amend its ANDA by withdrawing its Paragraph IV Certification and substituting a Paragraph III Certification. *See id.*, Ex. B § 5(a). A Paragraph IV Certification is the only mechanism for FDA approval to market a generic drug during the life of the pioneer drug's patent. *See* 21 U.S.C. § 355(j)(2)(A)(vii)(IV). By contrast, a Paragraph III Certification seeks permission to market the generic drug only after the patent on the pioneer drug has expired. *See* Pls.' J.A. § 355(j)(2)(A)(vii)(III). In addition, Barr, HMR and Rugby agreed not to file any ANDA IVs for products "relating to Cipro." *Id.*; Ex. B § 5(a); *id.*, Ex. C § 4(a).[51] "Cipro" is defined to mean "the novel compound commonly known as ciprofloxacin," which is claimed under the 444 Patent. *Id.*, Ex. B ¶ 2; *id.*, Ex. C ¶ 2. Lastly, the Settlement Agreements contain the following additional provisions:

A. Barr will not assist any third parties in "challenging in any way the validity or enforceability of any of the Patents other than the 444 Patent in the United States or any of the Patents outside the United States, the Settlement Agreements or the Supply Agreement." *Id.*, Ex. B § 5(d). Similarly, HMR/Rugby will not assist any nonaffiliate "in challenging in any manner the validity or enforceability of the Patents anywhere in the world, the Settlement Agreements or the Supply Agreement." *Id.*, Ex. C § 4(d).

B. Barr will deliver to its counsel, Williams & Connolly and Cohen, Pontani, Lieberman & Pavane (the "Law Firms"), letters set forth as exhibits to the Barr Settlement Agreement, which provide Barr's permission for the Law Firms to thereafter represent Bayer "in connection with potential challenges to its ciprofloxacin patent." *Id.*, Ex. B § 5(f) & Exs. C, D; *see also id.*, Exs. R, S.

C. Barr will "collect and destroy" all but one copy of certain documents that the parties had exchanged and/or created during the patent litigation, with that one copy to be held by the Law Firms, who are required to deliver all but privileged and work product documents to Bayer, with Bayer having the power to instruct the Law Firms how to handle the withheld documents. *Id.*, Ex. B § 3(b)-(d).

Plaintiffs maintain that, viewed together, the Supply Agreement and the Settlement Agreements operate to pay hundreds of millions of dollars to Bayer's competitors—Barr, HMR and Rugby—to relinquish all avenues open to them to enter the domestic market with a generic version of Cipro. *See* D.P. Summ. J. Mem. at 19. For more than a century, agreements between actual or potential competitors to allocate territories or customers have been considered *per se* violations of Section 1 of the Sherman Act. *See, e.g., United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 293–94 (6th Cir.1898), *aff'd*, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); *Palmer*, 498 U.S. at 49–50, 111 S.Ct. at 402–03;

---

**51.** However, the Barr Settlement Agreement permits Barr to "amend the certification relating to its Pending ANDAs to be a certification pursuant to Paragraph IV of the Act" if the 444 Patent is "declared invalid or unen- forceable by a court of competent jurisdiction or by administrative determination or becomes invalid or unenforceable by operation of law." Pls.' J.A., Ex. B § 5(a).

*Topco,* 405 U.S. at 608, 92 S.Ct. at 1133; *see also United States v. Koppers Co.,* 652 F.2d 290, 293–97 (2d Cir.1981). According to plaintiffs, the Supply Agreement and Settlement Agreements are functional equivalents to the horizontal restraints of trade that the Supreme Court found to be *per se* illegal in *Addyston Pipe* and *Palmer.*

In *Addyston Pipe,* the Sixth Circuit examined a complex agreement among manufacturers of cast iron pipe to allocate territories and customers among them. The result of the scheme was that purchasers were forced to buy pipe at artificially inflated prices from a single manufacturer, who then passed along a part of its profits to the manufacturers who had agreed not to compete. *See* 85 F. at 294–95. Judge Taft, writing for the Sixth Circuit, pondered, "Can there be any doubt that this was a restraint of interstate trade and commerce?" *Id.* at 295. His question was answered affirmatively, in a similar rhetorical vein, by the Supreme Court on appeal:

> If dealers in any commodity agreed among themselves that any particular territory ... should be furnished with such commodity by certain members only of the combination, and the others would abstain from business in that territory, would not such agreement be regarded as one in restraint of interstate trade? If the price of the commodity were thereby enhanced (as it naturally would be), the character of the agreement would be still more clearly one in restraint of trade.... Does not an agreement or combination of that kind restrain interstate trade, and when Congress has acted by the passage of [Section 1 of the Sherman Act], does not such a contract clearly violate that statute?

*Addyston Pipe & Steel Co. v. United States,* 175 U.S. 211, 241, 20 S.Ct. 96, 107, 44 L.Ed. 136 (1899).

In *Palmer,* the Supreme Court addressed an agreement between two potential competitors in the bar review market, BRG of Georgia and Harcourt Brace Jovanovich ("HBJ"), pursuant to which HBJ agreed not to compete with BRG in Georgia and BRG agreed not to compete with HBJ in any other state. *See* 498 U.S. at 46–48, 111 S.Ct. at 401–02. The Supreme Court found this agreement "unlawful on its face." *Id.* at 50, 111 S.Ct. at 403. Citing its earlier decision in *Topco,* the *Palmer* Court reiterated that "horizontal territorial limitations ... are naked restraints of trade with no purpose except stifling of competition" and are, therefore, *per se* illegal. *Id.* at 49, 111 S.Ct. at 402 (citing 405 U.S. at 608, 92 S.Ct. at 1133–34).

In reaching its conclusion, the Supreme Court rejected the assumptions of the district court and the court of appeals that an allocation of markets by competitors is unlawful only if the competitors divide a market in which they previously competed. *See id.* In this regard, the Supreme Court noted that a *per se* violation was found in *Topco,* even though the defendants had agreed merely to allocate territories but had never competed in the same market. *See id.,* 111 S.Ct. at 403. Therefore, the *Palmer* Court found the agreement between BRG and HBJ "anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for another." *Id.* Based on *Addyston Pipe* and *Palmer,* plaintiffs claim that the Settlement Agreements and Supply Agreement allocate the entire domestic Cipro market to Bayer and, in return, Bayer pays a portion of its unlawfully obtained monopoly profits to

Barr and HMR. This arrangement, they maintain, is a "classic" example of conduct that violates the Sherman Act. *See Topco,* 405 U.S. at 608, 92 S.Ct. at 1133 ("One of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of market structure to allocate territories in order to minimize competition.").

### (4)

### The *Cardizem* and *Terazosin* Holdings

Relying on the Supreme Court's jurisprudence on horizontal market allocation agreements, courts within other circuits have found that agreements between pioneer drug manufacturers and generic manufacturers that filed ANDA IVs seeking to market a generic version of the pioneer drug constitute horizontal market allocations agreements and are, thus, *per se* illegal. *See Cardizem,* 105 F.Supp.2d 682; *Terazosin,* 164 F.Supp.2d 1340.

The patent at issue in *Cardizem* was a formulation patent for Cardizem CD, a once-a-day time-release dose of the chemical compound diltiazem hydrochloride ("Cardizem"). Andrx, the generic manufacturer, filed an ANDA IV alleging that its formulation did not infringe the pioneer patent. *See* 105 F.Supp.2d at 686. In response, HMR, the patent holder (and, interestingly, one of the Generic Defendants in this case), sued Andrx, thereby triggering the 30–month stay on final FDA approval. On September 15, 1997, while the patent litigation was pending, the FDA granted tentative approval of Andrx's ANDA IV. Less than ten days later, HMR and Andrx entered into the agreement at issue, in which Andrx agreed not to enter the market with its generic version of Cardizem. *See id.* at 687. By July 1998, Andrx had obtained final FDA approval to market its product, and the 30–month stay had expired. This triggered HMR's obligation under the agreement to pay Andrx $10 million per quarter. *See id.* Pursuant to the agreement, HMR began making payments to Andrx, and Andrx did not market its generic version of Cardizem upon expiration of the 30–month statutory stay, i.e., Andrx did not trigger the 180–day exclusivity period. *See id.*

The court in *Cardizem* found the agreement constituted a *per se* market allocation agreement among horizontal competitors. The court found that HMR and Andrx were potential competitors at the time they entered into the challenged agreement and that the agreement eliminated an avenue of rivalry, namely Andrx's entry into the market with a generic Cardizem product. *See id.* at 700. In addition, the court found that the agreements sought to minimize generic competition in Cardizem and to allocate the entire domestic Cardizem market to HMR because the agreement "restrained Andrx from marketing non-infringing or potentially non-infringing versions of Cardizem" and "restrained Andrx from relinquishing or otherwise compromising its rights to the 180–day period of exclusivity it obtained under the Hatch–Waxman Amendments." *Id.* at 699. Accordingly, the court found that the agreement not only protected HMR from competition from Andrx, it also protected HMR from competition from other generic competitors. Indeed, it found that Andrx's delayed entry postponed the start of the 180–day exclusivity period, thereby precluding others from obtaining final FDA approval until that period expired. The court rejected the defendant's pro-competitive justifications, including an argument that the agreement fostered the expeditious resolution of the patent infringement dispute, noting that the agreement did not resolve the pending patent litigation and actually created an incentive to pursue litigation beyond the district court and

through the appellate courts.[52] *See id.* at 705. This decision is currently pending before the Sixth Circuit.

Like in *Cardizem*, in *Terazosin*, the patents at issue appear to be formulation patents that covered the tablet and capsule formulations of the drug terazosin hydrochloride, marketed by Abbot under the brand name "Hytrin." *See* 164 F.Supp.2d at 1346. Geneva and Zenith, generic drug manufacturers, filed their respective ANDA IVs alleging that they did not infringe Abbott's patents. *See id.* at 1344. Abbott sued Geneva for its tablet formulation, inexplicably failing to challenge its capsule formulation. *See id.* Thus, the 30–month statutory stay on FDA approval applied only to Geneva's ANDA IV for its tablet formulation. Abbott also sued Zenith twice for infringement and lost both times. During this period, however, Abbott listed two additional patents in the Orange Book. When the FDA informed Zenith that it had to amend its ANDA IV to certify with respect to these newly listed patents, Zenith sued Abbott for improperly listing the patents in the Orange Book. Zenith sought injunctive relief and asked the court to delist the challenged patents; the trial court denied Zenith's relief, and Zenith appealed. *See id.* On March 20, 1998, Zenith and Abbott settled their Orange Book-delisting dispute. Shortly thereafter, on March 30, 1998, Abbott learned that Geneva's ANDA IV for its capsule formulation had received final FDA approval and that Geneva was free to enter the market with its capsule. Within two days, Abbott signed separate agreements with both Geneva and Zenith under which they each agreed not to market a generic terazosin hydrochloride product until, *inter alia*, another drug maker sold such a product in the United States. *See id.* at 1346.

In addition, like the *Cardizem* court, the *Terazosin* court found the agreements "contain numerous covenants inimical to free enterprise," and are, therefore, *per se* illegal market allocation agreements. *Id.* at 1348. The court found that Geneva and Zenith were "poised to compete with Abbott at the same level of the market" since Geneva had received final FDA approval of its ANDA IV pending validation, and Zenith anticipated a favorable outcome in litigation that would result in final approval of its ANDA IV. With regard to the Abbott/Geneva agreement, the court emphasized that the agreement forestalled competition in the domestic terazosin hydrochloride market because Geneva agreed not to market its FDA-approved generic capsule, not to sell its rights to the capsule and its tablet ANDA IVs, to oppose attempts by other ANDA applicants to enter the market early, and if Geneva successfully defended its tablet ANDA before the Federal Circuit (thereby satisfying the FDA's "successful defense" requirement for 180–day exclusivity), to refrain from marketing its approved product until Abbott exhausted any appeals before the Supreme Court.[53]

---

**52.** The court did acknowledge, however, that the agreement resolved Andrx's antitrust and unfair practice counterclaims against HMR. *See Cardizem*, 105 F.Supp.2d at 705.

**53.** Notably, at the time of the challenged agreements in *Terazosin*, the FDA's "successful defense" requirement for 180–day exclusivity was still in effect. Thus, even if Geneva had final FDA approval of its tablet formula-

tion, it could not market exclusively a generic terazosin hydrochloride tablet until it successfully defended its ANDA IV against Abbott in the patent infringement case. *See* 164 F.Supp.2d at 1345. Under the Abbott/Geneva agreement, Geneva agreed to join and support any motion by Abbott in the patent infringement case to extend the 30–month statutory stay on FDA approval of its proposed tablet—effectively delaying both FDA approv-

*See id.* at 1346–47. With regard to the Abbott/Zenith agreement, the court emphasized that Zenith agreed not to sell or otherwise commercially distribute any terazosin hydrochloride product in the Untied States, not to aid or assist any person or entity to gain FDA approval to market such a product, and to obtain Abbott's permission to market such products once generic competition began. *See id.* at 1346. In exchange, Abbott agreed to pay Zenith $3 million and an additional $6 million per quarter [54] and to pay Geneva $4.5 million per month. *Id.*

Accordingly, the court found that Geneva and Zenith's agreements tended to forestall competition in the domestic terazosin hydrochloride market and were, therefore, classic examples of a market allocation agreement among horizontal competitors that has traditionally been subject to *per se* treatment. *Id.* at 1349. The court rejected defendants' argument that the agreements were "reasonably ancillary to procompetitive activity" because they were, *inter alia,* patent settlements, noting that, the Abbott/Geneva agreement did not resolve the pending litigation but instead "tended to prolong [the] dispute." *Id.* at 1350. While the Abbott/Zenith agreement ended the parties' Orange Book litigation, the court found that portion of the agreement to be "part of a larger scheme to restrain the domestic sale of generic terazosin hydrochloride products." *Id.* at 1353. This case is currently on appeal.

(5)

## Analysis of the Settlement Agreements and Supply Agreement in light of *Cardizem* and *Terazosin*

Plaintiffs contend that the holdings in *Cardizem* and *Terazosin* support a finding that the agreements in this case are *per se* illegal. Although there are some similarities, *Cardizem* and *Terazosin* are distinguishable from this case.

### a. Bayer and Barr are horizontal competitors.

 Like the pioneer manufacturer and generic manufacturer in *Cardizem* and *Terazosin,* Bayer and Barr are horizontal competitors. The issue of horizontal competition is critical in determining whether the challenged agreements in this case are appropriately analyzed as a horizontal restraint of trade, thereby justifying *per se* condemnation. The Supreme Court has held that parties can be horizontal competitors regardless of whether they are actual competitors (i.e., currently competing in the same market) or potential competitors. *See Palmer,* 498 U.S. at 46–48, 111 S.Ct. at 401–02; *Otter Tail Power Co. v. United States,* 410 U.S. 366, 378, 93 S.Ct. 1022, 1030, 35 L.Ed.2d 359 (1973); *see also* II Hovenkamp, *IP and Antitrust,* § 33.2 at 33–11; XI Hovenkamp, *Antitrust Law,* ¶ 1901b at 185. In this regard, the Southern District recently recognized that filing an ANDA is sufficient evidence that generic drug companies are competitors of brand-name manufacturers. *See In re Buspirone Patent Litig.,* 185 F.Supp.2d 340, 343 (S.D.N.Y.2002) (noting that ANDA IV filers are competitors of brand-

---

al and resolution of the patent infringement suit.

**54.** Abbott paid Zenith the initial $3 million payment in exchange for Zenith dropping its suit against Abbott, in which it claimed that

Abbott improperly listed patents in the Orange Book. The $6 million quarterly payments were in exchange for Zenith refraining from distributing generic terazosin hydrochloride. *See Terazosin,* 164 F.Supp.2d at 1346.

name manufacturer, who have been seeking to produce or sell generic versions of pioneer drug); *accord Andrx*, 256 F.3d at 806–08 (noting that ANDA IV filer is "potential competitor" of brand-name manufacturer); *Cardizem*, 105 F.Supp.2d at 701 (finding it "evident" that ANDA IV filer and brand-name manufacturer were competitors from generic manufacturer's ANDA, Paragraph IV Certification and subsequent patent suit); *Terazosin*, 164 F.Supp.2d at 1349 (finding that filing ANDA IV demonstrated that generic manufacturers were "poised to compete" with brand-name manufacturer at same level of market).

Similarly, challenging patents through litigation is a form of competition. *See United States v. Line Material Co.*, 333 U.S. 287, 319, 68 S.Ct. 550, 556, 92 L.Ed. 701 (1948) (Douglas, J., concurring) (noting that patent litigation undertaken for purpose of bringing competitive product onto market is itself form of competition); *see also* Anthony, *supra*, at 3 (noting that agreement to resolve ANDA IV litigation is "agreement between competitors"). In fact, Barr's Chairman and CEO recognized that challenging patents on brand-name drugs "is a key component of Barr's generic pharmaceutical development activities," Downey Decl. ¶ 12, and that such challenges are between "competitors." *Id.* ¶ 1; *cf.* G.Defs.' Mot. Dismiss Mem. at 14–15 (arguing that chilling patent challenges would "harm competition").

In this case, Barr filed an ANDA with a Paragraph IV Certification, the only certification that would permit Barr to market a generic version of Cipro before the 444 Patent expires. *See* 21 U.S.C. § 355(j)(2)(A)(vii). By making such a certification, "Barr announced to the FDA and to the world that it intended to compete with Bayer." I.P. Summ. J. Mem. at 24 (citation omitted); *see* 21 U.S.C. § 355

(stating purpose of ANDA is to gain approval "to introduce or deliver for introduction into interstate commerce" generic version of previously approved drug). In fact, Barr had to complete research and development and undertake various steps to pursue its ANDA, such as procure raw materials, formulate the product, analyze the patent, and perform the requisite bioequivalence testing. *See* Downey Decl. ¶¶ 13, 15, 17. Such actions are sufficient to show that Barr had the "desire, intent and capability to enter the market." *Engine Specialties, Inc. v. Bombardier Ltd.*, 605 F.2d 1, 9 (1st Cir.1979) (noting that to find horizontal relationship, it must be shown that potential competitor had necessary desire, intent, and capability to enter market at same level); *see also* David A. Balto, *Pharmaceutical Patent Settlements: The Antitrust Risks*, 55 Food Drug. L.J. 321, 334 (2000) (discussing *Terazosin* and noting that generic manufacturer "is a potential competitor since it had declared its intention and capability to enter with a bio-equivalent drug that it had certified as noninfringing").

In response to all this, defendants argue that Generic Defendants are not actual or even potential competitors of Bayer because, until the 444 Patent expires or is invalidated, Bayer's patent monopoly absolutely prohibits all competition in the domestic Cipro market. Defendants are incorrect; their argument ignores the Hatch–Waxman statutory scheme. Indeed, as discussed above in relation to defendants' motion to dismiss, the Hatch–Waxman Amendments provide that an ANDA IV filer can market its generic drug once it has received final FDA approval, even before resolution of the patent litigation. *See* 21 U.S.C. § 355(j)(2)(B)(iii); *see also Elan*, 212 F.3d at 1247 n. 5; *Zeneca*, 16 F.Supp.2d at 115–16; Anthony, *supra*, at 2. If an ANDA IV filer has received tentative FDA approval before

the 30–month statutory stay has expired, courts have found that final FDA approval is immediate at the end of the 30–month period. *See Bristol–Myers Squibb Co. v. Copley Pharm., Inc.*, 144 F.Supp.2d 21, 23 (D.Mass.2000) (noting that once first ANDA IV filer receives tentative approval, final approval is delayed only by 30–month stay). At the time of the challenged agreements, the FDA had tentatively approved Barr's ANDA IV, further supporting its capability to enter the Cipro market. In fact, had Bayer and Barr not stipulated to extend the 30–month stay, Barr would have been free to market its generic Cipro as of April 1995. Even with the stipulation, plaintiffs contend that Barr would have been free to market its generic product upon resolution of the patent litigation in 1997 (assuming Barr prevailed in litigation). Accordingly, Barr was at least a potential competitor of Bayer's when it entered into the Barr Settlement Agreement and Supply Agreement.

**b. The agreements in this case do not exceed the scope of Bayer's 444 Patent.**

However, simply because Bayer and Barr are horizontal competitors does not automatically mean that any agreement between them is *per se* illegal. Plaintiffs assert that the agreements in this case are analogous to the agreements in *Cardizem* and *Terazosin* and that, accordingly, since those agreements were condemned as *per se* illegal, these agreements should be subject to the same fate. However, the courts in *Cardizem* and *Terazosin* found that the agreements at issue covered noninfringing, and potentially noninfringing, generic products; manipulated the 180–day exclusivity period, effectively delaying entry by other generic manufacturers; and perpetuated the underlying patent infringement suits. Thus, those courts concluded that the agreements were *per se* illegal horizon-

tal market allocation agreements. Despite plaintiffs' arguments to the contrary, these cases are inapposite because the facts as found by those courts are materially different from the facts in this case.

First, defendants submit that the 444 Patent is a compound patent on ciprofloxacin hydrochloride, the single active ingredient in any Cipro product. Thus, viewing the facts in favor of the defendants, Bayer's 444 Patent lawfully excludes all generic manufacturers from the Cipro market regardless of the generic product's formulation or delivery method. By contrast, the *Cardizem* and *Terazosin* cases appear to involve only formulation patents, which cover only a particular formulation or method of delivering a drug and do not necessarily foreclose all competition in the market for the drug itself. In *Cardizem*, the patent covered a once-a-day timerelease delivery and its dissolution profile; in *Terazosin*, the patent covered the tablet formulation of the pioneer drug. The difference between those cases and this case is that the generic manufacturers in *Cardizem* and *Terazosin* could avoid infringement by using a different delivery method or formulation for the generic product. In fact, that is exactly what the generic manufacturer in *Cardizem* did. Indeed, the saga in *Cardizem* did not end at the challenged agreement. After HMR and Andrx entered into the agreement, but while the patent litigation was still pending, Andrx submitted to the FDA a prior approval supplement to its original ANDA IV, seeking to change the dissolution profile of its generic drug. Accordingly, Andrx urged HMR to reconsider its infringement claims. *See Cardizem*, 105 F.Supp.2d at 688. After a flurry of activity spanning almost a year, the FDA's approval of Andrx's prior approval supplement became effective on June 9, 1999. On that same date, HMR and Andrx stipulated to settle

the patent infringement case and terminated the HMR/Andrx agreement at issue. *See id.* at 689. The stipulation provided, *inter alia,* that HMR would not institute a patent infringement challenge against Andrx's reformulated drug. *See id.*

When the *Cardizem* court condemned the HMR/Andrx agreement, it emphasized that the agreement restrained Andrx from marketing other bioequivalent or generic versions of Cardizem that were not at issue in the pending patent litigation, including the reformulated drug that Andrx submitted in its prior approval supplement. Thus, the court found that the agreement's restrictions extended to non-infringing and/or potentially noninfringing versions of generic Cardizem. *See id.* at 699. Similarly, the *Terazosin* court found that the challenged agreements in that case precluded Zenith and Geneva from selling *any* generic terazosin hydrochloride product, despite the fact that the underlying patent litigation involved only tablet formulation patents. For instance, the court noted that the Abbott/Geneva agreement precluded Geneva from selling its FDA-approved capsule formulation of terazosin hydrochloride, despite Abbott's unexplainable failure to sue for infringement with regard to its capsule formulation patent. By contrast, in this case, as more fully discussed below, the compound 444 Patent precludes all use of the active ingredient ciprofloxacin hydrochloride—no matter what form or delivery method used.

c. **The agreements in this case finally resolved pending litigation and did not result in a "bottleneck".**

■ Second, the agreements at issue in *Cardizem* and *Terazosin* did not resolve the underlying patent disputes. *See Cardizem,* 105 F.Supp.2d at 705 (finding HMR/Andrx agreement "did not resolve the pending patent claims"); *Terazosin,*

164 F.Supp.2d at 1353 (finding Abbott/Geneva agreement "did not resolve [Geneva's] infringement suit"). Instead, in *Terazosin* and *Cardizem,* the challenged agreements restricted marketing during the pendency of ongoing patent litigation. Indeed, in those cases, the brand-name drug manufacturers entered into agreements with prospective generic competitors on the verge of commencing marketing in exchange for the generic manufacturer's agreement to stay off the market pending the outcome of the patent litigation. This fact, in connection with the agreements' other restraints, underscores the anticompetitive nature of the agreements in *Cardizem* and *Terazosin.* By agreeing both not to end the underlying patent dispute and not to market a generic drug product in the relevant domestic market, Andrx and Geneva effectively precluded or seriously delayed both the court decision and the commercial marketing trigger of the 180–day exclusivity period. As a result, any future ANDA IV filers were delayed in coming to market with their generic products until the expiration of the 180–day exclusivity period.

This last point is probably the most significant difference between this case and *Cardizem* and *Terazosin;* those cases involved so-called "bottlenecks" that effectively delayed future ANDA IV filers from entering the relevant generic drug market. For instance, the *Cardizem* court construed the HMR/Andrx agreement as requiring Andrx to maintain its ANDA IV certification, an element the court characterized as an attempt to block other generic competitors by maintaining indefinitely Andrx's 180–day exclusivity period. *See* 105 F.Supp.2d at 699. Indeed, as indicated above, by not relinquishing its rights under its ANDA IV, Andrx retained its right to 180–day exclusivity once it began marketing its generic drug (its ANDA IV

had already received *final* FDA approval, i.e., the 30–month statutory stay had expired) or the court ruled in the patent litigation. However, since Andrx agreed under the HMR/Andrx agreement not to market its generic drug, and since the patent litigation continued with Andrx agreeing to defend vigorously its ANDA IV, the challenged agreement delayed triggering the 180–day exclusivity period, thereby delaying other ANDA IV filers from entering the Cardizem market. Accordingly, the court found the HMR/Andrx agreement not only protected HMR from Andrx's competition, but also protected HMR from other generic manufacturers' competition. *See id.*

Similarly, in *Terazosin,* the Abbott/Geneva agreement required Geneva, the first ANDA IV filer, not to transfer the rights to its ANDA IVs or its FDA-approved generic capsule. The agreement also required Geneva not to market *any* generic terazosin hydrochloride drug. Like the generic manufacturer in *Cardizem,* Geneva had received *final* FDA approval of its ANDA IV for a generic terazosin hydrochloride capsule, subject to validation. Thus, like the HMR/Andrx agreement, the Abbott/Geneva agreement delayed triggering Geneva's 180–day exclusivity period, effectively holding up FDA approval of other generic manufacturers' ANDA IVs.

By contrast, the Settlement Agreements here did not create a "bottleneck" for future ANDA IV filers. First, at the time of the Settlement Agreements, the FDA regulation in effect conditioned the first ANDA IV filer's right to 180–day exclusivity on a "successful defense" of its ANDA IV against the patent holder's lawsuit. *See* 21 C.F.R. § 314.107(c)(1), *revoked,* Effective Date of Approval of Abbreviated New Drug Application, 63 Fed.Reg. 59710 (Nov. 5, 1998). In this case, the Barr Settlement Agreement ended the underlying patent litigation, and, in the Consent Judgment, Barr acknowledged the validity, and its infringement, of the 444 Patent. More significantly, under the Barr Settlement Agreement, Barr agreed to withdraw its Paragraph IV Certification and to amend its ANDA to contain a Paragraph III Certification. In other words, Barr withdrew its attack on the 444 Patent instituted through its ANDA IV filing. Thus, Barr failed to satisfy the successful defense requirement. Indeed, as discussed more fully below, in direct contrast to the generic manufacturers in *Cardizem* and *Terazosin,* Barr agreed under the Barr Settlement Agreement to *relinquish* its right to the exclusivity period provided by the Hatch–Waxman Amendments. Plaintiffs' attempt to substantiate their argument by pointing to the subsequent demise of the successful defense requirement is unconvincing.

In 1997, after the Settlement Agreements and Supply Agreement were executed, two federal courts rendered conflicting decisions on the validity of the successful defense requirement. *Compare Mova Pharm. Corp. v. Shalala,* 955 F.Supp. 128 (D.D.C.1997) (questioning validity of successful defense requirement and enjoining FDA from enforcing successful defense regulation against plaintiff because the underlying statutory language does not contain such a requirement), *aff'd,* 140 F.3d 1060 (D.C.Cir.1998); *with Granutec, Inc. v. Shalala,* No. 5:97 Civ. 485, 1997 WL 1403894 (E.D.N.C. July 3, 1997) (upholding validity of successful defense requirement and enjoining FDA from *refusing* to enforce the requirement), *rev'd,* 139 F.3d 889, 1998 WL 153410 (4th Cir.1998) (unpublished table decision) (per curiam). In April 1998, the Courts of Appeal for the District of Columbia Circuit and the Fourth Circuit both issued opinions striking down the FDA's successful defense

regulation. *See Mova*, 140 F.3d 1060; *Granutec*, 139 F.3d 889, 1998 WL 153410.

Then, in June 1998, the *Mova* district court permanently enjoined the FDA from enforcing the successful defense regulation. Shortly thereafter, the FDA issued guidance announcing that it will remove the requirement, and the successful defense provisions were formally removed from the regulations in November 1998. *See* Effective Date of Approval of Abbreviated New Drug Application, 63 Fed.Reg. at 59711. However, despite the ultimate withdrawal of the successful defense requirement, the fact still remains that the requirement was in effect at the time of the Bayer/Barr settlement.[55] Therefore, by settling the patent litigation and withdrawing its ANDA IV, Barr failed to meet the successful defense requirement and was consequently ineligible for 180–day exclusivity. *Cf. Terazosin*, 164 F.Supp.2d at 1345 (noting that, before circuit courts invalidated successful defense requirement, "Geneva [the first ANDA IV filer] would

have to successfully defend its ANDA against Abbott's infringement suit before Zenith [the second ANDA IV filer] successfully defended its ANDA" in order to market exclusively the first generic drug product).[56]

Apparently ignoring this plain fact, plaintiffs nonetheless maintain that the challenged agreements in this case blocked other generic manufacturers' attempts to enter the domestic Cipro market because Barr did not relinquish its right to 180–day exclusivity by amending its ANDA IV to an ANDA III. For support, plaintiffs emphasize that Barr consistently maintained to the FDA and the Federal Trade Commission ("FTC") that its amendment did not affect its right to the exclusivity period. In supplemental memoranda, plaintiffs attempt to substantiate their argument with provisions from FDA regulations, but their arguments are unconvincing.

55. Plaintiffs emphasize that a court decision from 1989 placed the successful defense requirement in substantial doubt before the challenged agreements in this case were executed. *See Inwood Labs., Inc. v. Young*, 723 F.Supp. 1523 (D.D.C.1989) (finding precursor policy of FDA allowing exclusivity only when ANDA IV filer has been sued in patent litigation unenforceable), *vacated as moot*, 43 F.3d 712 (D.C.Cir.1989). The *Inwood* court enjoined the FDA's application of the requirement in that case, but the parties' subsequent settlement rendered the FDA's appeal moot. Despite plaintiffs' arguments to the contrary, *Inwood* does not undermine the conclusion that the successful defense requirement was enforceable and in effect in January 1997. Indeed, the FDA formalized the successful defense requirement as a regulation in 1994, despite the recognition that it was contrary to the decision in *Inwood* and subject to further attack. *See* Abbreviated New Drug Application Regulations; Patent and Exclusivity Provisions, 59 Fed.Reg. 50338 (Oct. 3, 1994) (promulgating 21 C.F.R. § 314.107(c)(1)); *id* at 15352–53.

56. This court recognizes that the court in *Andrx* rejected an argument by the generic manufacturer in the *Cardizem* case that it had no ability to put a "cork in the bottle" because, under prevailing law, it was entitled to exclusivity only if it successfully defended the patent litigation. *See Andrx*, 256 F.3d at 803. In doing so, the court stated that the agreement, although dated September 24, 1997, did not go into effect until three months after the circuit court ruling in *Mova* in July 1998. *See id.* Thus, the court stated that "the timing of the Agreement and the demise of the successful defense requirement" defeats the generic manufacturer's claim. *Id.* The *Andrx* case is distinguishable from this case. In this case, the challenged agreements were entered into in January 1997, two months before the initial district court ruling in *Mova*, which invalidated the successful defense requirement. When the agreements in *Andrx* were signed, there was uncertainty as to the successful defense regulation, as two conflicting district court decisions had been rendered. When the agreements in this case were executed, there was no such uncertainty.

As an initial matter, Barr's subjective belief as to its right to the 180–day exclusivity period is irrelevant to the issue of *per se* liability. As indicated above, plaintiffs stress that Barr repeatedly asserted that it maintained 180–day exclusivity even though it amended its ANDA IV to an ANDA III.[57] However, courts have expressly refused to attach *per se* liability based on a party's intent. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136–38, 119 S.Ct. 493, 497–99, 142 L.Ed.2d 510 (1998); *K.M.B. Warehouse Distribus., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 130 (2d Cir.1995). Indeed, *per se* liability applies only when courts are certain that an agreement is "one that would always or almost always tend to restrict competition and decrease output." *Broad. Music, Inc. v. CBS*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979). Thus, any "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than ... upon formalistic line drawing." *Cont'l T. V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2562, 53 L.Ed.2d 568 (1977). Where, as here, plaintiffs have failed to demonstrate any "demonstrable economic effect" on competition, the parties' intent is irrelevant. Consequently, plaintiffs cannot attach *per se* liability to defendants based on subjective belief alone.

Furthermore, the FDA's regulatory posture does not substantiate plaintiffs' claims that Barr retained its 180–day exclusivity period despite amending its ANDA IV to an ANDA III. The only regulation in effect in January 1997 governing amendments of an ANDA IV to an ANDA III mandates, *inter alia*, that such an amendment is required "[a]fter a final judgment ... finding the patent to be infringed," and provides that, after the amendment, "the application will no longer be considered to be one containing a certification under paragraph [IV]." 21 C.F.R. § 314.94(a)(12)(viii)(A). In this case, the Consent Judgment found that Barr infringed the 444 Patent and that the 444 Patent was valid and enforceable as to Barr. Shortly after the Consent Judgment was entered, Barr amended its ANDA IV to an ANDA III, as mandated by the regulation. Accordingly, it would appear, as defendants suggest, that if Barr's application is no longer considered to contain a Paragraph IV certification, Barr is no longer entitled to 180–day exclusivity.

Nonetheless, plaintiffs point out that, in *Mova*, the FDA referred to the amendment regulation as existing merely for "housekeeping" purposes, and, thus, of no practical consequence. *See* 140 F.3d at 1071 n. 13. To prove this point, plaintiffs emphasize that Barr argued successfully to the FDA that is was entitled to 180–day exclusivity for the drug tamoxifen citrate, even after it amended its ANDA IV to an ANDA III.[58] In fact, in June 1998, shortly after the *Mova* ruling, Barr filed a Petition for Stay of Action with the FDA to block

**57.** To corroborate their claims, plaintiffs submit various letters from Barr to regulatory agencies stating Barr's belief that amending its patent certification does not render it ineligible for 180–day exclusivity. *See* App. to Aff. of Joseph Lipofksy in Supp. of Indirect Purchaser Class Pls.' Reply Mem. of Law ("I.P.App."), Ex. 22 at 5; *see also* Supp. Mem. in Supp. of Indirect Purchaser Class Pls.' Mot. for Partial Summ. J. ("I.P.Supp.Mem."), Exs. 2, 5, 6. In one such letter dated August 13, 1999, Barr claimed that it still retained the 180–day exclusivity period for Cipro despite its amendment. *See* I.P. Supp. Mem., Ex. 5 at 5.

**58.** As in this case, in the tamoxifen citrate case, Barr was the first generic manufacturer to submit an ANDA IV, prompting a lawsuit by the brand-name manufacturer, which was ultimately settled. The corresponding agreement required Barr to (and Barr did in fact) amend its ANDA IV to an ANDA III.

final marketing approval of another generic manufacturer's ANDA IV for a generic form of tamoxifen citrate. *See* I.P. Supp. Mem., Ex. 2. In the Petition, Barr maintained to the FDA that it was still entitled to the exclusivity period and that the FDA could not approve any other ANDA until Barr's exclusivity period expired. On March 2, 1999, the FDA granted Barr's petition to preserve its exclusivity period and to stay FDA approval of any other ANDA IV for tamoxifen citrate until that period expired. *See id.*, Ex. 3.

However, the FDA reversed its position in a subsequent letter to Barr dated June 26, 2000. *See id.*, Ex. 4. This change in interpretation followed the rejection of the FDA's interpretation of the Hatch–Waxman Amendments by the United States District Court for the District of Columbia in *Mylan Pharms., Inc. v. Henney*, 94 F.Supp.2d 36, 49 (D.D.C.2000) (finding Barr no longer eligible for the 180–day exclusivity period for tamoxifen citrate), *vacated as moot sub nom. Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627 (D.C.Cir.2002).[59] In rejecting that interpretation, the *Henney* court ridiculed the FDA's argument that its amendment regulation was "purely administrative" and concluded that "[i]n the absence of [a] cogent explanation[,] the agency's failure to follow its own regulation is fatal." 94 F.Supp.2d at 57 (citation omitted); *see also id.* (noting that "this argument inspired 'laughter' and jest from the [*Mova*] appeals court"); *Mova*, 140 F.3d at 1071 n. 13 (dicta) (con-

fessing not to understand "how the FDA can reconcile its reading with the language of its own regulation"). This regulatory history, while colorful, does not support plaintiffs' assertions that the Barr Settlement Agreement created a bottleneck for future ANDA IV filers. It is simply too speculative to assume that in January 1997, when the agreements in this case were signed, the parties predicted that the *Mova* court would ultimately strike down the successful defense regulation, that the regulation would be formally withdrawn, and that, consequently, the FDA would entertain requests by generic manufacturers, like Barr's Petition in the tamoxifen citrate case, to preserve exclusivity despite an amendment of the generic manufacturer's ANDA IV.

This conclusion is not undermined by the fact that the FDA proposed, but ultimately rejected, regulations that would have prevented the first ANDA IV filer who amends to an ANDA III to maintain its claim to exclusivity. On August 6, 1999, the FDA proposed new regulations to address a variety of concerns arising from the exclusivity provision of the Hatch–Waxman Amendments.[60] *See* 180–Day Generic Drug Exclusivity for Abbreviated New Drug Applications, 64 Fed.Reg. 42873 (Aug. 6, 1999). In its comment withdrawing the proposed regulation, the FDA stated that "[t]he agency will continue to regulate directly from the statute and the applicable FDA regulations to make 180–day exclusivity decisions on an

---

59. The *Henney* decision was subsequently vacated as moot because Pharmachemie, the applicant denied final approval because of Barr's claimed exclusivity, lost its challenge to the tamoxifen citrate patent. Pharmachemie thus could not obtain final approval at all (during the life of the patent), and the appeal was moot. *See Pharmachemie*, 276 F.3d at 629, 634.

60. Among other submissions, the proposed rules provided as follows: "If the first applicant subsequently withdraws its application or changes or withdraws its paragraph IV certification, either voluntarily or as a result of a settlement or defeat in patent litigation, no ANDA applicant will be eligible for 180–day exclusivity." 180–Day Generic Drug Exclusivity for Abbreviated New Drug Applications, 64 Fed.Reg. at 42875.

issue-by-issue basis." 180–Day Generic Drug Exclusivity for Abbreviated New Drug Applications, 67 Fed.Reg. 66593, 66594 (Nov. 1, 2002).[61]

Given this spotty state of the law, it is understandable why plaintiffs failed to demonstrate how the settlement at issue here prevented generic entry. The fact that the settlement prevented Barr from meeting the successful defense requirement—thus precluding Barr from receiving 180–day exclusivity under the prevailing regulations—renders plaintiffs' amendment argument of no practical import. Even without the successful defense requirement, there is no support for plaintiffs' claim that Barr retained 180–day exclusivity after amending from an ANDA IV to an ANDA III in the face of the plain language of the FDA's regulation.

Moreover, since the settlement, Bayer has filed Hatch–Waxman lawsuits against four different generic applicants: Ranbaxy, Schein, Mylan, and Carlsbad. The Bayer/Ranbaxy case was dismissed as moot following Ranbaxy's voluntary withdrawal of its ANDA IV. *See* Bayer App., Ex. 21. In the next two cases, Schein and Mylan, Bayer prevailed on summary judgment rejecting validity challenges. The Bayer/Carlsbad trial is still pending. Thus, the Bayer/Barr settlement did not prevent other generic manufacturers from challenging the 444 Patent. Furthermore, approximately seven additional companies have received tentative FDA approval of their respective ANDAs for generic Cipro products, which further undermines plaintiffs' bottleneck argument. *See* http://www.fda.gov/cder/approval/index.htm (last visited May 19, 2003); *see also* Decl. of Jerry A. Hausman, G.Defs.'

Summ. J. Mem., Ex. B ("Hausman Decl.") ¶ 36 & n. 18 (citation omitted). Consequently, plaintiffs cannot seek to attach *per se* liability to a set of agreements incapable of causing competitive harm because defendants believed, incorrectly, that it could cause harm. Thus, plaintiffs' reliance on the 180–day exclusivity provision in their argument for *per se* liability is misplaced.

In sum, plaintiffs rely on *Cardizem* and *Terazosin* to support their argument that *per se* liability applies to defendants' conduct in this case. As described above, both *Cardizem* and *Terazosin* involve attacks on purported market allocation agreements involving challenges under the Hatch–Waxman Amendments to ANDA IVs filed by other generic manufacturers seeking to market generic versions of other brand-name drugs. However, any persuasive authority that those cases might have is entirely undermined by the significant factual distinctions between those agreements and the settlement here. This is not a case where the challenged agreements restrict noninfringing goods, perpetuate litigation or manipulate the 180–day exclusivity period. Accordingly, this court declines plaintiffs' invitation to follow the reasoning in *Cardizem* and *Terazosin* and to find the Settlement Agreements and Supply Agreement in this case *per se* illegal without a more elaborate inquiry into the effect of Bayer's patent monopoly on the conduct at issue.

(6)

### The Effect of Bayer's 444 Patent and the Hatch–Waxman Amendments on *Per Se* Analysis

 Defendants accept as true many of the material facts concerning the Settle-

---

**61.** Current FDA regulations provide that the FDA will approve subsequent ANDAs if "the applicant submitting the first application is not actively pursuing approval of its abbreviated application...." 21 C.F.R. § 314.107(c)(3).

ment Agreements and Supply Agreement. They do, however, differ greatly with plaintiffs on the legal conclusions to be drawn from these facts. The thrust of defendants' argument is that a hasty application of the *per se* rule is inappropriate in this case because such an analysis ignores the exclusionary effect of Bayer's 444 Patent. *See* Bayer's Summ. J. Mem. at 20–23. Indeed, Bayer maintains that because the essence of a patent is the right to exclude, patent cases generally are not amenable to *per se* treatment. *See id.* at 16.

The patent laws, authorized by the Constitution, were enacted by Congress to stimulate invention and reward innovation by granting a patent holder a limited monopoly on the manufacture, use and sale of the patented invention. *See* U.S. Const. art. 1, § 8. It is well established that the exclusion of infringing rivals is at the "heart" of the patent right. *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1204 (2d Cir. 1981); *see also E Bement & Sons v. Nat'l Harrow Co.*, 186 U.S. 70, 91, 22 S.Ct. 747, 755, 46 L.Ed. 1058 (1902)(stating that "[t]he very object of [the patent] laws is monopoly"); *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1362 (Fed.Cir.1999) ("[T]he antitrust laws do not negate the patentee's right to exclude others from patent property."). Thus, the Supreme Court has stated that a patent holder does not run afoul of the Sherman Act unless the patent holder acts beyond the confines of the patent monopoly. *See United States v. Singer Mfg. Co.*, 374 U.S. 174, 196–97, 83 S.Ct. 1773, 1785, 10 L.Ed.2d 823 (1963) (citing *Line Material*, 333 U.S. at 308, 68 S.Ct. at 561); *United States v. Masonite Corp.*, 316 U.S. 265, 278, 62 S.Ct. 1070, 1078, 86 L.Ed. 1461 (1942).

In *United States v. Studiengesellschaft Kohle*, 670 F.2d 1122 (D.C.Cir.1981), the Court of Appeals for the District of Columbia Circuit considered whether the *per se* standard should apply to a patent license agreement that the United States alleged violated Sections 1 and 2 of the Sherman Act. *See* 670 F.2d at 1126. The case involved a patent holder with a "process patent" on a particular process for producing aluminum trialklys (ATAs), a catalytic agent and chemical reactant used to make biodegradable detergents and synthetic rubber for tires. *See id.* at 1124. The patent holder granted non-exclusive licenses to others to use his patented process to make ATAs, as long as they used them internally and did not sell them. *See id.* The United States sued the patent holder and, after a bench trial, the district court found the restrictions on the nonexclusive licenses violated Sections 1 and 2 of the Sherman Act, both under the *per se* rule and the rule of reason. *See id.* at 1125.

The circuit court reversed the district court's application of the *per se* standard, concluding that only the rule of reason applies. *Id.* at 1128. In criticizing the district court's analysis as treating the patent laws and antitrust laws as two separate inquiries, the circuit court remarked that "[s]uch a formalistic, two-step analysis forecloses adequate consideration of the fundamental fact that a patent by definition restrains trade, and in effect makes most exclusive patent licenses *per se* violations of the antitrust laws." *Id.; see also id.* (stating that it was "error to consider the scope of the patent protection irrespective of any competitive effects in the first phase of the case, and then rule separately on the anticompetitive effects of the arrangement without consideration of the protection of the patent"). The D.C. Circuit stated that, under its analysis, "the conduct at issue is illegal if it threatens competition in areas other than those protected by the patent, and is otherwise legal." *Id.* The circuit court then proceeded to examine the alleged anticompetitive effects

of the restraint at issue—a license agreement—and determined that they were all "legitimate rewards of the patent monopoly." *Id.*

Accordingly, when patents are involved, case law directs that the exclusionary effect of the patent must be considered before making any determination as to whether the alleged restraint is *per se* illegal. Therefore, the proper analysis in this case is whether the plaintiffs have proven as a matter of law that the challenged agreements restrict competition beyond the exclusionary effects of the 444 Patent.[62]

It is uncontested that ciprofloxacin hydrochloride is the only active ingredient in Bayer's brand-name drug Cipro. *See* Orange Book, NDA Nos. 19537 (Cipro tablet, oral); 19847 (Cipro injectable, injection); 20780 (Cipro for suspension, oral), *available at* http://www.fda.gov/cder/ob/default.htm (last visited May 19, 2003); *see also* Pls.' J.A., Ex. X. Thus, to obtain FDA approval to market a generic version of an approved drug product, like Cipro, which contains only a single active ingredient, a generic manufacturer must demonstrate, *inter alia,* that the "active ingredient of [its proposed] new drug is the same as that of the listed drug." 21 U.S.C. § 355(j)(2)(A)(ii)(I). Accordingly, any FDA-approved generic version of Cipro must therefore contain ciprofloxacin hydrochloride. *See* Downey Decl. ¶¶ 9, 17, 18.

As for the 444 Patent, it claims the compound ciprofloxacin hydrochloride. A patent on a compound that is the only active ingredient in a drug covers all generic versions of that drug. Indeed, such a compound covers any generic product, regardless of how formulated, processed or delivered (e.g., tablet, capsule, intravenous, time release). By contrast, a formulation patent—the type of patent at issue in *Cardizem* and *Terazosin*—covers only a particular formulation or delivery method. In *Cardizem,* the delivery method was a once-a-day time release of Cardizem. In *Terazosin,* the formulations were tablet and capsule forms of terazosin hydrochloride. Accordingly, in this case, the filing of an ANDA IV for *any* generic version of Cipro before the 444 Patent expires or is invalidated would necessarily infringe the 444 Patent.[63]

The Barr Settlement Agreement ended the patent litigation between Bayer and Barr. In the Consent Judgment, the patent litigation was dismissed, and Barr stipulated that its ANDA IV for a generic Cipro product infringed the 444 Patent and that the 444 Patent was valid and enforceable. *See* Pls.' J.A., Ex. N ¶¶ 2–3. Although not parties to the patent litigation, HMR, Rugby, Sherman, and Apotex also executed settlement agreements with Bayer. *See generally id.,* Exs. C, D. Under the Settle-

---

**62.** It is fairly evident that the district courts in *Cardizem* and *Terazosin* did not employ this analysis and, instead, immediately labeled the challenged restraints *per se* illegal horizontal market allocation agreements. Indeed, the *Cardizem* court expressly stated that "[t]he anticompetitive effects of [HMR]'s patents are ... not at issue." 105 F.Supp.2d at 701. In addition, the *Terazosin* court's discussion was noticeably silent with regard to the subject patents. To the extent that these courts ignored the exclusionary effects of the patents in their *per se* determination under Section 1 of the Sherman Act, defendants submit that those cases were incorrectly decided. It is not necessary to address this argument here because it is sufficient to reject the applicability of those cases as factually distinguishable.

**63.** For this reason, Barr's Chairman and CEO explained that Barr's only option for challenging the 444 Patent was to file an ANDA IV certifying that the 444 Patent was invalid. *See* Downey Decl. ¶ 9.

ment Agreements, the parties acknowledged (and agreed not to challenge) the validity of the 444 Patent and additional U.S. patents held by Bayer. *See id.,* Ex. B § 4; *id.,* Ex. C § 3; *id.,* Ex. D § 1. In addition, Barr agreed to amend its ANDA IV to an ANDA III. *See id.,* Ex. B § 5. In return, Bayer agreed to pay $49.1 million to the Barr Escrow Account, and Bayer, Barr and HMR agreed concurrently to enter into the Supply Agreement (which provides for further payments). *See id.,* Ex. B §§ 1, 2; *id.,* Ex C §§ 1, 2.

The Supply Agreement precludes Barr and HMR from manufacturing Cipro in the United States and requires them to purchase Cipro solely from Bayer. *See id.,* Ex. E § 3.01. It also provides that Bayer either can supply Cipro to Barr and HMR or make quarterly payments to the Barr Escrow Account. *See id.* §§ 4.01, 4.02. In sum, on their face, the challenged agreements prevent Barr, HMR and Rugby from manufacturing generic Cipro products and prevent all signatories from challenging the validity of the 444 Patent and other designated patents closely related to the 444 Patent. Plaintiffs claim that these restraints are *per se* illegal.

However, as indicated above, the 444 Patent is a compound patent that covers the active ingredient in all Cipro products. Thus, until the 444 Patent either is invalidated or expires, it lawfully precludes the manufacture and use of any generic product containing the compound ciprofloxacin hydrochloride regardless of the form or method of delivery. Therefore, the restrictions in the Supply Agreement on manufacturing Cipro appear within the confines of Bayer's lawful patent monopoly. Moreover, although the Settlement Agreements operate to preclude validity challenges to other U.S. patents held by Bayer, as discussed below, they do not appear to preclude future ANDA filings for generic Cipro products. Indeed, Barr, HMR or Rugby can file an ANDA IV certifying that their proposed generic product does not infringe any of Bayer's patents.[64] Lastly, as discussed below, by agreeing to amend its ANDA IV to an ANDA III, Barr relinquished its right to 180–day exclusivity. Thus, unlike in the *Cardizem* case, in this case there is no clear intent "to protect the 180–day period of exclusivity awarded ... under the Hatch–Waxman Amendments as the first-filed ANDA with a Paragraph IV certification." *Cardizem,* 105 F.Supp.2d at 696. Accordingly, the Settlement Agreements and Supply Agreement do not restrict competition in areas other than those protected by Bayer's 444 Patent and, thus, are not *per se* illegal under the Sherman Act. *See Studiengesellschaft Kohle,* 670 F.2d at 1128.

Plaintiffs, however, argue that the challenged agreements restrain competition beyond the exclusionary effects of the 444 Patent in many instances. First, plaintiffs assert that so-called reverse payments—payments flowing from the patent holder to the generic manufacturer—are nefarious and, therefore, the challenged agreements in this case, which provide for such payments, are *per se* illegal. In response, defendants assert that there is something unique about Hatch–Waxman settlements: they are a function of Hatch–Waxman's impact on the parties' relative risk. *See* Expert Decl. of George A. Hay, Bayer App., Ex. 20 ("Hay Decl.") ¶ 21. Accordingly, defendants argue that reverse pay-

---

**64.** Of course, as previously mentioned, since the 444 Patent is a compound patent that covers the active ingredient in all Cipro products, any ANDA IV for a generic Cipro product will infringe the 444 Patent. Thus, Bayer, HMR and Rugby cannot file such ANDA IVs until the 444 Patent either is invalidated or expires.

ments are not suspect and are, in fact, a natural by-product of Hatch–Waxman's shift of the litigation risk from the generic manufacturer to the patent holder. *See id.*

In this case, Barr certified in its ANDA IV that its generic Cipro product contained the active ingredient ciprofloxacin hydrochloride and that it, therefore, would infringe the 444 Patent if the patent is found valid and enforceable.[65] However, Barr's "act of infringement" occurred simply by filing its ANDA IV pursuant to the Hatch–Waxman Amendments, even though Barr made no commercial sales subjecting it to infringement damages. *See id.* This act of infringement provided the basis for Bayer's patent infringement suit against Barr, and the opportunity for Barr to attack the validity of the 444 Patent in court. However, defendants maintain, this contrived act of infringement deprived Bayer of the traditional leverage that a patent owner has against a typical infringer—obtaining damages from the court—and also subjected Bayer to enormous losses if Barr invalidated its pioneer patent.

It is uncontested that parties settle cases based on their perceived risk of prevailing in the litigation. In a traditional patent litigation, Barr normally would have had to enter the market with its product, incurring the costs of clinical trials, manufacturing and marketing. This market entry would have driven down Bayer's profits, as it took sales away. As a result, Bayer would have sued Barr, seeking damages for lost profits and willful infringement. If this were a traditional scenario, and Bayer and Barr settled (assuming a valid patent), the money would flow from Barr to Bayer because Barr would have put its company at risk by making infringing sales.

By contrast, in creating an artificial act of infringement (the ANDA IV filing), the Hatch–Waxman Amendments grant generic manufacturers standing to mount a validity challenge without incurring the cost of entry or risking enormous damages flowing from infringing commercial sales. *See id.* This statutory scheme affects the parties' relative risk assessments and explains the flow of settlement funds and their magnitude. Because of the Hatch–Waxman scheme, Barr's exposure in the patent litigation was limited to litigation costs, but its upside—exclusive generic sales—was immense. The patent holder, however, has no corresponding upside, as there are no infringement damages to collect, but has an enormous downside—losing its patent.

Moreover, patent holders realize that it is a "gamble" to place "a technology case in the hands of a lay judge or jury." Seymour E. Hollander, *Why ADR May be Superior in Patent Disputes,* 2 No. 1 Intell. Prop. Strategist 1, 6 (1995). In settling the patent litigation, Bayer not only saved litigation expenses but achieved essentially all that it could hope to achieve by continuing to litigate, i.e., a determination that, as to Barr, the 444 Patent is valid and Barr promises not to infringe the patent in the future. *See* Hay Decl. ¶ 21. In addition, Barr obtained less than it would have received if it had won (i.e., the court invalidated the patent) but more than it would have received if it had lost. *See* Downey Decl. ¶ 32; Hausman Decl. ¶ 39 & n. 21. To compromise, consideration

---

**65.** At this point, it is worth reiterating that a Paragraph IV Certification can include one of two certifications with regard to the brand-name manufacturer's patents: (1) that the patent is invalid *or* (2) that the proposed product does not infringe the patent. *See* 21 U.S.C. § 355(j)(2)(A)(vii); *see also* 21 C.F.R. § 314.94(a)(12)(A)(4). Defendants in this case emphasize that Barr's ANDA IV contained only the former certification.

flows from the patent owner—Bayer—to the challenger—Barr—and not vice versa, as in a traditional context. However, the consideration paid to Barr—one-half of the aggregate $398 million payment—was substantially less than if Barr succeeded in invalidating Bayer's patent, thereby permitting generic entry of one of the most widely prescribed and best-selling antibiotics. *See* Downey Decl. ¶¶ 32, 33.

In fact, even in the traditional context, implicit consideration flows from the patent holder to the alleged infringer. For instance, suppose a case is ready for trial and the patent holder can prove damages (infringing sales) of $100 million. The parties settle before trial with the alleged infringer paying the patent holder $40 million and agreeing to cease sales of its product. In addition to the $40 million payment to the patent holder, there is an implicit $60 million payment to the alleged infringer to cease its sales. In reality, what has occurred is the alleged infringer is permitted to keep a portion of the profits from its sales. Under plaintiffs' analysis, a settlement such as this, where the patent holder forgoes collecting all damages due, would be a *per se* violation. Such a rule would discourage any rational party from settling a patent case because it would be an invitation to antitrust litigation. Thus, in sum, because of the generic manufacturer's entitlement under the Hatch–Waxman Amendments to institute patent litigation merely by filing an ANDA IV, the statutory scheme has the unintended consequence of altering the litigation risks of patent lawsuits. Accordingly, so-called reverse payments are a natural by-product of the Hatch–Waxman process, and—even if such payments were not contemplated or intended by the amendments—plaintiffs have not shown that they are so nefarious in this case as to subject the challenged agreements, which provide for such payments, to *per se* treatment.

Second, plaintiffs assert that the challenged agreements in this case are *per se* illegal because they restrain other parties—HMR, Rugby, Sherman, and Apotex—that were not parties to the Bayer/Barr patent litigation. However, Bayer asserts that it was proper and legal to enter into agreements with these other parties because each party had a relationship to either Barr or the underlying litigation. *See* Bayer Summ. J. Mem. at 41. In fact, the HMR/Rugby Settlement Agreement acknowledges that "HMR and Rugby have maintained co-control with Barr of the defense against Bayer's claims in the Case and have paid or reimbursed Barr for a portion of its cost of defending against Bayer's claims in the Case." Pls.' J.A., Ex. C ¶ 1. In addition, the Sherman/Apotex Settlement Agreement notes that "Sherman owns, directly or indirectly, a majority of the outstanding voting stock of, and controls, Apotex, Inc." and "owns, directly or indirectly, a majority of the outstanding common stock of, and controls, Barr Laboratories, Inc." *See id.,* Ex. D ¶¶ 1, 2.

The Supreme Court has recognized, outside the context of patent litigation, that a judgment in an action is binding on a person "who assists in the prosecution or defense of an action in aid of some interest of his own" as if he or she were a party to the record. *See Montana v. United States,* 440 U.S. 147, 154, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979) (quoting *Souffront v. La Compagnie De Sucreries,* 217 U.S. 475, 486–87, 30 S.Ct. 608, 612, 54 L.Ed. 846 (1910)); *see also Schnell v. Peter Eckrich & Sons, Inc.,* 365 U.S. 260, 262 n. 4, 81 S.Ct. 557, 559 n. 4, 5 L.Ed.2d 546 (1961); Restatement (Second) of Judgments § 39 ("A person who is not a party to an action but who controls or substantially participates in the control of the presentation on behalf of a party is bound by the determi-

nation."). This preclusion falls under the doctrine of collateral estoppel. *See, e.g., Montana,* 440 U.S. at 154, 99 S.Ct. at 974 (citations omitted). In this case, HMR and Rugby clearly assisted Barr in Barr's defense of the Bayer/Barr patent litigation in aid of their respective interests under the Litigation Funding Agreement, and, thus, it was proper for Bayer to enter into agreements with these parties. With regard to Sherman and Apotex, although their relationship to Barr is clear from the Sherman/Apotex Settlement Agreement, their relationship to the Bayer/Barr litigation raises issues of fact that preclude summary judgment.

Plaintiffs next argue that the challenged agreements restrict Barr, HMR and Rugby not only in regard to the 444 Patent—the patent at issue in the Bayer/Barr patent litigation—but also in regard to other Cipro patents by allegedly prohibiting the filing of *any* ANDA IV on *any* formulations of generic Cipro. As support, plaintiffs cite Section 5(a) of the Barr Settlement Agreement, which provides, in relevant part, "Barr agrees hereafter not to, and to cause its subsidiaries not to, file any [ANDA] related to Cipro with, or amending the Pending ANDAs to have, a certification made pursuant to Paragraph IV of the Act." Pls.' J.A., Ex. B § 5(a); *see also id.,* Ex. C § 4(a) (setting forth similar restriction on HMR and Rugby). However, plaintiffs interpretation of the Settlement Agreements appears to be flawed and to fly in the face of subsequent actions taken by the parties.

In the Barr and HMR/Rugby Settlement Agreements, "Cipro" is defined as "the novel compound commonly known as ciprofloxacin." Pls.' J.A., Ex. B at 1; *accord id.,* Ex. C at 1. Defendants persuasively argue that, in effect, the Settlement Agreements preclude Barr, HMR and Rugby from filing ANDA IVs in which they certify that the 444 Patent itself is invalid. This, they maintain, is consistent with Barr's stipulation that the 444 Patent is valid and that Barr's ANDA IV infringed the patent. According to defendants, the agreements, do not, however, place any restrictions on Barr, HMR and Rugby filing ANDA IVs concerning other Cipro patents. Thus, viewing the evidence in the light most favorable to defendants, the challenged agreements restrict no more than the 444 Patent.

This conclusion is bolstered by provisions in the Supply Agreement and Barr's subsequent actions. Indeed, in Section 11.01(b) of the Supply Agreement, Bayer grants Barr and HMR a limited license to "manufacture and distribute Product in the same sizes, shapes and colors as Product offered for sale by Bayer in the United States or Puerto Rico as of the date of termination ..., *subject to any patent rights of Bayer* ... that are in force at such time." Pls.' J.A., Ex. E § 11.01(b) (emphasis added).[66] According to defendants, this provision recognizes that to obtain FDA approval to market these licensed products, independent of Bayer, Barr and/or HMR/Rugby must file with the FDA an ANDA IV certifying that the sale of their product will not infringe any of Bayer's patents. FDA regulations describe what an ANDA IV certification should include when the basis for non-

---

**66.** "Product" is defined in the agreement as "all oral dosages forms of ciprofloxacin presently or subsequently marketed by Bayer or any of its subsidiaries in the United States under a New Drug Application or a Supplemental New Drug Application of Bayer or any of its subsidiaries and pursuant to or under the authority of (i) the Patents or (ii) the Patents and other patents owned by Bayer or any of its subsidiaries...." Pls.' J.A., Ex. E § 2.

infringement of a patented drug is a license: "If the abbreviated new drug application is for a drug or method of using a drug claimed by a patent and the applicant has a licensing agreement with the patent owner, a [Paragraph IV Certification] as to that patent and a statement that it has been granted a patent license." 21 C.F.R. § 314.94(a)(12)(v). If the phrase "relating to Cipro" is interpreted as plaintiffs submit it should be—to preclude filing any ANDA IVs for any Cipro product—such an interpretation conflicts with this license provision in the Supply Agreement. Based on defendant's account of the provision, Barr and/or HMR/Rugby must be permitted to file ANDA IVs on licensed formulations of Cipro so that they can enter the market under Bayer's limited license after the 444 Patent expires, even though they cannot file ANDA IVs on the active ingredient ciprofloxacin hydrochloride.

Moreover, plaintiffs interpretation of the phrase "relating to Cipro" is inconsistent with Bayer and Barr's conduct since the settlement. Under the Barr Settlement Agreement, it appears that Barr is free to file ANDA IVs at any time on the ground that its generic product does not infringe any of Bayer's patents (except the 444 Patent per the stipulation). Plaintiffs have not demonstrated otherwise. Under FDA regulations, a Paragraph IV Certification can certify either that the patent "is invalid *or* ... will not be infringed by the manufacture, use, or sale of the [generic] drug." 21 U.S.C. § 355(j)(2)(A)(vii) (emphasis added); *see also* 21 C.F.R. § 314.94(a)(12)(A)(4). In fact, on April 11, 2002, Barr notified Bayer that it had filed

an ANDA IV to supplement its pending ANDA III and to certify that its proposed generic Cipro tablets will not infringe Bayer's tablet formulation patent. *See* Bayer App., Ex. 22. Under plaintiff's logic, this action would breach the Barr Settlement Agreement, yet there is no indication that Bayer has taken any action. Thus, assuming FDA approval of Barr's ANDAs, it appears that Barr would be free to sell a noninfringing generic Cipro tablet after the 444 Patent expires, despite any provision of the Barr Settlement Agreement.

Lastly, plaintiffs challenge the Settlement Agreements because Barr, HMR, Rugby, Sherman, and Apotex agreed to acknowledge (and not to challenge) the validity of certain Bayer patents other than the 444 Patent. *See* Pls.' J.A., Ex. B § 4; *id.,* Ex. C § 3; *id.,* Ex. D § 1. The patents are described as "related to the synthesis, manufacture, compound or precursors to ciprofloxacin and any pharmaceutical formulation containing ciprofloxacin existing throughout the world...." Pls.' J.A., Ex. B ¶ 3; *accord id.,* Ex. C ¶ 3; *id.,* Ex. D ¶ 7; *see also generally* Petrovicki Decl.[67] Specifically, Dr. Petrovicki—Bayer's patent portfolio manager—explains the patents as follows:

All of the U.S. patents and U.S. patent applications identified in Schedule I are closely related to one or more of Bayer's Cipro products. Several of these patents claim chemical intermediates or processes that can be used, *although they are certainly not necessary,* to make ciprofloxacin.... The remainder of the patents and the pending application relate to specific formulations of

---

**67.** The patents in existence at the time of the Settlement Agreement—12 U.S. patents and two U.S. patent applications—are listed on Schedule 1 to that agreement. *See id.,* Ex. B, Sch. 1. Since the challenged agreements were executed, two of the patents expired, and one of the referenced applications has matured into two additional U.S. patents. *See* Petrovicki Decl. ¶ 3. In addition, Bayer has abandoned the other patent application that was referenced in Schedule 1. *See id.* ¶ 3 & n. 2.

Bayer's Cipro products: tablets ...; oral liquid ...; and intravenous....

Petrovicki Decl. ¶ 8 (emphasis added). Until the 444 Patent expires in December 2003, the alleged acknowledgment of validity restraints are of no moment because, as discussed above, the 444 Patent precludes any generic product that includes Cipro, regardless of formulation or delivery method.[68]

With respect to the period after expiration of the 444 Patent, defendants maintain that plaintiffs fail to establish any *per se* violation and that the rule of reason should therefore apply for two reasons: (1) the alleged restraints are ancillary to a license and (2) the restraints further the parties' desires to settle all actual and potential patent disputes in connection with Cipro. These arguments miss the mark.[69] Defendants have not persuasively argued that this agreement is a bona fide licensing agreement, and they offer no evidence that any of the additional patents were either the subject of the current litigation or the subject of a dispute between the parties. Nonetheless, as discussed above, nothing in the challenged agreements appears to prevent these parties from filing ANDA IVs that certify that a generic product does not infringe any of these additional patents or ANDA IIIs that seek to manufacture generic products after the 444 Patent (or any other patent) expires. Accord-ingly, evaluating the evidence in the light most favorable to defendants, plaintiffs have not adequately demonstrated that the Settlement Agreements and Supply Agreement contain restrictions that extend beyond the lawful confines of Bayer's 444 Patent and, thus, are subject to *per se* treatment.

### (7)

### Proper Analysis in this Case

■■■ The policies behind the patent laws and the Sherman Act are to some extent in conflict. All patent license agreements are market allocation agreements, and divorced from the patent monopoly rights, these restrictions would likely be illegal. However, the purposes of the patent law renders these restrictions lawful. The flexibility necessary to balance these competing policies, particularly in the context of a new statutory scheme, suggests that a rule of reason rather than a *per se* analysis should be employed in this case.

The Hatch–Waxman Amendments sought to balance respect for the property rights conferred by the patent laws with the public interest in preventing invalid patents from being used to deprive the public of low-cost generic drugs. One of the ways the amendments sought to accomplish this goal was by encouraging challenges to questionable patents, a prac-

---

**68.** For this reason, defendants argue that plaintiffs have no present injury and, thus, lack standing to seek a declaration that the challenged agreements are *per se* illegal based on alleged restraints that will not become relevant until the 444 Patent expires later this year. It is not necessary to determine this issue because, for the reasons discussed, plaintiffs' argument does not support *per se* treatment.

**69.** Bayer asserts that it was entitled to include the additional patents in the agreements to avoid undefined future disputes. *See* Bayer Summ. J. Mem. at 47. The cases cited by Bayer, however, do not support this proposition. For instance, in *Foster v. Hallco Manufacturing Co.*, the parties' settlement included only those patents at issue in the litigation (and their foreign counterparts). *See* 947 F.2d 469 (Fed.Cir.1991). Similarly, in *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, the patents included in the settlement were limited to those that were either the subject of current litigation or were actively being disputed by the parties. *See* 61 F.Supp.2d 102, 104–05 (D.Del.1996).

tice that has long been acknowledged to promote the public interest. *See United States v. Glaxo Group Ltd.*, 410 U.S. 52, 58, 93 S.Ct. 861, 865, 35 L.Ed.2d 104 (1973) (" 'It is as important to the public that competition should not be repressed by worthless patents, as that the patentee of a really valuable invention should be protected in his monopoly.' ") (quoting *Lear, Inc. v. Adkins*, 395 U.S. 653, 663, 89 S.Ct. 1902, 1908, 23 L.Ed.2d 610 (1969)); *id.* at 69, 93 S.Ct. at 871 (Rehnquist, C.J., dissenting) ("There is public interest favoring the judicial testing of patent validity and the invalidation of specious patents."). The incentives created by the Hatch–Waxman Amendments have led to generic investment in product development, patent review and product challenges through litigation. Indeed, Barr has admitted that it has over ten ANDA challenges in litigation today and more than twice that number under review. *See* Downey Decl. ¶ 14. To maximize these incentives, a generic company should be permitted to choose not only when to commence patent litigation, but also when to terminate it. Otherwise, the incentives to mount an ANDA IV challenge could be reduced. *See* Hausman Decl. ¶¶ 21–24, 54; Decl. of M. Laurentius Marais, G.Defs.' Summ. J. Mem., Ex. C ¶ 22.

In addition, the American legal process encourages the settlement of lawsuits where possible, and unless the law explicitly states otherwise, neither party is obligated to litigate to a final conclusion. Nothing in the legislative history supports a conclusion that Hatch–Waxman lawsuits cannot be settled. Moreover, a rule that makes it *per se* illegal to settle a Hatch–Waxman lawsuit, like the Bayer/Barr patent litigation, limits the options available to both generic and brand-name manufacturers. If brand-name manufacturers are unable to control or limit their risk by settling Hatch–Waxman litigation, they, like

generic manufacturers, may be less inclined to invest the research and development ("R & D") costs associated with bringing new drugs to the market. The pharmaceutical industry depends greatly on R & D and the economic returns to intellectual property created when a successful new drug is brought to market. *See* Hausman Decl. ¶ 61. A rule prohibiting settlements of Hatch–Waxman patent litigation can have grave consequences for R & D and, in turn, severe consequences for consumers:

> The outcomes of … R & D have extremely large effects on the economic welfare and medical well-being of U.S. customers. The pharmaceutical industry in the U.S. spent $26 billion on R & D in 2000 with the average cost of developing a new drug now estimated at $802 million. Yet only 30% (or less) of marketed drugs produce revenues that equal or exceed their average R & D costs. If incorrect judicial determinations are made that decrease the value of the intellectual property, expected returns on R & D will decrease and new drug innovation in the U.S. will decrease. The results will be fewer new drugs that have led in the past to healthier and more productive lives for U.S. customers and large gains to the U.S. economy.

Hausman Decl. ¶ 61 (footnotes omitted).

Although a policy in favor of settlement of litigation cannot save a *per se* violation from the strictures of the Sherman Act, a rule that too quickly condemns actions as *per se* illegal, potentially chilling efforts to research and develop new drugs and challenge the patents on brand-name drugs, does competition—and thus, the Sherman Act—a disservice. *Cf.* Hausman Decl. ¶ 51 ("[T]he ability to settle a patent challenge on flexible terms can have a pro-competitive effect because it increases the number of patent challenges by decreasing barriers

to entry."). Application of the rule of reason will permit the court, in light of the evidence presented by the parties, to balance the anticompetitive effects of the Settlement Agreements and Supply Agreement against the benefits of allowing brand-name drug companies to invest in R & D with some degree of confidence that they will be able to control patent litigation risk when they introduce new drugs. In weighing these competing policy concerns under a rule of reason analysis, the court will be able to take into account a variety of factors affecting the degree of anticompetitive impact caused by the agreements. For example, the fact that the other generic drug manufacturers filed ANDA IVs despite the Settlement Agreements and Supply Agreement demonstrates that the agreements did not chill the attempts of other generic manufacturers to enter the Cipro market. Similarly, evidence concerning royalties that Bayer would have charged had it granted a license to Barr may be highly relevant in evaluating the anticompetitive impact of the Settlement Agreements and Supply Agreement because a high royalty rate would suggest less of an impact upon price competition than a lower one.

While an unfortunate aspect of the Hatch–Waxman Amendments is that pioneer and generic drug manufacturers have often been entering into mutually beneficial agreements that result in delayed entry of generic drugs into the market place, the cases that have found such agreements *per se* illegal involve findings that the agreements at issue restrained noninfringing products, delayed generic entry and perpetuated litigation. Such is not the case here. At this early juncture, this case should not be relegated to the *per se* category reserved for the most blatant antitrust violations. Bayer's compound patent precludes all generic entry of a product containing Cipro until the 444 Patent ei-

ther expires or is invalidated. Plaintiffs have failed to show that the Settlement Agreements and Supply Agreement impose restraints with anticompetitive effects broader than the exclusionary effects of Bayer's patent. Therefore, for all the reasons stated above, the Settlement Agreements and Supply Agreement do not warrant *per se* condemnation under Section 1 of the Sherman Act.

**Motion to Dismiss—State Law Claims**

At this time, the court is not in a position to rule on the defendants' motions to dismiss the Indirect Purchaser Plaintiffs' state law claims because they require interpretations of the laws of at least twelve states and their relationship to the rulings made in this case. I am considering appointing an academic expert or experts to provide a report and recommendation to the court with respect to each relevant state law with an opportunity for the parties to comment. I would appreciate receiving by June 30, 2003 any views that the parties may have with respect to this proposal or any alternative proposal that they may wish to offer.

**Conclusion**

This court is mindful that its determination in this case—that is, to deny the motion to dismiss on the basis that but for the challenged agreements, Bayer would have issued a license for generic Cipro and to refuse to find the challenged agreements *per se* illegal—may at first blush appear somewhat contradictory. Of course, in denying a motion to dismiss, all facts pleaded by plaintiffs are assumed to be true. Whether plaintiffs will even be able to establish that Bayer would have granted a license at a price substantially benefitting consumers rather than litigate its infringement claim remains an open question. Moreover, it should be noted that this decision is not meant to indicate that the

challenged agreements here are conclusively legal, and, thus, not subject to further antitrust scrutiny. It is possible that after further discovery in this case plaintiffs can show that the challenged agreements are unreasonable restraints of trade under the rule of reason. However, at this stage, plaintiffs have not demonstrated that the agreements at issue are "naked restraints of trade with no purpose except stifling of competition" and, therefore, *per se* illegal. *Palmer*, 498 U.S. at 49, 111 S.Ct. at 402 (citing *Topco*, 405 U.S. at 608, 92 S.Ct. at 1133–34).

Therefore, in sum,

• All defendants' motions to dismiss each of the four complaints in this case for alleged common deficiencies is granted in part and denied in part;

• Watson's motion to dismiss the Aston Complaint and Indirect Purchaser Plaintiffs' Complaint in granted, and Watson is dismissed from this case;

• Generic Defendants' motion to dismiss the Organizational Plaintiffs' claims in the Aston Complaint as time-barred is granted; and

• Plaintiffs' motion for partial summary judgment is denied.

SO ORDERED.